**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| AMERICAN AIRLINES, INC., <br><br> Plaintiff, <br><br> v. <br><br> THE CITY OF CHICAGO and TRACEY PAYNE, in her capacity as the Acting Commissioner of the Chicago Department of Aviation, <br><br> Defendants. | Case No. 25-cv-4874 <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff American Airlines, Inc. ("American"), by its attorneys Latham & Watkins LLP, for its Complaint for Relief against the City of Chicago (the "City") and Tracey Payne, in her official capacity as the Acting Commissioner of the Chicago Department of Aviation (the "Aviation Department" and, together with the City, "Defendants"), allege as follows:

## SUMMARY OF ACTION

1. Chicago O'Hare International Airport ("O'Hare") occupies a unique position in the U.S. aviation system. It is the only airport that acts as a hub for two global network carriers, American and United Airlines, Inc. ("United"). That dual hub structure, which Defendants have fostered and supported for decades, makes Chicago one of the busiest, most widely served, and most competitive aviation markets in the world.

2. As the slightly larger hub operator, United has long sought to marginalize American, as United openly aspires to be the sole hub carrier at O'Hare. United's long-term plan for O'Hare envisions no place for American: United seeks "to grow incredibly, and . . . to someday

take over those gates that currently have the AA [logo] on them." Skift, *Chicago Is Becoming the Center of the Growing Conflict Between United and American* (Feb. 17, 2017), https://skift.com/ 2017/02/15/chicago-is-becoming-the-center-of-the-growing-conflict-between-united-and-american ("Skift"); *see also* Investing.com, *United Airlines at J.P. Morgan Conference: Navigating Challenges and Opportunities* (Mar. 11, 2025), https://www.investing.com/news/ transcripts/united-airlines-at-jp-morgan-conference-navigating-challenges-and-opportunities-93CH-3921120 (United's CEO telling investors that "it's hard to be kind of global and comprehensive [as a premium airline] if you can't be number 1 in . . . big cities," including "Chicago"). Because United wants so intensely to "win in Chicago," Skift, *supra*, it comes as little surprise that United wishes to see American lose market share at O'Hare.

3.      Chicago has thrived as a two-hub airport because, historically, it has fairly allocated scarce gates and airport infrastructure between all carriers, including its two hub carriers, American and United. As part of its plan to begin marginalizing American at O'Hare, United recently requested that Defendants redetermine the gate space assigned to each airline this year (the "Gate Redetermination"). If completed, the Gate Redetermination would be premature under the AULA and would cause United to gain gate space—and improve its competitive position—while American loses gates, all in violation of the terms of the AULA. American has brought this suit to enjoin this breach of the AULA, which, if left unremedied, would inhibit American's continued growth at O'Hare. American remains committed to building on its long history in Chicago by flying more capacity in 2025 than ever before and by making substantial investments at the airport to improve the customer experience.

4.      While United's self-serving action may be predictable, Defendants' acquiescence is not.

5.     This action turns on the meaning and intent of terms fiercely negotiated in 2018, when American, other airlines, and Defendants signed an agreement—the "Airline Use and Lease Agreement" (the "AULA")—that led to historic multi-billion-dollar investments to improve O'Hare.  This agreement contemplated a substantial rebuilding of O'Hare, and competition at O'Hare depended upon a mechanism that would fairly distribute gates between the two hub carriers, American and United, as well as other carriers that serve the airport.  Negotiation on the precise point that underlies the dispute here became the last issue to be resolved in this historic agreement.

6.     At the last moment during negotiations, United sought to implement a secretly negotiated side deal to gain a gate advantage.  American—concerned specifically that United would attempt to expand its gate gap at O'Hare—fought back and reached an agreement with Defendants that would give American the opportunity to earn its fair share of gates at O'Hare before a gate redetermination could be triggered.  That compromise envisioned a "Gate Space Ramp-up Period," that would only begin after completion of certain specified construction projects, including the opening of new gates in Terminal 5 after a planned expansion, Delta Airlines, Inc.'s ("Delta") relocation from Terminal 2 to Terminal 5, and the opening of 3 new gates adjacent to American's existing operations in Terminal 3. Defendants would be prohibited from initiating a gate redetermination for at least one year during this ramp up period.  This pause was designed to ensure all airlines had the opportunity to use newly constructed gates for at least one full year to establish a pattern of service that would inform future redeterminations.

7.     Defendants' obligation to honor the Gate Space Ramp-up Period is clear under the language of the AULA and was reconfirmed by an email exchange between Defendants and American as they reached agreement on this last remaining and highly contentious issue.

3

Defendants, at United's request, now want to proceed with the Gate Redetermination this year while the Gate Space Ramp-up Period has only just begun, depriving American of its opportunity to earn its fair share of gates.

8.      Under the AULA (attached hereto as Exhibit 1), which governs airline operations and gate assignments at O'Hare, the redetermination of gate space requested by United is prohibited.

9.      While the AULA contemplates regular redeterminations of gate space at O'Hare,[1] and American supports redeterminations that adhere to the process and timing set forth in the AULA, the AULA also contains a mechanism to prevent redeterminations that might disadvantage airlines whose operations are in flux due to this movement of gates. This mechanism is the twelve-month Gate Space Ramp-up Period that prohibits Defendants from initiating a gate redetermination until April 1 of the year following the end of the Gate Space Ramp-up Period.

10.     To secure American's agreement to the AULA, Defendants agreed that, among other things, the Gate Space Ramp-up Period would not begin until three new gates in Terminal 3—which were to be built adjacent to American's existing gates and isolated from all other airlines—were operational. And Defendants specifically modified the AULA to incorporate that agreement before the AULA was executed.

11.     The last of these Terminal 3 gates became operational on March 14, 2025. As a result, the Gate Space Ramp-up Period just started and cannot end until next year, and Defendants cannot redetermine gate space until April 1, 2027, at the earliest.

---

[1]     Section 5.4 of the AULA provides for annual redetermination of preferential use gates (i.e., gates assigned for the primary use of a particular airline). This annual redetermination can be initiated by Defendants or requested by an airline. If requested by an airline, Defendants shall analyze flight data from the previous calendar year and other factors to determine the number of preferential use gates assigned to each airline.

12. Nonetheless, Defendants are proceeding with the Gate Redetermination requested by United, directly contravening the agreement reached with American. The Gate Redetermination would be based on airlines' flight statistics from calendar year 2024, before all three new gates became available for American to use for additional flights, and would go into effect on October 1, 2025. Unsurprisingly, the Gate Redetermination requested by United would benefit United and harm American. Indeed, Defendants recently announced that, if the Gate Redetermination proceeds, United will receive approximately 5 more gates, while American will lose approximately 4 gates.[2]

13. For that reason, American has repeatedly informed Defendants that proceeding with the Gate Redetermination this year would violate the AULA and demanded that Defendants not proceed with any gate redetermination until at least April 1 of the year following the end of the Gate Space Ramp-up Period, as required by the terms of the AULA. Yet American's objections have gone ignored.

14. Defendants' unwillingness to halt the Gate Redetermination process has forced American to bring this suit. American asks this Court to declare that proceeding with the Gate Redetermination violates the terms of the AULA and to award American damages, injunctive relief, and any other relief necessary to remedy Defendants' breach of the AULA.

---

[2] The results of the Gate Redetermination are current as of the date of filing of this Complaint, based on Defendants' communication regarding the Gate Redetermination dated April 1, 2025. These projections are based on the amount of frontage at the airport required to accommodate narrowbody aircraft wingspan and dimensions (referred to as "narrowbody equivalent gates").

## THE PARTIES

15.     American is a corporation organized and existing under the laws of the State of Delaware.  Its principal place of business is 1 Skyview Drive, Fort Worth, Texas 76155.  American maintains a hub at O'Hare and employs more than 9,300 people in Chicago.

16.     The City is a municipal corporation and home rule unit of local government organized and existing under the laws of the State of Illinois and located in Cook County, Illinois. The Aviation Department is a department of the City that administers O'Hare.  Various City officials are signatories to the AULA.

17.     Tracey Payne is the current Acting Commissioner of the Aviation Department and is named a Defendant in her official capacity.  On information and belief, Acting Commissioner Payne resides in Cook County, Illinois.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because American and Defendants are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interests and costs.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because: (1) each Defendant resides in Illinois and one or more Defendants reside in this District; (2) a substantial portion of the events giving rise to the claims herein occurred within this District; and (3) each Defendant is subject to this Court's personal jurisdiction with respect to this complaint.

20.     Venue is further proper in this District pursuant to Section 18.8.2 of the AULA, which provides that "any action or proceeding to this Agreement" may be "brought in any court of competent jurisdiction having situs within the boundaries of the federal district of the Northern District of Illinois."

## FACTUAL BACKGROUND AND ALLEGATIONS

**A.    Background of the AULA**

21.    To understand the context of the current dispute, it is important to understand the events leading up to the signing of the AULA in 2018.  Beginning in 2016, Defendants' officials began meeting with airlines regarding the AULA—a contract governing airline operations and gate allocations at O'Hare.

22.    The AULA is unlike an ordinary commercial lease.  Due to the federal regulatory scheme governing airports, agreements like the AULA involve collective negotiations among airlines and the airport authority (here, the City's Aviation Department).

23.    At the time of the AULA negotiations, United had more gates at O'Hare than any other airline.  United's gate advantage was a significant point of concern in the negotiation of the AULA, as having more gates at O'Hare allows an airline to offer more flight options and improve its competitive position.

24.    In particular, Defendants and the airlines focused on eight contested gates that would become available in Terminal 2 after Delta relocated to Terminal 5, an expansion of which was then slated for completion in 2021.

25.    During the original discussions regarding the assignments for these eight contested gates in August 2016, American advocated for a formula that would have allocated three gates to American, three gates to United, and two gates for smaller carriers.

26.    Rejecting this approach, Ginger Evans, who was then the Commissioner of the Aviation Department, proposed an allocation that would have given five gates to United and left three gates for smaller carriers.  That proposal excluded American entirely.

27.    After American objected to this proposal, Defendants countered in October 2016 with a modified proposal that would have given American one of the gates, leaving five to United

and two as common use—meaning they would be available to any airline, rather than assigned to a particular airline (what is called "preferential use"). Defendants also proposed constructing three new gates in the Concourse L "Stinger" adjacent to other American gates in Terminal 3 (a project that would be called the "L-Stinger Expansion"[3]), which would be assigned to American. United rejected this proposal, and Defendants ultimately shelved the discussion.

28. The question of how to allocate the eight contested gates next arose during AULA negotiations in July 2017. Defendants proposed designating all eight contested gates as common use. Neither United nor any other airline objected to this proposal, nor did any airline make any other proposal. As a result, this common use allocation was reflected in the first AULA draft circulated by Defendants in July 2017.

29. Extensive negotiations followed the first draft, with negotiation sessions held at least every other week until the AULA was finalized. In addition to these negotiation sessions, there were also monthly "high level" meetings between Defendants' officials and senior executives from American, United, and Spirit Airlines ("Spirit").[4] During those extensive meetings, no party suggested the eight contested gates would be anything other than common use gates, nor, to American's knowledge, did any party ever submit any proposals to that effect.

30. On January 9, 2018, United submitted what it described to the other airlines as its last set of comments on the proposed draft AULA to Defendants, copying American. Again, there were no changes to the language designating the eight contested gates as common use.

---

[3]    Concourse L contains an additional wing called the L-Stinger due to Terminal 3's scorpion-like design. American and Defendants agreed to further extend the L-Stinger in the L-Stinger Expansion to add three additional gates.

[4]    Spirit was designated at the outset of negotiations to represent the interests of smaller, non-hub airlines.

31.     On February 15, 2018, Defendants' officials presented a "final lease proposal" during the last "high level" meeting with representatives of American, United, and Spirit. Extraordinarily, at the very end of that meeting, these officials presented revised language that essentially resurrected the previously abandoned August 2016 proposal, awarding five of the contested gates to United for its preferential use in Terminal 2 (where United controlled most of the gates) and designating the other three as common use at a location that would be impractical for American to access.

32.     After American objected to the timing and substance of this proposal, Defendants' officials, including then-Commissioner Evans, repeatedly stated that they had made this change unilaterally and without conferring with any third party, including United.

33.     Defendants' statements proved to be untrue.  On February 28, 2018, United issued a public statement explaining that "[its] agreement with the city for five additional gates was made more than 18 months ago."  CNN Business, *American Airlines Says United Got a Better Deal in Major O'Hare Makeover* (Feb. 28, 2018), https://money.cnn.com/2018/02/28/news/companies/american-airlines-united-chicago-ohare/index.html (quoting United statement).  Commissioner Evans was then reported as siding with United's version of events.  *See id.*

34.     These statements made clear that United and Commissioner Evans had struck a backroom deal 18 months earlier and revealed that the proposal to allocate all eight contested gates as common use gates—which had appeared in the draft AULA for about seven months—was simply pretense.

35.     American felt deceived and betrayed, and made its objections widely known to the public, noting to the press that Defendants' favoritism "undermine[d] competition and consumer

choice" at O'Hare. *Id.* (quoting American statement). American also publicly announced that it would not sign the AULA in its then-proposed form. *Id.*

36. In contrast, Defendants' officials openly suggested that they would either bully American into agreeing to the proposal or move forward without American's agreement.

37. As news of the backroom dealing and strongarm tactics spread, pressure mounted for Defendants to return to the negotiating table and reach a deal with American.

**B.     Defendants Reached a Compromise with American**

38. American proposed a compromise: American would acquiesce in Defendants giving United five of the eight contested gates on the condition that Defendants would do two things. First, Defendants would expedite construction of the three new gates in the L-Stinger Expansion. Second, Defendants would not redetermine gates for at least a year after the L-Stinger Expansion became operational (and Delta had relocated from Terminal 2 to Terminal 5 following completion of the planned expansion). These conditions were critically important to American's ability to ramp up operations using all three new gates (the "L-Stinger Expansion Gates") before any redetermination of gate space could be completed.

39. Defendants agreed to American's proposal and memorialized that agreement in revisions to the AULA and in contemporaneous communications with American.

**C.     Several Provisions of the AULA Are Relevant to This Dispute**

40. Several interworking provisions in the AULA are key to understanding the compromise reached by American and Defendants as well as the present dispute.

41. Sections 5.3 and 5.4 of the AULA contemplate that Defendants will periodically redetermine gate space at O'Hare.

42. Section 5.3 concerns redeterminations of common use gate space, or gate space that is available for all airlines to use. Section 5.3.1 provides that, "[b]y April 1, 2021, and by April 1

of each year thereafter, . . . the City shall . . . determine and give written notice to all Signatory Airlines of the amount and locations of both Domestic Gate Space and International Gate Space to be reserved for use as Common Use Gate Space"—based on certain factors outlined in Section 5.3—"to be effective on October 1 of the same year." Under Section 5.3.4, "[a]ll remaining Gate Space . . . shall be offered by the City to Long-Term Signatory Airlines for use as Preferential Use Gate Space to be allocated in accordance with Section 5.4."

43.     Section 5.4 concerns redeterminations of preferential use gate space, or gate space that is assigned to a specific airline. Under Section 5.4.1, Defendants shall undertake such a redetermination if either (a) they "determine[] under Section 5.3 that the amount or locations of Common Use should be changed" or (b) "a Long-Term Signatory Airline requests additional Preferential Use Gate Space that would be available to [it] if the City made a redetermination of Gate Space assignments under this Section 5.4." If either of those triggers occurs "as of February 1, 2021, or no later than February 1 of each year thereafter," then Defendants shall redetermine preferential use gate space by April 1 of that year, and the new gate assignments go into effect on October 1 of that year.

44.     A redetermination of preferential use gate space is based, in significant part, on flight statistics for each airline from the "immediately preceding calendar year." In short, the more gates an airline operates at full capacity during the calendar year prior to such a redetermination, the higher the chance it will be awarded more preferential use gates during that redetermination.

45.     However, Defendants' ability to redetermine gate space is subject to further constraints. Specifically, under Section 5.3.2:

> Upon the completion of the T-5 Extension and the relocation from the Main Terminal to Terminal 5 of one or more Long-Term Signatory Airlines, the City shall cease the annual redetermination of Gate Space currently in process, if any, and shall not initiate the

11

next annual redetermination of Gate Space until April 1 of the year following the end of the Gate Space Ramp-up Period, as defined in Section 5.2.4.

46.     Section 5.2.4, which defines the "Gate Space Ramp-up Period," provides as follows:

> Upon the completion of the T-5 Extension and the relocation from the Main Terminal to Terminal 5 of one or more Long-Term Signatory Airlines ("Relocating Airlines"), the City shall allocate Linear Frontage in accordance with Exhibit D-1.3 with such assignments to remain in place for a period of at least twelve (12) months ("Gate Space Ramp-up Period").[5]

47.     Exhibit D-1.3 is a gate footprint, which (as discussed further below) was revised during the AULA negotiations to show gate assignments following the Terminal 5 expansion, Delta's relocation to Terminal 5, and the opening of the three L-Stinger Expansion Gates:



---

[5]     "Linear Frontage" (sometimes called "linear footage") is a measurement of space abutting a terminal suitable to park aircraft. Because aircraft are different sizes, this measurement is more precise than counting gates. As used in Section 5.2.4, allocating "Linear Frontage" is synonymous with, and a proxy for, allocating gates. This plain meaning is reinforced by Section 5.2.4's description of the ensuing period as the "*Gate Space* Ramp-up Period" (emphasis added).

**D.  Under These AULA Provisions, Defendants' Recently Announced Gate Redetermination Is Forbidden**

48.  On February 3, 2025, Defendants informed the AULA's airline signatories that United had requested a redetermination of preferential use gate space pursuant to Section 5.4.1 of the AULA, and that Defendants were preparing to initiate that redetermination using flight data from calendar year 2024.

49.  However, Defendants are barred from completing the Gate Redetermination under the AULA, as American told Defendants in letters dated February 28, 2025, March 18, 2025, and March 29, 2025.

50.  As highlighted above, under Section 5.3.2 of the AULA, Defendants "shall cease the annual redetermination of Gate Space currently in process, if any," "[u]pon the completion of the T-5 Extension and the relocation from the Main Terminal to Terminal 5 of one or more Long-Term Signatory Airlines [*i.e.*, Delta]."

51.  These events—"the completion of the T-5 Extension" and Delta's relocation "from the Main Terminal to Terminal 5"—occurred no later than June 2023.

52.  Also under Section 5.3.2 of the AULA, Defendants "shall not initiate the next annual redetermination of Gate Space until April 1 of the year following the end of the Gate Space Ramp-up Period, as defined in Section 5.2.4."

53.  Under Section 5.2.4 of the AULA, the Gate Space Ramp-up Period cannot begin until Defendants have allocated gate space "in accordance with Exhibit D-1.3," and "such assignments" must "remain in place for a period of at least twelve (12) months."

54.  As depicted above, Exhibit D-1.3 of the AULA includes the three L-Stinger Expansion Gates, so gates could not have been allocated "in accordance with Exhibit D-1.3" until all three L-Stinger Expansion Gates were complete, allocated, and operational.

13

55.     The last of the three L-Stinger Expansion Gates was complete and went into operation on March 14, 2025.  Indeed, concrete had not even been poured on the apron in front of the third L-Stinger Expansion Gate until early 2025; instead, there was just a large, uneven hole resulting from excavation that rendered the gate unusable for any aircraft, and thus precluded the gate from being allocated in accordance with Exhibit D-1.3.[6]

56.     As a result, the earliest possible start of the Gate Space Ramp-up Period was March 14, 2025, and because gate assignments in accordance with Exhibit D-1.3 must remain in place for at least 12 months, the earliest possible end of the Gate Space Ramp-up Period is March 14, 2026.

57.     Under Section 5.3.2 of the AULA, therefore, Defendants "shall not initiate the next annual redetermination of Gate Space" until, at the earliest, April 1, 2027—*i.e.*, "April 1 of the year following" March 14, 2026, the earliest possible "end of the Gate Space Ramp-up Period." A redetermination initiated on April 1, 2027, would include a full calendar year of 2026 flight statistics for all three L-Stinger Expansion Gates.

58.     That makes sense under the logic of the AULA and was the protection that American bargained for.  The purpose of the interlocking provisions ceasing and restarting redeterminations of gate space is to allow all airlines to operate out of the gate assignments depicted in Exhibit D-1.3—those that followed major changes after the completion of the Terminal 5 expansion, Delta's relocation, and the completion of the L-Stinger Expansion Gates— for at least a full calendar year before that calendar year's flight statistics would be used in a redetermination.  That is, as the defined term "Gate Space Ramp-up Period" signals, the AULA

---

[6]     In order to be allocable as "Linear Frontage," terminal space must be a "usable area[] where there is sufficient space to park passenger aircraft."

provided airlines a "Period" to "Ramp-up" their operations out of the "Gate Space" assignments shown in Exhibit D-1.3 before the next gate redetermination.

59.     As most relevant to American, these mechanisms ensured that the three L-Stinger Expansion Gates would be available for use for a full calendar year before the next redetermination. Those gates are adjacent to American's other gates and are isolated from other airlines' gates. The availability of those three L-Stinger Expansion Gates would permit American to fly more flights and accrue additional flight statistics for the next redetermination.

60.     The Gate Redetermination announced on February 3, 2025, if completed, would deprive American of the benefits of these protections that American insisted upon and Defendants agreed to in the AULA. Under Section 5.4.1 of the AULA, this Gate Redetermination would be based on flight statistics from calendar year 2024. But all three L-Stinger Expansion Gates were not available for American to use in 2024 because the third one opened only in March 2025. For the same reason, all three of the L-Stinger Expansion Gates will not be available for use during all of 2025. Rather, the first calendar year that will include American's flight statistics for all three L-Stinger Expansion Gates is 2026. Under the text and logic of the AULA, the next gate redetermination should occur no earlier than 2027, based on the flight statistics for calendar year 2026.

### E.     During AULA Negotiations, Defendants' Officials Agreed with American's Interpretation of the AULA

61.     The recently announced Gate Redetermination not only flies in the face of the text and logic of the AULA, but also contradicts what Defendants told American during the negotiations that led up to the signing of the AULA.

15

62.     As discussed above, under Section 5.2.4 of the AULA, the allocation of gates "in accordance with" Exhibit D-1.3 was the condition precedent to the beginning of the Gate Space Ramp-up Period.

63.     Before the compromise that American proposed and Defendants accepted (discussed above), the working draft of Exhibit D-1.3 did not include the L-Stinger Expansion:



64.     As a result, under this draft of the AULA, the Gate Space Ramp-up Period could have started even if the L-Stinger Expansion Gates were not complete, allocated, or operational.

65.     After agreeing to American's compromise, however, Defendants revised Exhibit D-1.3 to include the L-Stinger Expansion Gates and thus make clear that the Gate Space Ramp-up Period would begin only after the L-Stinger Expansion Gates are complete, allocated,

and operational. The final version of Exhibit D-1.3 executed by American and Defendants memorialized this critical revision:



66. The requirement that the Gate Space Ramp-up Period begin only when the L-Stinger Expansion Gates are operational was also repeatedly confirmed in discussions between American's representatives and Defendants' officials, including Robert Rivkin (then Deputy Mayor), Carole Brown (then Chief Financial Officer), Susan Warner-Dooley (then the First Deputy Commissioner of the Aviation Department and Defendants' chief negotiator), and Erika Ituassu (then the Assistant Commissioner of the Aviation Department for Intergovernmental Affairs). American specifically proposed in these discussions, and Defendants agreed, that the first gate redetermination would not occur until at least 12 months after the last of the three L-Stinger Expansion Gates went into service, and American thus would not be prejudiced by any delay in the availability of those gates.

67.    As Defendants' chief negotiator, Warner-Dooley was in charge of making any changes to the AULA.  Warner-Dooley proposed that Defendants and American memorialize their agreement by revising the gate assignments in Exhibit D-1.3 as shown above.

68.    Defendants and American agreed, and Mike Minerva, one of American's representatives, confirmed the parties' understanding in an email to Brown and Warner-Dooley:

> Carole and Susan,
>
> This email confirms matters discussed and agreed between the City and American today.
>
> First, it is our mutual interpretation of the above-referenced sections of the 2018 ORD U&LA (and Exhibit D-1.3).  Specifically, the City interprets those provisions to mean that the term **"such assignments," which shall remain in place for a period of at least twelve (12) months, includes American's use of the three common use gates on the L Stinger Expansion**.
>
> Second, the City also **committed to accelerate the construction of the L Stinger Expansion gates**, and we both believe the project should be built by American under a reimbursement agreement.
>
> Third, the City committed to restore American's preferential linear footage that had erroneously been marked as common use linear footage in the version of the lease introduced to City Council.
>
> It is on the basis of the three matters described above that American changed its position and agreed to support the 2018 ORD U&LA as part of discussions that took place this same day.  **The City will revise Exhibit D-1.3 and resubmit to the City Council to reflect the addition of the L Stinger 3-gate Expansion** and the change of the 90 linear footage at the end of the G concourse from common use to American preferential use.
>
> Best regards and thank you,
> Mike

69.    Brown responded, clarifying that the L-Stinger Expansion Gates would not technically be assigned for American's preferential use, but said that Minerva's email was otherwise "consistent with [Defendants'] understanding."[7]

70.    The AULA, with the revised Exhibit D-1.3 showing the L-Stinger Expansion Gates, was submitted to the City Council.  The City Council approved the agreement, including the revised Exhibit D-1.3, March 28, 2018.  Thereafter, Defendants and each airline executed independent leases containing the AULA's terms.

71.    By moving forward with the Gate Redetermination long before the Gate Space Ramp-up Period has ended, Defendants are not only violating the AULA but reneging on the commitments they made to American during the AULA negotiations, and which American relied upon in agreeing to sign the AULA.

**F.    The Announced Gate Redetermination Would Harm American and the Flying Public**

72.    Defendants' refusal to honor the AULA and cease the current Gate Redetermination as requested by American would harm American and the flying public.

73.    On April 1, 2025, Defendants announced that, due to the Gate Redetermination requested by United, United would gain approximately 5 preferential use gates at O'Hare and American would lose approximately 4 preferential use gates at O'Hare.

74.    This change, if it goes into effect on October 1, 2025, as planned, would hamper American's ability to fly its full intended schedule and meet customer needs.

---

[7]    Despite Defendants' position that the L-Stinger Expansion Gates would not be assigned for American's preferential use, the AULA provided that American's use of those gates would count in gate redeterminations pursuant to Sections 5.1.5 and 5.4.1(b) of the AULA.

## CAUSES OF ACTION

### Count I — Breach of Contract

75.     American incorporates the allegations in paragraphs 1 through 74 by reference as though fully set forth herein.

76.     By executing the AULA on March 28, 2018, American entered into a contract with Defendants.

77.     Under the AULA, Defendants are barred from making a redetermination of gate space until April 1, 2027.

78.     The Gate Redetermination requested by United and announced by Defendants on February 3, 2025, is forbidden under the AULA, and Defendants are in breach of the AULA.

79.     Due to this Gate Redetermination, American will lose gate space at O'Hare, thereby suffering substantial damages.

### Count II — Breach of Duty of Good Faith and Fair Dealing

80.     American incorporates the allegations in paragraphs 1 through 79 by reference as though fully set forth herein.

81.     A covenant of good faith and fair dealing is implicit in the AULA as a matter of law, imposing a contractual duty on the parties.

82.     Under Illinois law, the doctrine of good faith and fair dealing requires a party vested with contractual discretion to exercise that discretion reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.

83.     Under Illinois law, the duty of good faith and fair dealing requires a party vested with contractual discretion not to injure other parties to the contract by action or omission and not to act inconsistently with other parties' rights.

84.     The AULA vested Defendants with contractual discretion in initiating gate redeterminations.  For example, under Section 5.4.2 of the AULA, after a redetermination of preferential use gate space is triggered, "the City" must "exercis[e] its reasonable discretion . . . [to] assign the amount and location of Preferential Use Gate Space" based on certain "requirements and factors" enumerated in the AULA.

85.     Defendants' initiation of the Gate Redetermination announced on February 3, 2025, is an exercise of contractual discretion that will injure American.

86.     Defendants' initiation of the Gate Redetermination is inconsistent with the reasonable expectations of the parties and American's rights as memorialized in the AULA and in written statements clarifying the AULA's meaning.

87.     Defendants abused their discretion and acted unreasonably, arbitrarily, and capriciously by proceeding with the Gate Redetermination.

88.     Defendants breached the duty of good faith and fair dealing implicit in the AULA by proceeding with the Gate Redetermination, causing American to lose preferential use gate space at O'Hare and inflicting substantial damages on American.

### Count III — Declaratory and Injunctive Relief Under the AULA

89.     American incorporates the allegations in paragraphs 1 through 88 by reference as though fully set forth herein.

90.     A ripe, justiciable, and actual controversy has arisen between American and Defendants as to whether the AULA requires Defendants to cease the Gate Redetermination requested by United and not initiate a redetermination of gate space until April 1, 2027.

91.     American has a clear, ascertainable, and protectable legal interest in safeguarding its bargained-for right to have the L-Stinger Expansion Gates fully operational for the full Gate Space Ramp-up Period.

92.     Defendants have actively disregarded their obligations under the AULA and are attempting to redetermine gate space in direct violation of the AULA.  An actual controversy therefore exists between American and Defendants.

93.     A judicial declaration of the rights and obligations of the parties under the AULA—specifically that under the AULA the next gate redetermination may not occur until April 1, 2027—is necessary and would terminate the controversy between the parties.

94.     In the absence of such a declaration, American faces an irreparable injury. Defendants' position threatens to reduce American's preferential use gate space at O'Hare, harming American.

95.     The harm to American of having to continue operating at O'Hare on a skewed playing field is immense and immeasurable.  This harm cannot be quantified or redressed by any amount of damages, and there is no adequate remedy at law.

## DEMAND FOR JURY TRIAL

American demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE,** American respectfully requests that this Court enter judgment as follows:

A.     Declare that, under the AULA, a redetermination of gate space may not occur until April 1, 2027, at the earliest; and

B.      Preliminarily and permanently enjoin Defendants from initiating a redetermination of gate space until at least April 1, 2027, consistent with Sections 5.2.4 and 5.3.2 of the AULA; and

C.      Award American damages resulting from Defendants' breach of the AULA by initiating the Gate Redetermination in a manner inconsistent with the AULA's terms; and

D.      Grant American such other and further relief as the Court deems just and equitable.

Dated:  May 2, 2025              Respectfully submitted,

/s/ *Sean Berkowitz*

Sean Berkowitz (ARDC No. 6209701)
Garrett S. Long (ARDC No. 6290075)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Tel.:   (312) 876-7700
Fax:   (312) 993-9767
sean.berkowitz@lw.com
garrett.long@lw.com

David C. Tolley (MA No. 676222) (*pro hac vice* forthcoming)
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
Tel.:   (617) 948-6000
Fax:   (617) 948-6001
david.tolley@lw.com

*Attorneys for American Airlines, Inc.*