# Exhibit 1

## Part 1



# Chicago Department of Aviation

## CITY OF CHICAGO

Date:       May 15, 2018

To:         Air Carriers who have executed an Airline Use and Lease
            Agreement, Affiliate Operating Agreement or Non-Signatory
            Airline Operating Agreement

Subject:    Notification of Modification to Insurance Requirements for Air
            Carriers using passenger aircrafts with 20 seats or less

Capitalized terms used but not defined herein shall have the meanings ascribed
thereto in the Airline Use and Lease Agreement effective on or after May 12,
2018, between each Signatory Airline and the City of Chicago ("AULA").

Pursuant to Section 13.2.2(1) (City's Right to Modify) of each of the AULA and
the Non-Signatory Airline Operating Agreement and Section 13 of the Affiliate
Operating Agreement, the City has modified its requirement in Section 13.2.1 (b)
(Commercial General/Airline Liability Insurance (Primary and Umbrella)) of the
AULA and Non-Signatory Operating Agreement for commercial general/airline
liability insurance coverage for Air Carriers as follows:

> $75,000,000 per occurrence and in the aggregate for war risks and allied
> peril, for Air Carriers using passenger aircrafts with 20 seats or less.

Sincerely,

Ginger S, Evans
Department of Aviation
Commissioner

Cc:  General Counsel, City of Chicago Department of Aviation

10510 WEST ZEMKE ROAD, P.O. BOX 66142, CHICAGO, ILLINOIS 60666

UNITED
CONTRACT
185193

# CITY OF CHICAGO

# AIRLINE USE AND LEASE AGREEMENT

## MAY 12, 2018 – DECEMBER 31, 2033

### AIRLINE:

### UNITED AIRLINES, INC.

### O'HARE INTERNATIONAL AIRPORT

**Table of Contents**

Page

Article 1 DEFINITIONS ...........................................................................................................1

    1.1    Definitions ................................................................................................................1

    1.2    Interpretation.........................................................................................................23

    1.3    Incorporation of Exhibits......................................................................................24

Article 2 TERM ......................................................................................................................25

    2.1    Effective Date ........................................................................................................25

    2.2    Long-Term Signatory Airlines and Short-Term Signatory Airlines.....................25

    2.3    Term.......................................................................................................................26

    2.4    Extension Periods ..................................................................................................26

    2.5    Termination of Prior Use and Lease Agreement ..................................................26

Article 3 USES, RIGHTS AND PRIVILEGES ......................................................................27

    3.1    Airline Rights, Privileges, Limitations and Prohibitions on Use of the Airport.........27

    3.2    Terminal Complex .................................................................................................27

    3.3    Gate Space and Gate Ramps..................................................................................29

    3.4    Airfield...................................................................................................................30

    3.5    Communications Equipment and Antennae ..........................................................30

    3.6    City Equipment .....................................................................................................31

    3.7    Handling Arrangements and Third-Party Service Providers .................................31

    3.8    Exclusions and Reservations .................................................................................32

    3.9    Flight Information Management System ................................................................33

    3.10    Safety Management System ..................................................................................33

Article 4 AIRLINE'S PREMISES...........................................................................................34

    4.1    Rights to Use Premises ..........................................................................................34

    4.2    Assignment and Subletting ...................................................................................35

    4.3    City's Right of Entry .............................................................................................38

    4.4    Quiet Enjoyment ...................................................................................................38

    4.5    Surrender and Removal of Personal Property .......................................................38

    4.6    Hold Over ..............................................................................................................39

    4.7    No Warranty of Condition or Suitability ..............................................................40

    4.8    City's Title.............................................................................................................40

i

| | 4.9 | Work on Airline's Premises | 40 |
|---|---|---|---|
| Article 5 | | ASSIGNMENT AND USE OF SPACE | 41 |
| | 5.1 | Types of Gate Space | 41 |
| | 5.2 | Assignment of Preferential Use Gate Space Rights and Conversion of Common Use Gate Space to Preferential Use Gate Space | 42 |
| | 5.3 | Annual Redetermination of the Number and Locations of Common Use Gate Space | 42 |
| | 5.4 | Annual Redetermination of Preferential Use Gate Space Assignments | 44 |
| | 5.5 | City's Right to Accommodate Other Passenger Carriers in Airline's Preferential Use Gate Space | 47 |
| | 5.6 | Gate Accommodation and Reassignment During TAP Program Construction | 54 |
| | 5.7 | Terminal Facilities Advisory Committee | 54 |
| | 5.8 | Accommodation in Space Other than Gate Space | 55 |
| | 5.9 | City's Use of Airline-Owned PLBs | 58 |
| Article 6 | | AFFILIATES AND ALLIANCE PARTNERS | 58 |
| | 6.1 | Airline's Designation of Affiliates | 58 |
| | 6.2 | Applicability of Agreement to Affiliates | 59 |
| | 6.3 | Designation by More than One Signatory Airline | 59 |
| | 6.4 | Termination of Status of Affiliate | 59 |
| | 6.5 | Airline's Designation of Alliance Partners | 60 |
| | 6.6 | Application of Agreement to Alliance Partners | 60 |
| | 6.7 | Designation by More than One Signatory Airline | 60 |
| | 6.8 | Termination of Status of Alliance Partner | 60 |
| Article 7 | | SUBORDINATION TO BOND INDENTURE AND CREATION OF FUNDS | 61 |
| | 7.1 | Definitions | 61 |
| | 7.2 | Subordination to Bond Indenture | 61 |
| | 7.3 | Sufficiency of Airport Revenues | 61 |
| | 7.4 | Deposit of Revenues and Creation of Funds | 61 |
| | 7.5 | Assignment by the City | 62 |
| Article 8 | | CALCULATION OF RATES AND CHARGES | 62 |
| | 8.1 | Generally | 62 |
| | 8.2 | Calculation of the Landing Fee | 63 |
| | 8.3 | Calculation of Terminal Rental Rates | 64 |

| | | |
|---|---|---|
| 8.4 | Exclusive Use Rent | 66 |
| 8.5 | Preferential Use Gate Rent | 66 |
| 8.6 | Preferential Use Check-in Rent | 66 |
| 8.7 | Preferential Use and Joint Use Baggage Claim Rent | 66 |
| 8.8 | Preferential Use and Joint Use Baggage Make-up Rent | 67 |
| 8.9 | Preferential Use and Joint Use City-owned Baggage System Charges | 67 |
| 8.10 | Common Use Fees | 68 |
| 8.11 | FIS Facility Fee | 73 |
| 8.12 | Priorities of Use for Net Aeronautical Real Estate Revenues | 73 |
| 8.13 | Priorities of Use for Net Commercial Real Estate Revenues | 74 |
| 8.14 | City Equipment Charges | 74 |
| 8.15 | Air Service Incentive Program | 74 |
| 8.16 | Mid-year Adjustments | 75 |
| 8.17 | Annual True-Up | 75 |
| 8.18 | Transition Period Rates and Charges | 76 |
| 8.19 | Activity Reports | 77 |
| Article 9 | PAYMENT OF RENTALS, FEES AND CHARGES AND SECURITY DEPOSIT | 78 |
| 9.1 | Payment of Landing Fees and Terminal Charges | 78 |
| 9.2 | Place of Payment; Late Payments | 78 |
| 9.3 | Security Deposits | 79 |
| 9.4 | Right to Contest; No Abatement or Set-off | 81 |
| 9.5 | Airline Books and Records | 81 |
| 9.6 | City Books and Records | 82 |
| Article 10 | CAPITAL IMPROVEMENT PROJECTS | 82 |
| 10.1 | Previously Approved Projects | 82 |
| 10.2 | Pre-Approval of the Phase I TAP Elements | 83 |
| 10.3 | Additional TAP Elements | 84 |
| 10.4 | Other Pre-Approved Projects in the City's Capital Improvement Program (CIP) | 85 |
| 10.5 | Pre-Approved Allowances | 86 |
| 10.6 | Majority-in-Interest Review of New Projects | 86 |
| 10.7 | Capital Improvement Projects Exempt from Majority-In-Interest Review | 87 |

10.8    Method of Obtaining Majority-in-Interest Approval.................................................88

10.9    Project Implementation.............................................................................................89

10.10   PFC Priorities...........................................................................................................91

Article 11 ADDITIONAL OBLIGATIONS OF THE AIRLINE AND THE CITY ....................92

11.1    Operation, Maintenance, Replacement and Repair ..................................................92

11.2    Taxes, Licenses and Permits.....................................................................................93

11.3    Performance by the City upon Failure of Airline .....................................................93

11.4    Utilities .....................................................................................................................94

11.5    City Ownership of Airport.........................................................................................94

Article 12 CONSORTIUM.......................................................................................................95

12.1    Equipment and Services Consortium........................................................................95

Article 13 INDEMNIFICATION AND INSURANCE.............................................................95

13.1    Indemnification.........................................................................................................95

13.2    Insurance...................................................................................................................98

13.3    City's Insurance ......................................................................................................103

Article 14 ENVIRONMENTAL MATTERS..........................................................................103

14.1    Airline Representations, Warranties, and Covenants .............................................103

14.2    Right of Entry to Perform Environmental Inspections and Sampling.....................106

14.3    Information to be Provided to the City ...................................................................107

14.4    Airline's Environmental Response and Compliance Obligations ...........................108

14.5    Investigation, Remediation, or Corrective Action Process.....................................109

14.6    The City's Rights to Ensure Airline's Compliance with Environmental
        Response and Compliance Obligations ...................................................................109

14.7    Environmental Indemnification and Reimbursement..............................................111

14.8    Limitations..............................................................................................................112

14.9    Baseline Environmental Site Inspection.................................................................113

14.10   Concluding Environmental Site Inspection ............................................................113

14.11   Airline's Hazardous Substance-Related Equipment and Fixtures...........................113

14.12   Waiver.....................................................................................................................114

14.13   Notice for Environmental Matters ..........................................................................114

14.14   Survival of Environmental Provisions....................................................................114

Article 15 DAMAGE, DESTRUCTION AND CONDEMNATION........................................114

15.1    Damage to, Destruction or Condemnation of Airport .............................................114

15.2     Untenantable Conditions ................................................................................115

Article 16 COMPLIANCE WITH LAWS AND RULES ................................................115

16.1     Airport Rules ..................................................................................................115

16.2     Observance and Compliance with Laws.........................................................116

16.3     Subordination to Sponsor's Assurance Agreement ........................................116

16.4     Agreements with the United States.................................................................116

16.5     PFC Act and Assurances .................................................................................116

16.6     PFCs to be held in Trust for the City ..............................................................117

16.7     Security and Payment of Fines for Violation of Federal Regulations ............118

16.8     No Exclusive Rights ........................................................................................119

16.9     Federal Tax and Securities Laws ....................................................................119

16.10    Anti-Scofflaw ..................................................................................................119

16.11    Ethics ...............................................................................................................120

16.12    Inspector General.............................................................................................120

16.13    Business Relationships With Elected Officials, Municipal Code Section
         2-156-030(b) ....................................................................................................120

16.14    City of Chicago Hiring Plan (Shakman Accord) ............................................121

16.15    No Waste Disposal in Public Way, Municipal Code Section 11-4-1600(E).............121

16.16    Visual Artists Rights Act Waiver ....................................................................121

16.17    Boarding And Deplaning Assistance To Passengers With Disabilities....................122

Article 17 DEFAULT, TERMINATION AND CHANGE OF LEASE TERM .........................122

17.1     Events of Default .............................................................................................122

17.2     Termination by the City ..................................................................................124

17.3     Change of Lease Term .....................................................................................125

17.4     Pursuit of Remedies Against Defaulting Air Carriers ....................................125

17.5     Agreement to Pay Attorneys' Fees and Expenses ..........................................126

17.6     Force Majeure ..................................................................................................126

Article 18 GENERAL PROVISIONS ...............................................................................126

18.1     Agreement Not to Grant More Favorable Terms ............................................126

18.2     No Partnership or Agency ...............................................................................126

18.3     No Personal Liability .......................................................................................127

18.4     Notices..............................................................................................................127

18.5     Entire Agreement .............................................................................................129

18.6    Amendment ........................................................................................................ 129

18.7    Applicable Law ................................................................................................. 129

18.8    Authorization to Operate; Consent to Service of Process and Jurisdiction .............. 129

18.9    Severability ..................................................................................................... 130

18.10   Representatives ................................................................................................ 130

18.11   Successors and Assigns .................................................................................... 130

18.12   No Third Party Beneficiaries ............................................................................ 130

18.13   No Waiver ....................................................................................................... 131

18.14   No Exclusive Right or Remedy ......................................................................... 131

18.15   Labor Disputes ................................................................................................ 131

18.16   Action or Exercise of Power by the City ............................................................ 131

18.17   Headings ......................................................................................................... 131

18.18   Counterparts .................................................................................................... 131

This AIRLINE USE AND LEASE AGREEMENT ("Agreement") is made by and between the **City of Chicago** (the "City"), a municipal corporation of the State of Illinois, and **United Airlines, Inc.** ("Airline"), a corporation organized and existing under the laws of the State of Delaware and authorized to do business in the State of Illinois.

Article 1

# DEFINITIONS

1.1     **Definitions**

The following words, terms and phrases shall, for purposes of this Agreement, have the following meanings:

"**AAAC**" or "**Airline Airport Affairs Committee**" means the Airline Airport Affairs Committee consisting of a representative designated by each Signatory Airline operating at the Airport.

"**AAAC Representative**" means the person designated in writing by Airline to serve as its representative on the AAAC and to receive notice pursuant to Sections 9.3.1(a) and 11.3.

"**Activity-Based Terminal Charges**" means Terminal Charges calculated under Sections 8.10 and 8.11.

"**Additional TAP Elements**" means certain Capital Improvement Projects that have been approved by Airline by execution of this Agreement, subject to the conditions specified Section 10.3.

"**Additional TAP Element Trigger**" means the conditions, specified in Exhibit M, that must be met before the City may proceed with the design, construction and equipping of an Additional TAP Element.

"**Aeronautical Real Estate**" means the parcels and other areas of the Airport where aviation support, cargo, hangar and maintenance activities occur, including all roads and facilities serving such areas and associated air rights. The Aeronautical Real Estate areas as of the Effective Date are generally depicted in Exhibit A for illustrative purposes.

"**Aeronautical Real Estate Revenue**" means all revenues collected by the City for the right to use Aeronautical Real Estate.

"**Aeronautical Service Provider**" means any entity providing commercial aeronautical services to one or more Air Carriers with the approval of the City.

"**Affiliate**" means an Air Carrier providing air service at the Airport that has executed an Affiliate Operating Agreement and has been properly designated as an Affiliate by a Signatory Airline in accordance with Section 6.1 and either (a) is a parent or subsidiary of the designating

1

Signatory Airline or a subsidiary of said Signatory Airline's parent company or under the same parental control as said Signatory Airline, or (b) meets one or more of the following conditions:

        (i)      operates flights under an International Air Transport Association ("IATA") flight designator code of the designating Signatory Airline; or

        (ii)     otherwise operates under essentially the same trade name of the designating Signatory Airline and uses essentially the same livery as said Signatory Airline; or

        (iii)    operates cargo feeder flights at the Airport under the direction and control of the designating Signatory Airline;

provided, however, that an Air Carrier's Affiliate status under clause (b) shall be limited to the extent the Air Carrier is operating flights on behalf of the designating Signatory Airline.

"**Affiliate Operating Agreement**" means the agreement described in Section 6.1.1, the form of which is attached as Exhibit F.

"**Agreement**" means this Airline Use and Lease Agreement, together with its Exhibits, as hereafter amended or supplemented from time to time in accordance with its terms.

"**Air Carrier**" means a carrier certificated by the Secretary of the U.S. Department of Transportation as a Passenger Carrier under 49 U.S.C. § 41102 or a Cargo Carrier under 49 U.S.C. § 41103.

"**Air Transportation Business**" means that business operated by Airline at the Airport for the commercial transportation by air of persons, property, mail, parcels and/or cargo.

"**Aircraft Parking Fees**" means the Aircraft Parking Fees established by the City pursuant to Section 8.10.8.

"**Airfield**" means those areas of the Airport that provide for the landing, taking off, taxiing and parking of aircraft, and all facilities, equipment and improvements now or hereafter located thereon, including the runways, taxiways, Apron Areas and facilities at the Airport for the purpose of controlling and assisting arrivals, departures and operations of aircraft using the Airport, such as control towers or other facilities operated and maintained by the FAA or any other federal agency, security fences, service roads, signals, beacons, wind indicators, flood lights, landing lights, boundary lights, construction lights, radio and electronic aids or other aids to operations, navigation or ground control of aircraft whether or not of a type herein mentioned and even though located away from but related to the rest of the Airfield as all such areas, facilities, equipment and improvements may be modified, improved, or enlarged from time to time by the City. The Airfield as of the Effective Date is generally depicted in Exhibit A for illustrative purposes.

"**Airfield Revenue Requirement**" means the Airfield Revenue Requirement calculated in accordance with Section 8.2.1.

"**Airline**" means the Air Carrier named on the signature page hereof.

"**Airline Airport Affairs Committee**" or "**AAAC**" means the Airline Airport Affairs Committee consisting of a representative designated by each Signatory Airline operating at the Airport.

"**Airline Alliance**" means the Star Alliance, SkyTeam, oneworld and similar airline partnerships.

"**Airline Liaison Office**" means an entity designated by the Airline Airport Affairs Committee that provides technical and financial consulting services to the Airport and the Airline Airport Affairs Committee and facilitates airport/airline relations.

"**Airline Rate-Based Capital Costs**" means the Capital Costs of a Capital Improvement Project that are reasonably allocable to one or more Airline-Supported Cost Centers.

"**Airline Rate-Based O&M Expenses**" means the O&M Expenses of a Capital Improvement Project that are reasonably allocable to one or more Airline-Supported Cost Centers.

"**Airline Rate-Based Project Costs**" means the Project Costs of a Capital Improvement Project that are reasonably allocable to one or more Airline-Supported Cost Centers.

"**Airline Rented Space**" means any space in the Terminal Complex that is rented by Passenger Carriers on an exclusive, preferential or common use basis, plus any areas in the Terminal Complex that are rented to Aeronautical Service Providers; provided, however, that such leased space shall be at the same rental rate, and subject to the same rate adjustments as space leased to Passenger Carriers.

"**Airline-Supported Cost Centers**" means the following Cost Centers:

    (i)    Airfield Cost Center;

    (ii)    Terminal Cost Center;

    (iii)    Parking and Ground Transportation Cost Center;

    (iv)    Fueling System Cost Center;

    (v)    Aeronautical Real Estate Cost Center; and

    (vi)    Commercial Real Estate Cost Center.

"**Airline Use and Lease Agreement**" means an agreement with the City substantially similar to this Agreement.

"**Airport**" means Chicago O'Hare International Airport, together with any additions thereto, or improvements or enlargements of it, later made, but any land, rights-of-way, or improvements which are now or later owned by or are part of the transportation system operated

3

by the Chicago Transit Authority, or any successor thereto, wherever located within the boundaries of the Airport, are not deemed to be part of the Airport. The Airport as of the Effective Date is generally depicted in Exhibit A for illustrative purposes.

"**Airport Fees and Charges**" means, for any Fiscal Year, all rents, charges and fees payable by all Air Carriers for such Fiscal Year as determined and adjusted pursuant to Article 8.

"**Airport Revenue Bonds**" or "**GARBs**" means any bonds, commercial paper notes, credit agreement notes and any other debt obligations of the City, outstanding at any time having a lien on Revenues as provided in the Bond Indenture.

"**Airport Rules**" means, collectively, all rules, procedures, protocols and requirements currently effective and hereinafter amended, adopted or established by the City applicable to Airport operations and users, all of which are incorporated into and made a part of this Agreement, provided that such Airport Rules do not conflict with applicable provisions of state or federal law or the provisions of this Agreement.

"**Alliance Partner**" means a Signatory Airline or a Non-Signatory Airline that (a) is a member of the same Airline Alliance as Airline or a Codeshare Partner of Airline and (b) Airline has designated as an Alliance Partner pursuant to Section 6.5.

"**Allowable Airline Liaison Office Expenses**" means expenses of the Airline Liaison Office that are not Project Costs and have been approved for recovery through Landing Fees pursuant to Section 8.2.1(c) by Long-Term Signatory Airlines that together accounted for at least fifty percent (50%) of the total Maximum Gross Landed Weight of all Air Carriers during the immediately preceding Fiscal Year.

"**Applicable Laws**" means, collectively, all applicable present and future federal, state and local laws, rules, regulations, orders and ordinances, as they may be amended from time to time, whether foreseen or unforeseen, ordinary as well as extraordinary, including without implied limitation those relating to (i) health, sanitation and safety; (ii) the environment, including without limitation the Environmental Laws; (iii) access for persons with disabilities, including without limitation the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*; and (iv) airport security, including without limitation the regulations of the Transportation Security Administration, 49 CFR Parts 1540, 1542, 1544 *et seq.* This Agreement does not constitute a waiver by Airline of whatever rights it may have to challenge a local law, rule, regulation or ordinance on the basis that it is pre-empted by State or Federal law.

"**Approved Project**" means Previously Approved Projects, Phase I TAP Elements, Additional TAP Elements and Pre-Approved CIP Projects that have been approved by execution of this Agreement and New Projects submitted for Majority-in-Interest review pursuant to the procedures in Section 10.8 and not disapproved by a Majority-in-Interest.

"**Apron Areas**" means the paved areas surrounding the Terminal Complex intended for use by Passenger Carriers for aircraft or aircraft servicing equipment, including hardstand positions, and the paved areas available for use in common by or for the benefit of the Cargo Carriers, as all such paved areas may be modified, improved, or enlarged by the City during the

Term. The Apron Areas as of the Effective Date are generally depicted in Exhibit B for illustrative purposes.

"**Arriving Domestic Seats**" means all Delivered Arriving Seats on domestic flights or international flights without FIS Users.

"**Arriving International Seats Without FIS Users**" means all Delivered Arriving Seats on international flights without FIS Users.

"**Artwork**" means any work of visual art as defined in Section 101 of the Copyright Act.

"**Assignment**" means to assign, transfer, convey, sell, mortgage, pledge or encumber as described further in Section 4.2.

"**Associated Party(ies)**" means Airline's employees, contractors, subcontractors, agents, licensees, Sublessees, Affiliates, vendors, invitees (excluding passengers), and any other Air Carrier that Airline expressly authorizes to use its Premises, Airfield or Apron Area (regardless of whether Airline enters into a sublease or license with such Air Carrier), and other parties under Airline's direction or control that come onto the Airport arising out of or relating to Airline's use or occupancy of the Airport, but excluding Air Carriers that Airline is compelled by the City to accommodate within Airline's Premises pursuant to Article 5.

"**Bad Debt**" means a monetary amount owed to the City that is unlikely to be paid as it is beyond the collectible period as set by City policy as set forth in Section 9.2.3.

"**Bad Debt Recovery**" means the recapture of Bad Debt that has previously been allocated to a Cost Center.

"**Baggage Claim Space**" means the footprint of the Baggage Claim Systems and proximate circulation space, as it may be adjusted from time to time, all as shown in Exhibit B as of the Effective Date.

"**Baggage Claim System**" means all the equipment that delivers Inbound Checked Bags from inbound aircraft to arriving passengers through and including baggage claim devices and non-public conveyance equipment.

"**Baggage Make-up Space**" means the footprint of the Baggage Make-up Systems and proximate circulation space sufficient to accommodate the movement and parking of tugs and carts as well as any other operations required for the devices, as it may be adjusted from time to time, all as shown in Exhibit B as of the Effective Date.

"**Baggage Make-up Systems**" means all the equipment that delivers Outbound Checked Bags from passenger check-in areas through and including checked bag security screening conveyors, baggage make-up devices and interline belts.

"**Baggage Systems**" means equipment and related systems for the delivery of bags to arriving passengers and outbound aircraft, including both Baggage Claim Systems and Baggage Make-up Systems.

**"Bond Counsel"** means nationally-recognized municipal bond counsel selected by the City.

**"Bond Indenture"** means the Master Indenture of Trust Securing Chicago O'Hare International Airport General Airport Revenue Senior Lien Obligations, dated as of September 1, 2012, as the same may be amended, supplemented and restated from time to time, and any ordinance, credit agreement or indenture, or combination thereof adopted or authorized by the City Council of the City authorizing the issuance of notes, bonds or other obligations for the Airport and securing such obligations by a pledge of revenues or net revenues of the Airport, or any ordinance or indenture supplemental thereto.

**"Building Code"** means the "Building Code" as that term is defined in the Municipal Code.

**"Capital Costs"** means all costs related to the acquisition, construction or improvement of Airport assets, including the following:

      (a)    Debt Service net of pledged PFC revenues, grants and other applicable adjustments;

      (b)    Required Debt Service Coverage on the gross amount of such Debt Service;

      (c)    Program fees and other costs of borrowing not included in Debt Service;

      (d)    Costs of Capital Improvement Projects funded with Pre-Approved Allowances; and

      (e)    Equipment purchases and small capital outlays, if not otherwise classified as an O&M Expense.

**"Capital Improvement Project"** means an addition or improvement to the Airport's physical plant or equipment, and the acquisition of land or rights in land for expansion or operation of the Airport (including judgments and awards related to claims for inverse condemnation), or for avigation easements acquired from property owners releasing the City from any claims or liability arising from the flight of aircraft landing at or departing from the Airport.

**"Cargo Carrier"** means a carrier certificated by the Secretary of the U.S. Department of Transportation as a Cargo Carrier under 49 U.S.C. § 41103.

**"CDA"** or **"Department of Aviation"** means the Chicago Department of Aviation or any successor agency thereto.

**"Change in Project Scope Requiring MII Review"** means a change to the scope of an Approved Project, as specified in Exhibits J, L, M or N or in the proposal submitted for Majority-in-Interest review under Section 10.8.1, that triggers Majority-in-Interest review pursuant to the procedures in Section 10.8.

"**Check-in Hours**" means the number of hours that a Passenger Carrier has been assigned by the City or actually uses on each check-in, drop-off or queuing position within Common Use Check-in Space.

"**Check-in Space**" means the space in the Terminal Complex for passenger check-in, including the space used for counters, self-service kiosks and passenger check-in and baggage drop-off queuing space, as it may be adjusted from time to time, all as shown in Exhibit B as of the Effective Date.

"**City**" means the City of Chicago, a municipal corporation and home rule unit of local government organized and existing under Article VII, Sections 1 and (6)(a), respectively, of the 1970 Constitution of the State of Illinois.

"**City Equipment**" means moveable or permanent fixtures, furniture, millwork, technology systems, including SET components used by individual Passenger Carriers, and equipment located on or affixed to Airline's Premises, or elsewhere at the Airport, purchased, constructed or rented by the City or otherwise provided at the cost or expense of the City which the City makes available for use by Airline subject to Section 3.6 and the City Equipment Charge.

"**City Equipment Charges**" means standardized cost-recovery fees calculated annually by the City for the use of City Equipment.

"**City Equipment Costs**" means the Capital Costs, O&M Expenses, rental payments made by the City and any other cost or expense of the City allocable to City Equipment.

"**City Indemnified Parties**" means the City, its elected and appointed officials, officers, agents, employees, contractors, consultants and representatives.

"**Claim**" or "**Claims**" means any and all losses, liabilities, penalties, damages of whatever nature, causes of action, suits, claims, demands, judgments, injunctive relief, awards and settlements as described further in Section 13.1.1.

"**Codeshare Partner**" means a Signatory Airline or a Non-Signatory Airline that has entered into a codeshare agreement with Airline that covers all the flights that the Codeshare Partner operates at the Airport.

"**Commercial Real Estate**" means the parcels and other areas of the Airport where commercial non-aeronautical activities such as hotel, office, non-terminal retail, public vehicle fueling and charging stations not otherwise located in facilities included in the Parking and Ground Transportation Cost Center, and other real estate development occur, including all roads, utilities and facilities serving such areas and associated air rights. The Commercial Real Estate areas as of the Effective Date are generally depicted in Exhibit A for illustrative purposes.

"**Commercial Real Estate Revenue**" means revenues collected by the City for the right to use Commercial Real Estate.

"**Commissioner**" means the Commissioner of the Department of Aviation, her or his designee, or any successor to the duties of such official.

"**Common Use Baggage Claim Fees**" means the Common Use Baggage Claim Fees calculated pursuant to Section 8.10.5.

"**Common Use Baggage Claim Space**" means the Baggage Claim Space in the Terminal Complex designated by the Commissioner to be used in common by Passenger Carriers for arriving domestic flights or arriving international flights not carrying FIS Users, as it may be adjusted from time to time, all as shown in Exhibit B as of the Effective Date.

"**Common Use Baggage Make-up Space**" means the Baggage Make-up Space in the Terminal Complex designated by the Commissioner to be used in common by Passenger Carriers, as it may be adjusted from time to time, all as shown in Exhibit B as of the Effective Date.

"**Common Use Check-in Space**" means Check-in Space designated by the Commissioner to be used in common by Passenger Carriers. Common Use Check-in Space may be separately designated by the City as Domestic Common Use Check-in Space and International Common Use Check-in Space, as it may be adjusted from time to time, all as shown in Exhibit B as of the Effective Date.

"**Common Use City-owned Baggage Claim Systems**" means the Baggage Claim Systems owned by the City designated by the Commissioner from time to time to be used in common by Passenger Carriers to process inbound baggage.

"**Common Use Gate Space**" means the Gate Space designated by the City in accordance with Article 4 and Article 5 to be used in common by Passenger Carriers operating at the Airport, and shall not be deemed to include any Preferential Use Gate Space. Common Use Gate Space may be separately designated by the City as Domestic Common Use Gate Space and International Common Use Gate Space, as it may be adjusted from time to time, all as shown in Exhibit B as of the Effective Date.

"**Common Use Premises**" means those areas within the Terminal Complex, including Common Use Gate Space, Common Use Check-in Space, Common Use Baggage Claim Space and Common Use Baggage Make-up Space that are made available by the City to one or more Air Carriers, subject to Section 4.1.5 and as more fully described in the Terminal Complex Space Exhibit. Common Use Premises may be separately designated by the City as Domestic Common Use Premises and International Common Use Premises, as it may be adjusted from time to time, all as shown in Exhibit B as of the Effective Date.

"**Concluding Walk-Through**" means a physical walk-through of Airline's Premises or any portion thereof by a representative or consultant of the City and Airline prior to the date that such Premises are vacated or surrendered pursuant to this Agreement for the purpose of observing the environmental condition of Airline's Premises or any portion thereof and Airline's compliance with Section 14.10, the findings of which shall be documented in a report prepared by such City representative or consultant in consultation with Airline.

"**Consolidated Rental Car Facility**" or "**CONRAC**" means the portion of the joint use facility, roadways and equipment that constitutes the consolidated rental car facility at the Airport, including those portions of the joint use facility dedicated to rental car operations, the customer service area, and the quick turn-around facility. The CONRAC as of the Effective Date is generally depicted in Exhibit A for illustrative purposes.

"**Construction Cost Index**" means the Construction Cost Index for Chicago, Illinois published by Engineering News-Record or, in the event that Engineering News-Record ceases to publish such an index, a similar construction cost index selected in the reasonable discretion of the Commissioner after consultation with the Executive Working Group.

"**Contaminant**" means any of those materials set forth in 415 ILCS 5/3.165, as amended from time to time, that are subject to regulation under any Environmental Law.

"**Contractor**" means a person or firm hired by Airline to act as an agent or independent contractor, whether or not Airline is reimbursed by the City for costs of hiring such person or firm, as well as subcontractors of any such agent or independent contractor, in connection with or pursuant to the performance of any acts or obligations under this Agreement.

"**Copyright Act**" means the U.S. Copyright Act (17 U.S.C. § 101 *et seq.*).

"**Cost Centers**" means those areas of the Airport grouped together for the allocation of Capital Costs and O&M Expenses to calculate Airport Fees and Charges. The Cost Centers used to calculate Airport Fees and Charges are the Airfield Cost Center, Terminal Cost Center, Fueling System Cost Center, Aeronautical Real Estate Cost Center, Commercial Real Estate Cost Center, Parking and Ground Transportation Cost Center, and Consolidated Rental Car Facility Cost Center.

"**Customer Facility Charge**" means the customer facility charge authorized by the Illinois Vehicle Code (625 ILCS 5/6-305), or any successor law or provision, with respect to the Airport.

"**Date of Beneficial Occupancy**" or "**DBO**" means the date when a project or a phased element of a project has been substantially completed, a certificate of occupancy has been received, if required, and the Commissioner reasonably determines that it is available for use.

"**Debt Service**" means, collectively, debt service on GARBs and any other debt service on indebtedness payable from Revenues, net of capitalized interest.

"**Delivered Arriving Seats**" means all Seats on flights arriving at the Airport actually delivered by Passenger Carriers.

"**Delivered Departing Seats**" means all Seats on flights departing from the Airport actually delivered by Passenger Carriers.

"**Delivered Departing International Seats**" means all Delivered Departing Seats on international flights departing from International Common Use Gate Space.

"**Department of Aviation**" or "**CDA**" means the Chicago Department of Aviation or any successor agency thereto.

"**Design and Construction Manuals**" means the CDA Design, Renovation and Construction Tenant Projects Standard Operating Procedures and the CDA Design Standards, as may be amended from time to time by the CDA after consultation with the EWG.

"**Discharge**" means an act or omission by which Hazardous Substances or Other Regulated Material, now or in the future, are leaked, spilled, poured, deposited, or otherwise disposed into land, wetlands or Waters, or by which those substances are deposited where, unless controlled or removed, they may drain, seep, run or otherwise enter said land, wetlands or Waters.

"**Dispose**," "**Disposal**" or "**Disposing**" and variants thereof mean the discharge, deposit, injection, dumping, spilling, leaking, or placing of any Hazardous Substance or Other Regulated Material into or on any land or water so that such Hazardous Substance or Other Regulated Material or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

"**Domestic Common Use Baggage Make-up Fees**" means the Domestic Common Use Baggage Make-up Fees calculated pursuant to Section 8.10.3.

"**Domestic Common Use Baggage Make-up Space**" means the Baggage Make-up Space in the Terminal Complex designated by the Commissioner to be used in common by Passenger Carriers for processing outbound baggage primarily on domestic flights, as it may be adjusted from time to time, all as shown in Exhibit B as of the Effective Date.

"**Domestic Common Use City-owned Baggage Make-up Systems**" means Baggage Make-up Systems owned by the City designated by the Commissioner from time to time to be used in common by Passenger Carriers to process outbound baggage primarily on domestic flights.

"**Domestic Common Use Check-in Fees**" means the Domestic Common Use Check-in Fees calculated pursuant to Section 8.10.6.

"**Domestic Common Use Check-in Space**" means the Check-in Space designated by the Commissioner to be used in common by Passenger Carriers primarily for domestic passenger check-in, as it may be adjusted from time to time, all as shown in Exhibit B as of the Effective Date.

"**Domestic Common Use Gate Fees**" means the Domestic Common Use Gate Fees calculated pursuant to Section 8.10.1.

"**Domestic Common Use Gate Space**" means Domestic Gate Space that the City has designated as Common Use Gate Space in accordance with Article 5, as it may be adjusted from time to time, all as shown in Exhibit B as of the Effective Date.

"**Domestic Common Use Holdroom Space**" means the Holdroom Space associated with Domestic Common Use Gate Space.

"**Domestic Gate Space**" means any Gate Space that has not been designated as International Gate Space by the City.

"**Effective Date**" means the Effective Date as described in Section 2.1.

"**Enplaned Passengers**" means all originating and all outgoing on-line transfer and off-line transfer revenue passengers departing from the Airport, but does not include through passengers.

"**Environmental Claim**" means any demand, cause of action, proceeding or suit for (a) damages (actual or punitive), injuries to person or property, taking or damaging of property or interests in property without just compensation, nuisance, trespass, damages to natural resources, fines, penalties, interest, or (b) losses, or for the costs of site investigations, feasibility studies, information requests, health or risk assessments, contribution, settlement, or actions to correct, remove, remediate, Respond to, clean up, prevent, mitigate, monitor, evaluate, assess, or abate the Release of a Hazardous Substance or Other Regulated Material, or any other investigative, enforcement, cleanup, removal, containment, remedial, or other private or governmental or regulatory action at any time threatened, instituted, or completed pursuant to any applicable Environmental Law, or (c) to enforce insurance, contribution, or indemnification agreements being made pursuant to a claimed violation or non-compliance with any Environmental Law.

"**Environmental Indemnitees**" has the meaning set forth in Section 14.7.

"**Environmental Law(s)**" means any federal, state, or local law, statute, ordinance, code, rule, permit, plan, regulation, license, authorization, order, or injunction which pertains to health, safety, any Hazardous Substance or Other Regulated Material, or the environment (including, but not limited to, ground, air, water or noise pollution or contamination, and underground or above-ground tanks) and shall include, without limitation, the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. § 11001 *et seq.*; the Toxic Substances Control Act, 15 U.S.C. § 2601 *et seq.*; the Hazardous Material Transportation Act, 49 U.S.C. § 1801 *et seq.*; the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.*, as amended by the Hazardous and Solid Waste Amendments of 1984; the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601 *et seq.* ("CERCLA"), as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"); the Occupational Safety and Health Act, 29 U.S.C. § 651 *et seq.*; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.*; the Clean Air Act, 42 U.S.C. § 7401 *et seq.*; the Illinois Environmental Protection Act, 415 ILCS 5/1 *et seq.*; the Gasoline Storage Act, 430 ILCS 15/0.01 *et seq.*; the Sewage and Waste Control Ordinance of the Metropolitan Water Reclamation District of Greater Chicago ("MWRD"); the Municipal Code of the City of Chicago; and any other local, state, or federal environmental statutes, and all rules, regulations, orders, and decrees now or hereafter promulgated under any of the foregoing, as any of the foregoing now exist or may be changed or amended or come into effect in the future.

"**Equipment and Services Consortium**" means a consortium formed by Air Carriers and governed by an agreement amongst the consortium and its member Air Carriers.

"**Event of Default**" means an Event of Default as defined in Section 17.1.

"**EWG Protocols**" means the rules and protocols for the governance of the Executive Working Group, including procedures for establishing standing meetings, advance delivery of materials, provisions for remote participation, rules governing general and special meetings, quorum requirements and technical working groups for design and construction review on behalf of the Executive Working Group, as they may be developed and amended from time to time by the EWG, subject at all times to review and approval by the Commissioner.

"**Exclusive Use Premises**" means any office space, operation space, storage area, VIP Lounge, employee break room, baggage service office or other areas in the Terminal Complex designated for Airline's exclusive use, subject to Section 4.1.2 and as more fully described in the Premises Notice.

"**Executive Working Group**" or "**EWG**" means the group of City and Signatory Airline representatives established under Section 10.9.

"**Exempt Projects**" means those Capital Improvement Projects described in Section 10.7.

"**FAA**" or "**Federal Aviation Administration**" means the Federal Aviation Administration created under the Federal Aviation Act of 1958, as amended, or any successor agency thereto.

"**Facilities Maintenance Protocols**" means the City's policies, rules and protocols governing the maintenance of equipment and facilities at the Airport, as they shall be developed and may be amended from time to time by the Commissioner after consultation with the AAAC, which may include a matrix detailing operations and maintenance responsibilities of the City, the Airline, the Equipment and Services Consortium, and any other parties as indicated herein.

"**Federal Aviation Administration**" or "**FAA**" means the Federal Aviation Administration created under the Federal Aviation Act of 1958, as amended, or any successor agency thereto.

"**Federal Bankruptcy Code**" means 11 U.S.C. § 101 *et seq*.

"**Financial Accounting Protocols**" means the City's policies, rules and protocols, as they shall be developed and may be amended from time to time by the Commissioner after consultation with the AAAC, governing the allocation of costs, the compilation of the budgetary items used to calculate rates and charges under Article 8, the calculation of City Equipment Charges, the compilation of actual costs and Air Carrier activity information used to calculate annual adjustments-to-actual under Section 8.17 and other financial accounting matters arising under this Agreement.

"**Final Accounting**" means the annual calculation and reconciliation of actual revenues and expenditures and the final rates and charges for each Air Carrier for the preceding Fiscal Year as further specified in Section 8.17.

"**FIS Facilities**" means the federal inspection services facilities wherever located in the Terminal Complex, including the sterile corridors connecting any such facilities to International Gate Space, as they may be adjusted from time to time, all as shown in Exhibit B as of the Effective Date.

"**FIS Facility Fees**" means the FIS Facility Fees calculated pursuant to Section 8.11.

"**FIS User**" means passengers (excluding flight crew) arriving on international flights (including pre-cleared passengers) who are required to use FIS Facilities.

"**Fiscal Year**" means January 1 through December 31 of any year or such other fiscal year as the City may adopt for the Airport.

"**Fixed Terminal Charges**" means Terminal Charges calculated under Sections 8.4 through 8.9.

"**Fueling System**" means the fuel farm, fuel tanks, fuel hydrants and delivery systems and other facilities and infrastructure related to the fueling system at the Airport; the Fueling System does not include the real property or pipeline easements associated with the fueling systems, facilities and infrastructure.

"**Future Premises Commitment**" means Airline's commitment to accept the assignment of Exclusive Use Premises and Preferential Use Premises as the T-5 Extension and Phase I TAP Elements are completed, as further specified in Section 4.1.8 and Exhibit E.

"**GARBs**" or "**Airport Revenue Bonds**" means any bonds, commercial paper notes, credit agreement notes and any other debt obligations of the City, outstanding at any time having a lien on Revenues as provided in the Bond Indenture.

"**Gate**" means an area in the Terminal Complex made up of Holdroom Space and a portal or stairwell, if any, through which passengers must pass to board or disembark an aircraft and the associated Gate Ramp.

"**Gate Ramp**" means the Apron Area associated with Gate Space.

"**Gate-related Premises**" means the Exclusive Use Premises associated with the operation of a Gate consisting of back office support space (agent checkout, commissary storage or similar areas that are attached by function to the Gate Space) and operations space on the ramp level suitable to accommodate under-wing services, including but not limited to operations, maintenance, aircraft service, fueling, commissary storage and crew support.

"**Gate Space**" means the areas of the Terminal Complex and Apron Areas that consist of Linear Frontage and the associated Holdroom Space and Gate Ramp, as designated in the Premises Notice and Terminal Complex Space Exhibit.

"**Gate Space Plan**" means the aircraft parking layouts that shall be submitted in every Initial Schedule Submission of a Long-Term Signatory Airline that has been assigned Preferential Use Gate Space, as further specified in Section 5.5.2.

"**Gate Space Accommodating Airline**" means a Long-Term Signatory Airline that accommodates a Gate Space Requesting Airline, as further described in Section 5.5.

"**Gate Space Requesting Airline**" means a Scheduled Airline seeking to operate in Preferential Use Gate Space that is leased to a Long-Term Signatory Airline, as further described in Section 5.5.

"**Hazardous Substance**" has the meaning set forth in 415 ILCS 5/3.215, as amended from time to time.

"**Holdroom Space**" means the area in the Terminal Complex used for the staging of passengers waiting to board an aircraft.

"**IATA**" means the International Air Transport Association, a trade association of the world's airlines that is currently headquartered in Montreal, Quebec, Canada with executive offices in Geneva, Switzerland.

"**Inbound Checked Bags**" means inbound bags or other checked items delivered on Baggage Claim Systems.

"**Initial Schedule Submission**" means a Passenger Carrier's flight schedule that must be submitted to the Scheduling Manager at least semi-annually in the form specified in the Terminal Space Use Protocols required by the City and in accordance with Section 5.5.2.

"**Initial Walk-Through**" means a physical walk-through of the Premises by a representative or consultant of the City and Airline prior to the date Airline occupies the Premises or conducts operations thereon pursuant to this Agreement for the purpose of observing the environmental condition of Airline's Premises and Airline's state of compliance with Environmental Laws, the findings of which shall be documented in a report prepared by such City representative or consultant in consultation with Airline.

"**Interest Income**" means any interest on, and any gain realized from the investment of, moneys in any funds created pursuant to the Bond Indenture or this Agreement.

"**International Common Use Baggage Make-up Fees**" means the International Common Use Baggage Make-up Fees calculated pursuant to Section 8.10.4.

"**International Common Use Baggage Make-up Space**" means the space in the Terminal Complex designated by the Commissioner to be used in common by Passenger Carriers for processing of outbound baggage primarily on international flights, as it may be adjusted from time to time, all as shown in Exhibit B as of the Effective Date.

"**International Common Use Check-in Fees**" means the International Common Use Check-in Fees calculated pursuant to Section 8.10.7.

"**International Common Use Check-in Space**" means the Common Use Check-in Space designated by the Commissioner to be used in common by Passenger Carriers primarily for international passenger check-in, as it may be adjusted from time to time, all as shown in Exhibit B as of the Effective Date.

"**International Common Use City-owned Baggage Make-up Systems**" means Baggage Make-up Systems owned by the City designated by the Commissioner from time to time to be used in common by Passenger Carriers to process outbound baggage primarily on international flights.

"**International Common Use Gate Fees**" means the International Common Use Gate Fees calculated pursuant to Section 8.10.2.

"**International Common Use Gate Space**" means International Gate Space that the City has designated as Common Use Gate Space in accordance with Article 5, as it may be adjusted from time to time, all as shown in Exhibit B as of the Effective Date.

"**International Common Use Holdroom Space**" means the Holdroom Space associated with International Common Use Gate Space.

"**International Gate Space**" means Gate Space with direct passenger access to FIS Facilities that has currently been designated by the City for international flights, as it may be adjusted from time to time, all as shown in Exhibit B as of the Effective Date.

"**Irregular Operation**" means an off-schedule arrival or departure of an aircraft at a particular Gate that needs to operate at that Gate for reasons outside Airline's control.

"**Joint Use Baggage Claim Space**" means the Baggage Claim Space in the Terminal Complex assigned to multiple Passenger Carriers in their Premises Notices as Joint Use Premises.

"**Joint Use Baggage Make-up Space**" means the Baggage Make-up Space in the Terminal Complex assigned to multiple Passenger Carriers in their Premises Notices as Joint Use Premises.

"**Joint Use City-owned Baggage Claim Systems**" means the Baggage Claim Systems owned by the City within Joint Use Baggage Claim Space.

"**Joint Use City-owned Baggage Make-up Systems**" means Baggage Make-up Systems owned by the City within Joint Use Baggage Make-up Space.

"**Joint Use Premises**" means those areas designated as such in the Premises Notice that are within the Terminal Complex, including Joint Use Baggage Claim Space and Joint Use Baggage Make-up Space as more fully described in the Premises Notices of multiple Passenger Carriers, and as to which such Passenger Carriers have a priority of use over all other Passenger Carriers, subject to Article 5.

"**Landing Fee**" means the Landing Fee calculated pursuant to Section 8.2.

15

"**Light Maintenance**" means aircraft servicing and inspections that regularly occur on the terminal apron and unscheduled repairs necessary for continuing flight.

"**Linear Frontage**" means a line measured 100 feet from the face of the terminal building along usable areas where there is sufficient space to park passenger aircraft equivalent in size to a CRJ-100 or CRJ-200 aircraft. In determining usable areas, the City shall consider geometric factors that limit the ability to efficiently park aircraft. Factors that render an area unusable include (a) areas associated with "inside" 90 degree angles; (b) areas that are limited by the requirement to avoid active aircraft pushback operations onto taxiway; (c) areas that are limited by the location of retaining walls; and (d) areas that preclude efficient aircraft parking due to the geometry of the terminal. For illustrative purposes, Exhibit D depicts the Linear Frontage associated with the Terminal Complex as of the Effective Date and provides examples of excluded unusable areas.

"**Long-Term Signatory Airline**" means a Signatory Airline that executed this Agreement or a substantially similar agreement with a Term that expires on December 31, 2033 or otherwise qualifies as a Long-Term Signatory Airline pursuant to Section 2.2.3.

"**L-Stinger Gates**" means the "L-Stinger Gates" as defined in the L-Stinger Lease.

"**L-Stinger Lease**" means the Gate Ground Lease Agreement at Chicago O'Hare International Airport between City of Chicago and American Airlines, Inc. dated May 31, 2016, as it may be amended from time to time.

"**Main Terminal**" means the terminal buildings, associated concourses and facilities, other than Terminal 5, as all such facilities may be modified, improved, or enlarged during the Term. The Main Terminal as of the Effective Date is generally depicted in Exhibit A for illustrative purposes.

"**Majority-in-Interest**" means, for any Fiscal Year:

(i)      for a Capital Improvement Project with Airline Rate-Based Project Costs allocated solely to the Airfield Cost Center, the Aeronautical Real Estate Cost Center or the Fueling System Cost Center, Long-Term Signatory Airlines that together accounted for at least seventy percent (70%) of the total Maximum Gross Landed Weight of all Air Carriers during the immediately preceding Fiscal Year;

(ii)      for a Capital Improvement Project with Airline Rate-Based Project Costs allocated to the Terminal Cost Center, the Parking and Ground Transportation Cost Center or the Commercial Real Estate Cost Center, Long-Term Signatory Airlines that together paid at least seventy percent (70%) of the total Terminal Charges paid by all Air Carriers during the immediately preceding Fiscal Year; or

(iii)      for a Capital Improvement Project with Airline Rate-Based Project Costs allocated to the Airfield Cost Center and the Terminal Cost Center, Long-Term Signatory Airlines that together paid at least seventy percent (70%) of all Airport Fees and Charges paid by all Air Carriers during the immediately preceding Fiscal Year.

For purposes of these calculations, a Long-Term Signatory Airline's activity and payments shall include the activity and payments of each of its Affiliates, but not its Alliance Partners.

"**Maximum Gross Landed Weight**" or "**MGLW**" means the maximum certificated weight, in thousand pound units, at which each aircraft operated by an Air Carrier is authorized by the FAA to land at the Airport, as certified by the aircraft's manufacturer and recited in the Air Carrier's flight manual governing that aircraft type.

"**MGLW**" or "**Maximum Gross Landed Weight**" means the maximum certificated weight, in thousand pound units, at which each aircraft operated by an Air Carrier is authorized by the FAA to land at the Airport, as certified by the aircraft's manufacturer and recited in the Air Carrier's flight manual governing that aircraft type.

"**Monthly Activity Report**" means the accurate summary report prepared by Airline describing Airline's operations (and the operations of Airline's Affiliates, if any) at the Airport during the month preceding the month in which the summary is submitted to the City, signed by an authorized representative of Airline certifying the accuracy of the information set forth therein, and submitted by Airline to the City in accordance with Section 8.19.1.

"**Municipal Code**" means the Municipal Code of the City at the time in effect.

"**New Projects**" means certain Capital Improvement Projects that require Majority-in-Interest review, as further described in Section 10.6.

"**Non-Signatory Airline**" means any Air Carrier using the Airport for scheduled cargo or passenger service that is not a Signatory Airline.

"**Non-Signatory Airline Operating Agreement**" means the agreement that must be executed by a Non-Signatory Airline that is not an Affiliate of a Signatory Airline in order to operate at the Airport, the form of which is attached as Exhibit H.

"**NPDES**" means the National Pollutant Discharge Elimination System.

"**O&M Expenses**" means the costs incurred by the City in operating and maintaining the Airport's facilities.

"**Other Airfield Revenues**" means revenues collected by the City for the aeronautical use of the Airfield other than Landing Fees collected from Air Carriers, including but not limited to aircraft tie-down fees, aircraft parking fees, fuel fees as applicable, minimum Landing Fees collected under Section 8.2.4, ground rent collected for the real property and pipeline easements associated with the Fueling System and general aviation landing fees.

"**Other Regulated Material**" means any Waste, Contaminant, or any other material, not otherwise specifically listed or designated as a Hazardous Substance, that (a) is or contains: petroleum, including crude oil or any fraction thereof, motor fuel, jet fuel, natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel or mixtures of natural gas and such synthetic gas, asbestos, radon, any polychlorinated biphenyl, urea, formaldehyde foam

insulation, explosive or radioactive material, or (b) is a hazard to the environment or to the health or safety of persons.

"**Other Terminal Rental Payments**" means payments of rent or utility reimbursements received by the City from government agencies and other non-airline tenants of the Terminal Complex that are not Aeronautical Service Providers or Terminal Concessions.

"**Outbound Checked Bags**" means outbound bags or other checked items (including bags transferred aircraft-to-aircraft if the bags entered the outbound baggage system) delivered on Baggage Make-up Systems.

"**Parking and Ground Transportation**" means all Airport-related (a) public parking, including off-airport parking; (b) employee parking provided by the City; (c) taxi, transportation network and other ground transportation services; and (d) rental car services and facilities, excluding the CONRAC, at the Airport. The Parking and Ground Transportation areas as of the Effective Date are generally depicted in Exhibit A for illustrative purposes.

"**Parking and Ground Transportation Revenue**" means all revenues collected by the City for the right to provide Parking and Ground Transportation services and concessions; provided, however, that Parking and Ground Transportation Revenues does not include Customer Facility Charges or any revenues pledged to the repayment of Customer Facility Charge revenue bonds or Transportation Infrastructure and Innovation Action of 1998 (TIFIA) loans used to finance the CONRAC and related improvements.

"**Passenger Carrier**" means a Passenger Carrier certificated by the Secretary of the U.S. Department of Transportation under 49 U.S.C. § 41102.

"**Passenger Facility Charge**" or "**PFC**" means the passenger facility charge authorized under 49 U.S.C. § 40117 or any predecessor or successor law, and as approved by the FAA from time to time with respect to the Airport.

"**Passenger Loading Bridge**" or "**PLB**" means a passenger loading bridge and any preconditioned air system(s), ground power supply unit(s) and other related equipment attached to the bridge or a concourse at a Gate.

"**Period of Use**" means, for all aircraft operations included in a Passenger Carrier's then current Initial Schedule Submission provided to the Scheduling Manager in accordance with Section 5.5.2, including any amendments submitted in accordance with Section 5.5.2(g), the periods of time, as specified in the Terminal Space Use Protocols, during which Airline shall have scheduling preference for itself and its Affiliates and Alliance Partners within Airline's Preferential Use Gate Space.

"**Phase I TAP Elements**" means certain Capital Improvement Projects that have been approved by Airline by execution of this Agreement subject to Section 10.2.

"**PLB**" or "**Passenger Loading Bridge**" means a passenger loading bridge and any preconditioned air system(s), ground power supply unit(s) and other related equipment attached to the bridge or a concourse at a Gate.

"**Pre-Approved Allowance**" means amounts listed on Exhibit O that the City may spend or encumber on Capital Improvement Projects each Fiscal Year, as approved by Airline by way of its execution of this Agreement. There shall be separate Pre-Approved Allowances for Capital Improvement Projects for the following categories: Taxiway Pavement Rehabilitation, Apron Pavement Repair, Airfield Roadway Repair and Replacement, Vehicle Replacement, Parking Maintenance and Repair, Roadway Pavement Replacement, Terminal Conveyance Replacement and Restroom Refresh and Modernization. There shall also be a separate category for Infrastructure Reliability, which shall not be a recurring expense each Fiscal Year.

"**Pre-Approved CIP Projects**" means certain Capital Improvement Projects that have been approved by Airline by execution of this Agreement as further described in Section 10.4 and Exhibit N.

"**Preferential Use Baggage Claim Space**" means Baggage Claim Space assigned to a Long-Term Signatory Airline as Preferential Use Premises.

"**Preferential Use Baggage Make-up Space**" means Baggage Make-up Space assigned to a Long-Term Signatory Airline as Preferential Use Premises.

"**Preferential Use Check-in Space**" means Check-in Space assigned to a Long-Term Signatory Airline as Preferential Use Premises.

"**Preferential Use Gate Space**" means Gate Space assigned to a Long-Term Signatory Airline as Preferential Use Premises in accordance with Article 5, as it may be adjusted from time to time, all as shown in Exhibits B and C as of the Effective Date.

"**Preferential Use International Gate Space**" means International Gate Space assigned by the City to a Long-Term Signatory Airline as Preferential Use Premises in accordance with Article 5.

"**Preferential Use Premises**" means those areas designated as such in the Premises Notice that are within the Terminal Complex and Apron Area, including Preferential Use Gate Space, Preferential Use Baggage Claim Space, Preferential Use Baggage Make-up Space and Preferential Use Check-in Space as more fully described in the Premises Notice, and to which Airline has a higher priority of use over all other Air Carriers, subject to Article 5.

"**Premises**" means any: (a) Exclusive Use Premises, (b) Preferential Use Premises, (c) Joint Use Premises, and (d) Common Use Premises assigned to Airline by City under this Agreement; provided, however, that in the case of Common Use Premises, such areas will only constitute "Premises" during the period of time for which Airline has the right to use such areas.

"**Premises Notice**" means the notice described in Section 4.1 and in the form attached as Exhibit C.

"**Previously Approved Projects**" means certain Capital Improvement Projects that have been approved by Air Carriers under Prior Use and Lease Agreements and reconfirmed by execution of this Agreement, as further described in Section 10.1 and Exhibit J.

"**Prior Use and Lease Agreement**" means the Chicago-O'Hare International Airport Amended and Restated Airport Use Agreement and Terminal Facilities Lease with a stated expiration date of May 11, 2018 (the "Main Terminal Prior Use and Lease Agreement") or the International Terminal Use Agreement and Facilities Lease with a stated expiration date of May 11, 2018 (the "Terminal 5 Prior Use and Lease Agreement"), or other substantially similar agreement to use or lease the Terminal Complex or the Airfield.

"**Project Costs**" means capitalized expenditures associated with a Capital Improvement Project including direct construction costs and allocated soft costs, including contingencies.

"**Release**" or "**Released**" means any actual or threatened spilling, leaking, pumping, pouring, emitting, emptying, Discharging, injecting, escaping, leaching, dumping or Disposing of any Hazardous Substance or Other Regulated Material into the environment.

"**Required Debt Service Coverage**" means the amount of debt service coverage required by Section 404 of the Bond Indenture (as it may be amended or supplemented in accordance with Section 7.2).

"**Required Deposits**" means deposits to establish or replenish (a) any funds or accounts required by the Bond Indenture, including without limitation the Maintenance Reserve Fund, that are not otherwise recovered as Capital Costs; and (b) any funds or accounts specified in Article 7, including without limitation the Supplemental O&M Reserve Fund.

"**Response**" or "**Respond**" means action taken in compliance with Environmental Laws to correct, remove, remediate, clean-up, prevent, mitigate, treat, monitor, evaluate, investigate, assess or abate the Release of any Hazardous Substance or Other Regulated Material, or to prevent or abate any public nuisance.

"**Revenues**" means "Revenues" as defined in the Bond Indenture.

"**RON Activities**" means parking an aircraft overnight at a Gate after an operation included in an Initial Schedule Submission provided to the Scheduling Manager in accordance with Section 5.5.2, including any amendments submitted in accordance with Section 5.5.2(g).

"**Runways**" means paved areas at the Airport designated for the landing and taking-off of aircraft, including all associated safety areas.

"**Scheduled Airline**" means a Passenger Carrier performing or seeking to perform scheduled passenger service operations at the Airport.

"**Scheduled Departure**" means a departing Scheduled Operation.

"**Scheduled Operation**" means a Scheduled Airline's operation (arrival or departure) that occurs pursuant to a schedule that is or will be published in the Official Airline Guide (OAG) or any similar publication, Global Distribution System (GDS) or airline website.

"**Scheduled Seasonal Service**" means Seasonal Service reported to the City in its Initial Schedule Submission pursuant to Section 5.5.2(e).

"**Scheduled Seats**" means the total number of Seats available on an arriving or departing Scheduled Operation.

"**Scheduling Manager**" means the third party hired by the City to receive and analyze Initial Schedule Submissions and Gate Space Plans and perform the tasks specified for the Scheduling Manager under Section 5.5.

"**Seasonal Service**" means air service on a route that is provided by a Passenger Carrier for less than twelve consecutive (12) months, as further specified in the Terminal Space Use Protocols.

"**Seat**" means a seat on an aircraft arriving or departing from the Airport other than those seats reserved in the flight deck or aircraft cabin for members of the flight crew.

"**Securities Exchange Act**" means the Securities Exchange Act of 1934.

"**Shared Equipment and Technology**" or "**SET**" means equipment owned and installed by the City for use in passenger processing, including without limitation equipment casework, supporting infrastructure, network wiring, flight information displays ("FIDS"), gate information displays ("GIDS"), the baggage information display system ("BIDS"), boarding gate readers, passenger processing workstations and self-service kiosks (for boarding passes and bag tagging), and other shared use technology (such as a reservation system portal open to all Passenger Carriers at the Airport).

"**Short-Term Signatory Airline**" means a Signatory Airline that is not a Long-Term Signatory Airline.

"**Signatory Airline**" means Airline and each other Air Carrier that has executed an Airline Use and Lease Agreement with the City substantially similar to this Agreement. A Signatory Airline may be either a Long-Term Signatory Airline or a Short-Term Signatory Airline.

"**Space Requesting Airline**" means a Passenger Carrier seeking to commence or expand operations at the Airport without adequate space other than Gate Space for its operations, as further described in Section 5.8.

"**Sublease**" means the event of a sublet, as more fully described in Section 4.2.

"**Sublessee**" means any entity to which Airline subleases, subject to Section 4.2, any of its Preferential Use or Exclusive Use Premises.

"**Support Space**" means airline ticket office, baggage service office and other airline operations space in the Terminal Complex.

"**SWPPP**" means Storm Water Pollution Prevention Plan.

"**T-5**" or "**Terminal 5**" means the terminal buildings, associated concourses and facilities designated as of the Effective Date as Terminal 5 of the Airport, as all such facilities may be

modified, improved or enlarged during the Term. T-5 as of the Effective Date is generally depicted in Exhibit A for illustrative purposes. T-5 may be renamed during the Term.

"**T-5 Extension**" means the project to expand Terminal 5 by adding Gate Space to the east end of the existing terminal.

"**TAP Budget**" means the aggregate amount of total Project Costs for the Phase I TAP Program that has been approved by execution of this Agreement as further specified in Article 10 and Exhibit L.

"**TAP Program**" means the Terminal Area Plan capital improvement program as more fully described in Exhibit K.

"**Taxiways**" means paved areas designated as taxiways and taxilanes at the Airport for the ground movement of aircraft to, from and between the Runways, aircraft parking areas and other portions of the Airport.

"**Term**" means the lease term of this Agreement as further described in Article 2.

"**Terminal 5**" or "**T-5**" means the terminal buildings, associated concourses and facilities designated as of the Effective Date as Terminal 5 of the Airport, as all such facilities may be modified, improved or enlarged during the Term. Terminal 5 as of the Effective Date is generally depicted in Exhibit A for illustrative purposes. Terminal 5 may be renamed during the Term.

"**Terminal Charges**" means the charges calculated pursuant to Sections 8.3 through 8.11.

"**Terminal Complex**" means the Main Terminal and Terminal 5.

"**Terminal Concessions**" means restaurants, bars, newsstands, gift shops, specialty shops, duty free, foreign currency exchanges, indoor and outdoor advertising displays, insurance, public telephones, internet kiosks and WiFi services, sleep centers, banking and ATMs, and other merchandising concessions and consumer services in the Terminal Complex.

"**Terminal Concession Revenue**" means revenue collected by the City from Terminal Concessions.

"**Terminal Facilities Advisory Committee**" or "**TFAC**" means the group that provides advice to the City about the assignment and use of Gate Space and other Terminal Complex facilities as more fully described in Section 5.7.

"**Terminal Rental Rates**" means, for any Fiscal Year, the Terminal Rental Rates established for such Fiscal Year pursuant to Section 8.3.

"**Terminal Space Revenue Requirement**" means for any Fiscal Year, the Terminal Space Revenue Requirement established for such Fiscal Year pursuant to Section 8.3.

"**Terminal Space Use Protocols**" means the City's policies, rules and protocols, as they shall be developed and may be amended from time to time by the Commissioner after consultation with the AAAC, governing priorities, procedures and requirements for the assignment and use of Common Use Space, Preferential Use Space, and Exclusive Use Space in the Terminal Complex and on the Apron Area, including Gate Space, Check-in Space, and Baggage Systems use, assignment, scheduling and accommodation.

"**TFAC**" or "**Terminal Facilities Advisory Committee**" means the group that provides advice to the City about the assignment and use of Gate Space and other Terminal Complex facilities as more fully described in Section 5.7.

"**Total Delivered Seats**" means the sum of Delivered Arriving Seats and Delivered Departing Seats.

"**Total Terminal Revenue Requirement**" means for any Fiscal Year, the Total Terminal Revenue Requirement established for such Fiscal Year pursuant to Section 8.3.

"**Trust Account**" means a Trust Account as defined in Section 16.6.

"**TSA**" means the Transportation Security Administration or other federal agency which assumes the oversight and functions of the Transportation Security Administration, if the Transportation Security Administration is abolished or combined with or merged into any other federal agency.

"**Unrecovered Domestic Common Use Gate Costs**" means the portion (if any) of the Domestic Common Use Gate Revenue Requirement calculated pursuant to Section 8.10.1(a) that is not recovered due to the proviso in Section 8.10.1(c) or the monthly cap on Domestic Common Use Gate Fees provided for in Section 8.10.1(d).

"**VIP Lounge**" means those Exclusive Use Premises (if any) used by Airline to provide premium services to its passengers.

"**Waste**" means those materials defined in the Illinois Environmental Protection Act, 415 ILCS 5/1 *et seq.* as waste and identified subcategories thereof, including but not limited to, construction or demolition debris, garbage, household waste, industrial process waste, landfill waste, landscape waste, municipal waste, pollution control waste, potentially infectious medical waste, refuse, or special waste.

"**Waste Sections**" has the meaning set forth in Section 16.15.

"**Waters**" has the meaning set forth in 415 ILCS 5/3.550, as amended from time to time.

1.2      **Interpretation**

The terms "hereby," "herein," "hereof," "hereunder" and any similar terms used in this Agreement refer to this Agreement.

The term "including" shall be construed to mean "including, without limitation."

All references in this Agreement to Articles, Sections, subsections, clauses, provisions, sentences or Exhibits, unless otherwise expressly stated, are to Articles, Sections, subsections, clauses, provisions, sentences or Exhibits of this Agreement.

Words importing persons shall include firms, associations, partnerships, trusts, corporations, limited liability companies and other legal entities, including public bodies, as well as natural persons.

Any headings preceding the text of the Articles and Sections of this Agreement, and any table of contents or marginal notes appended to copies hereof, shall be solely for convenience of reference and shall not constitute a part of this Agreement, nor shall they affect the meaning, construction or effect of this Agreement.

Words importing the singular shall include the plural and vice versa. Words of the masculine gender shall be deemed to include correlative words of the feminine and neuter genders.

All references to a number of days mean calendar days, unless otherwise expressly indicated.

## 1.3    Incorporation of Exhibits

The following Exhibits attached hereto are hereby made a part of this Agreement:

Exhibit A  Map of the Airport

Exhibit B  Terminal Complex Space Exhibit

Exhibit C  Premises Notice

Exhibit D  Gate Space Assignments

Exhibit E  Future Premises Commitment

Exhibit F  Affiliate Operating Agreement

Exhibit G  Alliance Partner Designation Form

Exhibit H  Non-Signatory Airline Operating Agreement

Exhibit I   Illustrative Rates and Charges Calculations

Exhibit J   Previously Approved Projects

Exhibit K  TAP Program

Exhibit L  TAP Phase I Elements

Exhibit M Additional TAP Elements

Exhibit N  Pre-Approved CIP Projects

Exhibit O  Pre-Approved Allowances

Exhibit P  Compliance with Laws

Exhibit Q  Air Service Incentive Program Budget

Exhibit R  Short-Term Facilities Use Agreement

Any changes to the Exhibits that occur from time to time consistent with the terms of this Agreement shall be reflected in revised Exhibits provided by the City to Airline. Such revised Exhibits shall be deemed to be effective without requiring a formal amendment to this Agreement.

Article 2

**TERM**

2.1    **Effective Date**

Subject to execution and delivery by both Airline and the City prior to or on May 12, 2018, this Agreement shall become effective and binding upon the parties hereto as of May 12, 2018. If, however, the City and Airline execute or deliver this Agreement after May 12, 2018, the Effective Date shall be such date as is mutually agreed to by the City and Airline and reflected on the signature pages of this Agreement.

2.2    **Long-Term Signatory Airlines and Short-Term Signatory Airlines**

2.2.1    Long-Term Signatory Airlines. Any Air Carrier that has executed this Agreement or a substantially similar agreement with a Term that expires on December 31, 2033 shall be deemed a Long-Term Signatory Airline. In addition to the other rights of Signatory Airlines specified in this Agreement, Long-Term Signatory Airlines shall (a) have the right to participate in the Majority-in-Interest approval process under Section 10.8 and (b) be eligible, subject to the provisions of Article 5, to receive assignments of Preferential Use Gate Space, Preferential Use Check-in Space, Preferential Use Baggage Claim Space and Preferential Use Baggage Make-up Space.

2.2.2    Short-Term Signatory Airlines. Any Signatory Airline that is not a Long-Term Signatory Airline shall be deemed to be a Short-Term Signatory Airline. Short-Term Signatory Airlines shall not (a) have the right to participate in the Majority-in-Interest approval process under Section 10.8 or (b) be eligible to receive assignments of Preferential Use Gate Space, Preferential Use Check-in Space, Preferential Use Baggage Claim Space or Preferential Use Baggage Make-up Space.

2.2.3    Transition from Short-Term Signatory Airline to Long-Term Signatory Airline. Any Short-Term Signatory Airline shall have the right to become a Long-Term

Signatory Airline by, at the time it notifies the City of its election to extend the Term under Section 2.4, extending the Term through December 31, 2033; provided, however, that any such election must be made prior to January 1, 2028.

### 2.3    Term

2.3.1    For any Long-Term Signatory Airline, this Agreement shall continue in effect from the Effective Date through December 31, 2033, unless terminated earlier by operation of law or pursuant to the express provisions of this Agreement.

2.3.2    For any Short-Term Signatory Airline, this Agreement shall continue in effect from the Effective Date through December 31, 2023 (if the Effective Date is prior to January 1, 2024), December 31, 2028 (if the Effective Date is between January 1, 2024 and December 31, 2028), or December 31, 2033 (if the Effective Date is between January 1, 2029 and December 31, 2033) unless extended in accordance with Section 2.4 or terminated earlier by operation of law or pursuant to the express provisions of this Agreement.

### 2.4    Extension Periods

2.4.1    Short-Term Signatory Airlines may extend the Term for each of two successive five (5) year periods through December 31, 2028 and then through December 31, 2033 by notifying the City in writing at least twelve (12) months prior to the end of the then-current Term. For example, if a Short-Term Signatory Airline executes this Agreement with an Effective Date of May 12, 2018 and a Term that expires on December 31, 2023, it must notify the City by December 31, 2022 of its request to extend the Term for another five years. The City shall approve the extension, subject to reallocations of such Short-Term Signatory Airline's Premises as reasonably determined by the City are necessary to foster expansion and competition at the Airport.

2.4.2    If the City intends to reallocate a Short-Term Signatory Airline's Premises, the City shall provide written notice to the Short-Term Signatory Airline describing the reallocation at least six (6) months prior to the end of the Term. All out-of-pocket costs associated with such reallocation of Short-Term Signatory Airline Premises, including without limitation the costs of the City, shall be funded by the Short-Term Signatory Airline.

### 2.5    Termination of Prior Use and Lease Agreement

Airline's Prior Use and Lease Agreement shall be deemed terminated and shall be of no further force or effect on and after the Effective Date.

Article 3

## USES, RIGHTS AND PRIVILEGES

### 3.1    Airline Rights, Privileges, Limitations and Prohibitions on Use of the Airport

Subject to the terms of this Agreement and Airport Rules, including without limitation operating procedures and protocols that may be imposed by the Commissioner from time to time for the safe and secure operation of the Airport, Airline shall have the right to conduct its Air Transportation Business at the Airport and to perform all operations and functions in connection with the conduct and operation of such business at the Airport.  Except as provided in this Article 3, nothing in this Agreement shall be construed as authorizing Airline to conduct any business at the Airport separate and apart from the conduct of its Air Transportation Business.  Airline shall not use the Premises, and shall not cause or permit its Associated Parties to use the Premises, for any purpose other than as specified in this Agreement.

### 3.2    Terminal Complex

Airline's use of the Terminal Complex shall be limited to the following activities:

3.2.1    Airline's operation of an Air Transportation Business for the carriage and movement of persons, property, baggage, cargo, express packages and mail by means of aircraft, including but not limited to the following categories of flights: revenue, training, test, inspection, emergency, charter and sightseeing.

3.2.2    Airline's loading and unloading of persons, property, baggage, cargo, express packages and mail at the Terminal Complex by such motor vehicles or other means of conveyance as Airline may require in the operation of its Air Transportation Business; provided that Airline may designate third party transportation providers licensed by the City to operate at the Airport to transport Airline's employees, passengers and their baggage, if such transportation is paid for, directly or indirectly, or arranged, by Airline; provided, further, that Airline shall not operate commercial ground transportation for the general public; and provided, further, that Airline is not responsible for ensuring that hotel shuttle services utilized by Airline employees traveling to or from the Airport are properly licensed by the City. If such transportation is not paid for or arranged by Airline, the City may charge operators of vehicles carrying passengers for hire reasonable fees for the privilege of entering upon the Airport, using the streets, highways and public roads within the Airport, soliciting passengers upon the Airport, and otherwise operating on the Airport.

3.2.3    Airline's hiring, employment and training of personnel in the current or future employ of Airline, and training of Airline's Contractors.

3.2.4    Airline's use, alone or with other Air Carriers, for any and all purposes in connection with or incidental to the operation of its Air Transportation Business, including: the handling of reservations; the handling, ticketing and billing of passengers; services associated with the Airline's frequent flier program; the installation of debit-card dispensing or self-service ticketing kiosks; the operation of break rooms for Airline's employees and its Affiliates', Alliance Partners', and Contractors' employees only and, to the extent permitted by law, the

serving of food and beverages (complimentary or for sale) in such employee break rooms and cafeterias within Airline's Exclusive Use Premises, if any; the operation of one or more VIP Lounges, passenger clubs and lounge rooms, and, to the extent permitted by law, the serving of food and beverages (complimentary or for sale) in such VIP Lounges, passenger clubs and lounge rooms; and the offering of complimentary food and beverage during irregular operations and for limited promotions approved in writing by the Commissioner. Notwithstanding any provision in this Agreement to the contrary, Airline may sell retail items, food and beverages, or services to the public or to Airline's (or its Affiliates', Alliance Partners' or Contractors') employees and passengers in the Terminal Complex only to the extent expressly permitted by this Section 3.2.4. The City will not charge Airline a permit fee, concession fee or any other fee for the sale, or provision, of food and beverages or implementation of debit-card dispensing, self-service ticketing kiosks or similar amenities permitted under this Section 3.2.4.

        3.2.5    Airline's installation and maintenance in Airline's Preferential Use Premises and Exclusive Use Premises, at Airline's sole cost and expense, of identifying signs, posters, displays, and other similar materials which advertise the services offered by Airline (or its Affiliates or Alliance Partners) to the traveling public; provided, however, that only corporate identifiers or "logos" of Airline (or its Affiliates or Alliance Partners) shall be permitted on the Gate Ramp within Airline's Preferential Use Premises; and further provided that identifying signs, posters, displays, and other similar materials which advertise the services offered by Airline (or its Affiliates or Alliance Partners) to the traveling public may be installed by Airline on any PLBs within such Preferential Use Premises if and only if Airline is a Long-Term Signatory Airline. All such signs, posters, displays, and other similar materials must comply with any applicable Airport Rules.

        3.2.6    Airline's installation and operation, at Airline's expense, of static or digital signs identifying the name of Airline, and directional signs guiding passengers as needed; provided that such signs comply with the City's signage standards as set forth in the Airport Rules. In addition to such signage, Airline shall keep current its flight information on the City's multi-user flight information display system ("MUFIDS") and, if applicable, the Common Use Gate information display system ("GIDS"), the common use baggage information display system ("BIDS"), and other common use information display systems at the Airport as further delineated in Section 3.9.

        3.2.7    Airline acknowledges and agrees that all passenger terminal facilities and amenities related thereto shall be located within the Terminal Complex, and that no passenger terminal functions, other than remote passenger and baggage check-in by Passenger Carriers that primarily check in passengers and baggage in the Terminal Complex, shall be conducted elsewhere on the Airport. The term "passenger terminal functions" as used in this Section 3.2.7 includes the reception, ticketing, collection of fees, check-in, loading, unloading, collection, or transfer of all persons and their baggage being transported by air, or by ground transport incidental to such transportation. The term specifically includes, without limitation, persons and their baggage being transported by Air Carriers and, except as hereinafter provided, all other aircraft operators, including operators of corporate and private aircraft. Notwithstanding the foregoing, the City reserves the right to permit fixed-base operators to operate passenger lounges and facilities within facilities leased by such operators on an exclusive

use basis to accommodate passengers and baggage being transported on private Air Carrier charter and corporate aircraft.

### 3.3    Gate Space and Gate Ramps

Subject to Article 4, Article 5 and the Terminal Space Use Protocols, Airline's use of Gate Space and Gate Ramps shall be limited to:

3.3.1    Airline's ticketing, check-in, passenger and baggage handling, boarding, deplaning, and collection of fees from passengers and use of the Passenger Loading Bridge, if any, and associated equipment and Gate Ramp during Airline's use of Gate Space.

3.3.2    Airline's and, subject to Section 3.7, Airline's third-party service provider's, operational staging of equipment for and performance of fueling, deicing, servicing, loading, unloading, and unscheduled repairs and Light Maintenance that can be completed during Airline's use of such Gate Space, provided, however, that:

(a)    Airline may park or store its ground service equipment and operations vehicles on a Gate Ramp at its Preferential Use Gate Space, subject to Sections 5.5 and 5.6 and the Terminal Space Use Protocols;

(b)    Nothing in this Section 3.3.2 shall be implied or construed to grant to Airline the right to store or park equipment on a Gate Ramp in a Common Use Gate Space other than as required for the regular servicing of aircraft parked in such Gate Space during Airline's use of such Common Use Gate Space; and

(c)    In addition to regular Light Maintenance and so long as it does not interfere with another Passenger Carrier's operations, the City may permit Airline to perform emergency Light Maintenance of aircraft on a Gate Ramp within Common Use Gate Space.

3.3.3    Airline's loading and unloading of any persons, property, baggage, cargo, express packages and mail, and carriage and transport of all of the aforesaid, in properly designated areas by motor vehicles or other means of conveyance as Airline may reasonably require in the operation of its Air Transportation Business, all in accordance with Section 3.2.2.

3.3.4    Airline's installation, maintenance and operation of its loading bridge, air conditioning equipment, auxiliary power, potable water cabinets, dumbwaiter, baggage chutes, start-up and miscellaneous support equipment at Preferential Use Premises as reasonably necessary for Airline's operation of an Air Transportation Business and not otherwise provided by the City.

3.3.5    Subject to Section 3.7, Airline's provision, by its employees or others for whom Airline is responsible, to Airline's aircraft on Airline's Gate Ramp (including aircraft of each of Airline's Affiliates on such Gate Ramp) with supplies and services, including food and beverages and ground handling services required by Airline; provided, however, that Airline shall have the right to provide its own supplies and services, or to have such supplies and services provided by its wholly-owned subsidiary or majority-owned subsidiary, or wholly-owned subsidiary of its parent company, or by a third party (including another Air Carrier).

Airline may contract with another Air Carrier permitted by the City to operate at the Airport for the provision of supplies or services for Airline that Airline itself is permitted to provide under this Agreement without Airline entering into one or more additional agreements with the City, and without such Air Carrier being required to pay fees to the City that would otherwise be required. Additionally, subject to the requirements in Section 3.7, Airline may contract with other third parties for the provision of supplies or services for Airline that Airline itself is permitted to provide under this Agreement without Airline or any such third party being required to pay fees to the City (except for a license application fee) that may otherwise be required.

        3.3.6      Subject to Section 3.7, Airline's provision, by its employees or others for whom Airline is responsible (including an Affiliate or Airline's third party service provider), to aircraft of another Passenger Carrier on a Gate Ramp with supplies and services, including food and beverages and ground handling services, required by such other Passenger Carrier; provided, however, that Airline shall cause its third-party service providers to comply with the requirements described in Section 3.7.

3.4    **Airfield**

        3.4.1      Airline's use of the Airfield and related facilities shall be limited to take-off, landing, flying, taxiing, towing, maneuvering, parking, deicing, fueling, ground run-up, loading and unloading of Airline's aircraft by such motor vehicles, ground service equipment, or other equipment or means of conveyance as Airline may require, subject to the terms of this Agreement.

        3.4.2      Airline shall control all of its vehicular traffic on the Airfield and employ such means as may be necessary to direct the movements of its vehicular traffic and take all precautions reasonably necessary to promote the safety of its passengers, customers, employees, business visitors and other persons.

3.5    **Communications Equipment and Antennae**

Airline has no right to install or use any telecommunications equipment or antennae on the roof or exterior of the Terminal Complex, unless (a) the installation and use are directly related to the conduct of Airline's business at the Premises and are in full compliance with Applicable Laws and Airport Rules, and (b) the installation is effected in compliance with the requirements of Section 4.9. Airline will not license, sublease or in any other manner permit any other person to use any telecommunications equipment or antennae installed by Airline at the Terminal Complex; provided, however, that Airline may, without compensation to the City or any City concessionaire, license, sublease or in any other manner permit Airline's Alliance Partners, Affiliates, Contractors and third-party service providers to use any telecommunications equipment or antennae installed by Airline at the Terminal Complex so long as (i) such use is for aeronautical purposes and (ii) neither Airline, its Alliance Partners, Affiliates, Contractors or third-party service providers receive compensation from such use other than on a cost recovery basis; and provided further that Airline's passengers may have access to Airline's Wi-Fi services in Airline's VIP Lounges (if any), without compensation to the City or any City concessionaire. The City may, without compensation to Airline, install or use telecommunications equipment or antennae on the roof or exterior of the Premises and to install and attach cables, wires and

conduits on, over or under the Premises in connection with telecommunications equipment or antennae, or to license or otherwise permit others to do so, provided that such installations and operations do not unreasonably interfere with Airline's communication systems or operations. Airline and the City shall reasonably cooperate with each other to resolve any conflicts between Airline's and the City's communication systems. If Airline incurs any costs to resolve any conflicts between Airline and City systems, the City shall reimburse Airline for its reasonable actual costs.

3.6    **City Equipment**

The City grants to Airline a non-exclusive license to use, subject to City Equipment Charges and the City's control and maintenance thereof in accordance with Section 11.1, City Equipment in the ordinary course of its business at the Airport and otherwise in accordance with this Agreement. Airline agrees to accept and use City Equipment in its "as is" condition, without any representations or warranties of any kind whatsoever, express or implied, from the City as to any matters concerning City Equipment, and Airline further agrees to assume all risk of loss, damage and injury arising out of Airline's use of City Equipment. The City shall provide and keep City Equipment in a safe and operable condition in accordance with the Facilities Maintenance Protocols.

3.7    **Handling Arrangements and Third-Party Service Providers**

3.7.1    For so long as Airline actively conducts an Air Transportation Business at the Airport, Airline may use, subject to the provisions of Section 3.3.2 and to the prior written consent of the Commissioner (which consent shall not be unreasonably withheld), its Premises for the handling of the air transportation operations of any other Air Carrier using the Airport to the same extent as they may be used for the operations of Airline under this Agreement. However, no prior written consent shall be required for Airline's use of its Preferential Use Premises for the handling of Airline's Affiliates or Alliance Partners. The handling operations shall be subject to compliance with all applicable FAA standards and Airport Rules.

3.7.2    Airline may, subject to the provisions of Sections 3.3.5 and 3.3.6, contract with third-party service providers for the handling of Airline's air transportation operations within its Premises and within space where it is accommodated by another Airline; provided, however, that Airline shall require any such third-party service provider to, before beginning to provide the services to Airline, (a) obtain a license or other type of written contract issued by the City authorizing the third party to conduct the activities or provide the services to Airline, (b) provide evidence of insurance as required by the City, (c) obtain all required security authorizations in accordance with Airport Rules; and (d) comply with any other requirements imposed by the City on third-party service providers pursuant to its authority under Municipal Code § 2-20-020. The handling operations shall be subject to compliance with all applicable FAA standards and Airport Rules.

3.7.3    As contemplated in Section 3.7.2 and pursuant to its authority under Municipal Code § 2-20-020, the City may require third-party service providers to obtain a license from the City authorizing the third-party service provider to conduct certain activities or provide certain services at the Airport for an Air Carrier or other Airport user. For the avoidance

of doubt, an Air Carrier (or its wholly-owned subsidiary or majority-owned subsidiary, or a subsidiary of its parent company, which service only the Air Carrier, its Affiliates and its Alliance Partners) shall not be considered a third-party service provider subject to this license requirement.

(a)     The City may contract with a consortium established by Air Carriers to enforce compliance with Airport Rules related to third-party service providers licensed by the City, and if desired, to manage and maintain City-owned ground handling equipment.

(b)     The City may after consultation with the AAAC approve the fueling sources or propulsion systems for the equipment utilized by each licensed third-party service provider, specifically to ensure compliance with City ordinances and Department of Aviation environmental and sustainability standards based on commercially reasonable best practices.

(c)     The City may, at any time, after consulting with the AAAC, restrict the number of licensed third-party service providers at the Airport to no fewer than three (3) for safety and security reasons, and may, in such case, require an Air Carrier that wishes to contract with a third-party service provider to choose from a pool of third-party service providers approved and pre-qualified by the City.

## 3.8     Exclusions and Reservations

3.8.1     The City reserves the right to continue to offer Airline SET, rubbish removal and other services, including, but not limited to, new technology-related services, as provided in Sections 11.1 and 11.4, and to charge Airline for such services on a cost-recovery basis.

3.8.2     Airline shall not, by action or failure to act, knowingly interfere or permit interference with the use, operation, or maintenance of the Airport and other Air Carrier operations, including but not limited to, the effectiveness or accessibility of the drainage, sewerage, water, communications (including Wi-Fi services), fire protection, utility, electrical or other systems installed or located from time to time at the Airport.

3.8.3     Airline shall not do or permit to be done anything, either by act or failure to act, that shall cause the cancellation or violation of the provisions, or any part thereof, of any policy of insurance for the Airport or that shall cause a hazardous condition so as to increase the risks normally attendant upon operations permitted by this Agreement.  If Airline shall do or permit to be done any act not permitted under this Agreement, or fail to do any act required under this Agreement, regardless of whether such act shall constitute a breach of this Agreement, which act or failure, in and of itself, causes an increase in City's insurance premiums, then upon written notice from the City to do so, Airline shall promptly remedy or commence such actions as necessary to remedy or shall be subject to paying the increase in premiums to the extent caused by such act or failure of Airline until the issue is remedied.

3.8.4     The City or its duly authorized representative may enter upon the Premises at any and all reasonable times and upon reasonable notice of not less than forty-eight

(48) hours (except in emergency situations) for the purpose of determining whether or not Airline is complying with the terms and conditions of this Agreement or for any other purpose incidental to the rights of the City; provided that such right of entry does not unreasonably interfere with Airline's operations. In the case of an emergency, the City shall provide as much notice as reasonably possible in light of the circumstances.

      3.8.5      The City reserves the right to place advertising displays in all areas of the Airport that are visible to the public, including in Airline's Premises, except within Airline's Exclusive Use Premises and on any equipment owned by Airline, including PLBs, FIDs, BIDs and MIDs; provided, however, that (a) no City advertising display shall displace Airline's identifying signs, posters, displays, and other similar materials permitted pursuant to Section 3.2.5; (b) any City advertising display shall not unreasonably interfere with the use of Airline's Premises by Airline, its Affiliates or Alliance Partners; and (c) the City shall not allow the placement in Airline's Premises or in public space within thirty (30) feet of Airline's Premises of advertising of competing transportation services or of consumer products or services that are sold in competition with providers with which Airline has an affinity marketing program.. Airline shall not sell any advertising space anywhere within the Airport, including but not limited to within its Premises or on any information display equipment similar to the City's FIDs, BIDs, or MIDs that Airline may own, whether such equipment is located within Airline's Premises or not, except that Airline may sell advertising space on its PLBs or within its Exclusive Use Premises without paying a fee to the City. All advertising must comply with any applicable Airport Rules.

### 3.9    Flight Information Management System

    Airline shall provide or cause a third party to provide to the City information for the City's Flight Information Management System by providing real time data output from Airline's internal flight information display system, computer reservations system, cargo load message transmission, ARINC or SITA transmissions, or other information systems (including commercial information systems) on a per flight basis. Airline's flight information shall be in a format prescribed by the City and consistent with the requirements of the City's FIDS, Baggage Information Display Systems ("BIDS") and Resource Management Systems ("RMS"), which also shall be consistent with IATA standards for providing information about Airline's operations and activities at the Airport.

### 3.10    Safety Management System

    Airline agrees to cooperate with the City's implementation of a safety management system and safety risk management systems at the Airport including participation in committees, risk identification and assessment processes, training, and safety promotion and communication initiatives.

Article 4

**AIRLINE'S PREMISES**

4.1     **Rights to Use Premises**

4.1.1     <u>Premises Notice and Terminal Complex Space Exhibit.</u>  On or before the Effective Date, the City will issue to Airline (a) a Premises Notice, attached hereto as Exhibit C, that will designate which areas of the Airport, if any, the City will make available for Airline's use as: (i) Exclusive Use Premises, (ii) Preferential Use Premises and (iii) Joint Use Premises, and (b) a Terminal Complex Space Exhibit that will designate which areas of the Airport the City will make available for Airline's use as Common Use Premises.  Airline acknowledges and agrees that the Premises Notice and the Terminal Complex Space Exhibit may be revised by the City and reissued to Airline from time to time during the Term in accordance with the terms and conditions of this Agreement and the Terminal Space Use Protocols.  The City and Airline agree that, upon issuance by the City, and acknowledgement and acceptance in writing by the Airline, each revised Premises Notice or Terminal Complex Space Exhibit shall be deemed attached to and incorporated into this Agreement as Exhibits B or C, and shall supersede and replace the last issued Premises Notice or Terminal Complex Space Exhibit deemed attached to and incorporated into this Agreement as Exhibit B or C without the need for a written amendment of the Agreement signed by the City and Airline.

4.1.2     <u>Exclusive Use Premises.</u>  The City grants to Airline, subject to Article 5 of this Agreement and the Terminal Space Use Protocols, the exclusive right to use the Exclusive Use Premises (if any) identified in the Premises Notice.  The City may also grant Airline, other Signatory Airlines, Non-Signatory Airlines and Aeronautical Service Providers the exclusive right to use other areas within the Terminal Complex on a month-to-month basis subject to the terms of a Short-Term Facilities Use Agreement in the form attached as Exhibit R.

4.1.3     <u>Preferential Use Premises.</u>  The City grants to Airline, subject to Article 5 of this Agreement and the Terminal Space Use Protocols, the right to use, on a preferential use basis, the Preferential Use Premises (if any) identified in the Premises Notice.

4.1.4     <u>Joint Use Premises.</u>  The City grants to Airline, subject to Article 5 of this Agreement and the Terminal Space Use Protocols, the right to use jointly with other assigned Passenger Carriers on a preferential use basis, the Joint Use Premises (if any) identified in the Premises Notice.

4.1.5     <u>Common Use Premises.</u>  The City grants to Airline, subject to Article 5 of this Agreement and the Terminal Space Use Protocols, the right to use, on a common use basis, the Common Use Premises identified in the Terminal Complex Space Exhibit; provided, however, that the City shall at all times have exclusive control and management of the Common Use Premises in accordance with the terms of this Agreement.  In the event of a conflict between this Agreement and the Terminal Space Use Protocols, the terms of this Agreement shall control.

4.1.6     <u>Terminal Space Use Protocols.</u>  The City shall promulgate Terminal Space Use Protocols after consultation with the AAAC.  The Commissioner may amend the

Terminal Space Use Protocols from time to time after consultation with the AAAC. In the event of a conflict between this Agreement and the Terminal Space Use Protocols, the terms of this Agreement shall control.

4.1.7    <u>Condition of Premises.</u>  Except as otherwise expressly provided in this Agreement, including the City's maintenance responsibilities under Section 11.1, Airline specifically acknowledges and agrees that the City is permitting Airline's use of the Premises on an "as is with all faults" basis, and that Airline is not relying on any representations or warranties of any kind whatsoever, express or implied, from the City, as to any matters concerning the Premises.

4.1.8    <u>Long-Term Signatory Airlines' Commitment to Future Premises</u>. Each Long-Term Signatory Airline acknowledges and agrees that the location and amount of its Exclusive Use Premises and Preferential Use Premises is expected to be adjusted during the term of the Agreement in connection with the T-5 Extension and TAP Program. A summary of Airline's commitments, if any, and any applicable conditions are shown in Exhibit E ("Future Premises Commitment"). Each Long-Term Signatory Airline acknowledges that the plans for future facilities are conceptual in nature and therefore specific locations and quantities of future Premises have not been determined, but general locations, such as the terminal and concourse, have been identified and are specified in the Future Premises Commitment. Each Long-Term Signatory Airline agrees that, as the T-5 Extension and elements of the TAP Program are completed, it will relocate between and within the Main Terminal and Terminal 5 as directed by the City to the extent that it is consistent with the Future Premises Commitment, and each Long-Term Signatory Airline agrees subject to Article 5 to lease, at a minimum, the amounts of Exclusive Use Space and Preferential Use Space stated in the Future Premises Commitment in the locations specified by the City. The City agrees, subject to Article 5 and to the extent adequate space is constructed as part of the T-5 Extension and the TAP Program, to provide Airline the amounts of Exclusive Use Space and Preferential Use Space identified in the Future Premises Commitment within the terminals and concourses identified in Exhibit E. Before directing a Long-Term Signatory Airline to vacate Preferential Use Gate Space, the City shall make an equivalent amount of Linear Frontage available for Airline's relocation. Each Signatory Airline shall be responsible for any costs of relocating its Premises that are incurred as a result of this Section 4.1.8.

4.2    **Assignment and Subletting**

4.2.1    Airline covenants that it will not (i) assign, transfer, convey, sell, mortgage, pledge or encumber (any of the foregoing events being referred to as an "Assignment") or (ii) sublet (such event being referred to as "Sublease") the Premises or any part thereof, or any rights of Airline hereunder or any interest of Airline in this Agreement, nor will Airline allow the use of its Premises by any Air Carrier, except as otherwise provided in this Agreement (including Section 4.2.2, Section 4.2.8 and Section 6.2.1), without in each instance having first obtained the prior written consent of the City, to the extent required, as set forth in this Section 4.2. In determining whether or not to consent to an Assignment or Sublease, the City will take into account, among other factors, the balanced utilization of the Airport facilities and operational considerations relating to the proposed Assignment or Sublease.

4.2.2    The consent of the Commissioner on behalf of the City shall be required for any Assignment or Sublease, except for Airline's Assignment or Sublease of its Exclusive Use Premises or Preferential Use Premises to its Affiliates or Alliance Partners. Consent by the City to any type of Assignment or Sublease described in this Section 4.2 or elsewhere in this Agreement shall not in any way be construed to relieve Airline from obtaining further authorization from the City for any subsequent Assignment or Sublease of any nature whatsoever.

(a)    All Sublessees under this Section 4.2.2 must execute an Airline Use and Lease Agreement, Affiliate Operating Agreement, Non-Signatory Airline Operating Agreement or other agreement with the City to operate at the Airport in a form acceptable to the City.

(b)    If applicable, whenever Airline seeks consent for a proposed Sublease of its Premises under this Section 4.2.2, the City shall have the option to recapture such portion of the Premises Airline seeks to Sublease if the City has received a request from another Signatory Airline for such space. If the City exercises its option to recapture such portion of the Premises, Airline's leasehold with respect to such portion of the Premises shall terminate, and the City shall issue Airline a revised Premises Notice.

(c)    In the event that Airline subleases any of its Premises pursuant to this Section 4.2, Airline shall charge the Sublessee no more than the sum of the following:

(i)    Sublessee's pro rata share of Airline's Airport Fees and Charges;

(ii)    additional amounts sufficient for Airline to recover its direct costs, if any, of such Sublease, including a reasonable allocation of tenant improvement costs and equipment costs for property and equipment owned by Airline; and

(iii)    an additional administrative fee of up to 15 percent of the combined total of the amounts specified in Sections 4.2.2(c)(i) and (ii).

(d)    Whenever Airline makes an Assignment or Sublease of its Premises to any of Airline's Affiliates or Alliance Partners or, subject to Section 4.2.9, enters into a license agreement with a third-party without seeking the City's consent, Airline shall deliver to the City, within thirty (30) days following the execution by Airline and the assignee, Sublessee or licensee, as applicable, written notice of such assignment, sublease or license, together with copies of all documents, if any, relating to such assignment, sublease or license and, as applicable, information establishing that the proposed assignee or Sublessee is its Affiliate or Alliance Partner. If Airline terminates any such Assignment, Sublease or license earlier than the termination date set forth in the written notice, Airline shall provide City written notice thereof within thirty (30) days of such termination.

4.2.3    Notwithstanding any Sublease with or without City consent, Airline shall remain fully liable for the payment of all of its Airport Fees and Charges and fully responsible for the performance of all of its other obligations hereunder.

4.2.4    Any and all requests by Airline requiring consent under Section 4.2.1 shall be made in writing to the City and shall include copies of the proposed documents of Assignment or Sublease. Said documents of Assignment or Sublease shall fully disclose any and all consideration provided to Airline for said Assignment or Sublease.

4.2.5    If any Assignment or Sublease shall occur, whether or not prohibited by this Section 4.2, and Airline is in default of its payment obligations under this Agreement, the City may provide written notice to Airline of the City's intent to collect assignee's, Sublessee's or other transferee's pro rata share of Airport Fees and Charges from such assignee or Sublessee or other transferee of Airline. If Airline does not cure any such payment default within fifteen (15) business days from the City's notice, the City may collect such amounts for as long as such payment defaults remain outstanding directly from the assignee or Sublessee, and in such event shall apply the amount collected, net of any costs of collection, to the Airline Fees and Charges due from Airline hereunder without such action by the City releasing Airline from this Agreement or any of its obligations hereunder. If any Assignment or Sublease prohibited by this Section 4.2 shall occur without the consent of the City, and the City collects Airport Fees and Charges from any assignee, Sublessee or other transferee of Airline and applies the net amount collected in the manner described in the preceding sentence, such actions by the City shall not be deemed to be a waiver of the covenant contained in this Section 4.2 or constitute acceptance by the City of such Assignment, Sublease or transfer.

4.2.6    Any Sublease or Assignment shall require the Sublessee or the assignee to be bound by all of the terms and provisions of this Agreement. For purposes of interpretation of the immediately preceding sentence, in all provisions of this Agreement applicable to the Sublessee or the assignee, including Section 13.1 of this Agreement requiring that the City Indemnified Parties be indemnified, reference to the "Airline" shall be deemed to refer to the Sublessee or assignee.

4.2.7    Any Sublease or Assignment under this Section 4.2 must expressly name the City as a third-party beneficiary of the Sublessee's or the assignee's obligations under the Sublease or the Assignment and grant a direct right of enforcement thereunder to the City in the event Airline fails, after thirty (30) days' written notice from the City, to successfully enforce the obligations of the Sublessee or assignee, as applicable.

4.2.8    Notwithstanding the foregoing, this Section 4.2 shall not be interpreted to preclude the Assignment of this Agreement, and Airline's rights and obligations hereunder, to a parent, subsidiary, subsidiary of a parent, or merged company if such parent, subsidiary, subsidiary of a parent, or merged company conducts Air Transportation Business at the Airport and assumes all rights and obligations hereunder. Consent to such Assignment shall not be required, but written notice of such assumption shall be provided by the parent, subsidiary, subsidiary of a parent, or merged company within thirty (30) days of the effective day of such Assignment.

4.2.9    Subject to Section 3.7 and the notice provisions set forth in Section 4.2.2(d) as applicable, Airline may enter into a license agreement under which Airline's Affiliate or Alliance Partner, a Contractor or other Air Carrier handled by Airline, is given rights or

privileges to utilize portions of Airline's Exclusive Use Premises or Preferential Use Premises without seeking the City's consent.

### 4.3 City's Right of Entry

The City, by its officers, employees, agents, representatives, contractors, consultants and furnishers of utilities and other services, shall have the right at all times upon reasonable notice to enter Airline's Premises for the purpose of inspecting the same, for emergency repairs to utilities systems, and for any other purpose necessary for or incidental to or connected with the performance of the City's obligations hereunder, or in the exercise of its governmental functions or in the City's capacity as Airport owner. The City shall make commercially reasonable efforts to conduct each inspection, repair or other activity in a manner that does not unreasonably interfere with Airline's operations. The City will provide forty-eight (48) hours advance notice pursuant to Section 18.4 (which additionally may be provided by telephone, accompanied with or separately by written notice or electronic mail to Airline's local operations manager) of any planned inspection or intrusive sampling to Airline, except in emergencies, when advance notice shall not be required. Airline shall have the right to accompany the City when any such inspection or sampling is performed, provided that the City is not required to unreasonably delay its inspection or sampling to enable Airline to be present. The City shall repair any damage to Airline's Premises caused by such inspection or intrusive sampling and the cost of any repairs shall be an O&M Expense of the Terminal Complex. Notwithstanding the above, the City, its contractors and other agents' right of entry to Airline's Premises to perform environmental inspections and sampling shall be governed exclusively by Section 14.2.

### 4.4 Quiet Enjoyment

The City covenants, unless otherwise provided by this Agreement, that, if Airline shall perform all obligations and make all payments as provided herein, Airline shall peaceably have and enjoy the Premises and all the rights, privileges, appurtenances and facilities granted herein, subject to the exercise of governmental police powers by either the City or any other governmental authority having jurisdiction over the Airport.

### 4.5 Surrender and Removal of Personal Property

4.5.1    Airline covenants and agrees to surrender possession of the Premises (or a portion of the Premises, if applicable) upon:

(a)    the expiration or early termination of this Agreement;

(b)    partial termination of Premises under Section 15.2.2;

(c)    the effective date of the City's reallocation of all or any portion of the Premises under Article 5; or

(d)    termination of any holdover period

in substantially the same condition as of the Effective Date (or in the case of improvements or alterations made or fixtures installed subsequent thereto, then as of the date of such

improvements, alternations, or fixtures were made or installed), reasonable wear and tear, damage from casualty and condemnation as described in Article 15 resulting in the termination of this Agreement, and repairs that are the responsibility of the City, all excepted. No act or thing done by the City during the Term shall be deemed acceptance of a surrender of the Premises, and no agreement to accept such surrender shall be valid, unless in writing and signed by the City. Airline's improvements to the Premises, if any, shall be removed unless the City agrees in writing to allow them to be left in place or an agreement between the City and Airline allows them to be left in place; provided, however, that any Baggage Systems within any Premises to be surrendered by Airline shall be left in place, and the City shall be deemed to own any such Baggage Systems upon surrender of such Premises.

4.5.2    In the event of such expiration or earlier termination, Airline shall have thirty (30) days after such expiration or termination during which to remove personal property and trade fixtures; provided, however, the City shall have the right to assert such lien or liens against said property as the City may by law be permitted. Any damage to the Airport, the structure, the Premises or any fixtures located therein resulting from such removal shall be repaired or paid for by Airline.

4.5.3    If, upon such expiration or earlier termination, Airline shall fail to remove any personal property or trade fixtures as required herein, the City may, but without the obligation to do so, (a) remove said personal property and trade fixtures and hold them for the owners thereof, or may place the same in a public warehouse, all at the expense and risk of the Airline; or (b) deem such property abandoned and keep such property or, after written notice to Airline and at Airline's sole risk and expense, remove such property to a public warehouse for deposit, or retain the same in the City's possession and after the expiration of thirty (30) days sell the same, with notice and in accordance with applicable law, the proceeds of which shall be applied first to the expenses of such removal and sale, second to any sum owed by Airline to the City, and any balance remaining shall be credited to offset the Terminal Space Revenue Requirement. If the expenses of such removal, storage, disposal or sale shall exceed the proceeds of sale, Airline shall pay such excess to the City upon demand. Except where, and to the extent, caused by any willful and wanton act of the City, its agents, employees, contractors, officers or directors, Airline shall indemnify, defend, release and hold harmless the City from any and all damage, cost and expenses related to said removal, storage, disposal and sale, which obligations shall survive expiration or earlier termination of this Agreement.

4.6    **Hold Over**

Airline acknowledges it is bound to comply with all provisions of this Agreement until Airline vacates the Premises. If Airline holds over, refuses, or fails to give up the possession of the Premises or the relevant portion thereof, as applicable, on the expiration or earlier termination of this Agreement without express written consent of the City, no periodic tenancy will be deemed to be created, and the City shall have all rights and remedies under Applicable Laws to recover the Premises and damages, including recovery of interest, attorney's fees and costs. In addition to continuing Airport Fees and Charges payable, the City shall assess a penalty in the amount of twenty-five (25%) percent of the Airport Fees and Charges payable for such Premises at the time of expiration or termination of this Agreement for the first sixty (60) days of such hold over and fifty percent (50%) of such Airport Fees and Charges thereafter.

Furthermore, if the City so elects, the City may accept payment of Airport Fees and Charges from Airline and concurrently commence legal proceedings to regain possession of the Premises. The foregoing provisions shall not serve as permission to Airline to hold over, nor serve to extend the Term. The provisions of this Section 4.6 shall not operate as a waiver of any right of the City under this Agreement or Applicable Laws to re-enter and take possession of the Premises. If, during Airline's holdover period, Airline and the City execute a new use and lease agreement applicable to the Premises, then the terms and conditions of such new use and lease agreement shall determine whether such terms and conditions shall apply retroactively to Airline's use and occupancy of the Premises during said holdover period.

### 4.7    No Warranty of Condition or Suitability

EXCEPT AS OTHERWISE PROVIDED HEREIN, THE CITY MAKES NO WARRANTY, EITHER EXPRESS OR IMPLIED, AS TO THE CONDITION OF THE PREMISES OR THAT THE PREMISES SHALL BE SUITABLE FOR AIRLINE'S PURPOSES OR NEEDS. THE CITY SHALL NOT BE RESPONSIBLE FOR ANY LATENT DEFECT AND AIRLINE SHALL NOT, UNDER ANY CIRCUMSTANCES, WITHHOLD ANY RENTALS OR OTHER AMOUNTS PAYABLE TO THE CITY HEREUNDER ON ACCOUNT OF ANY DEFECT IN THE PREMISES. BY ITS ENTRY ONTO THE PREMISES, AIRLINE ACCEPTS THE PREMISES IN ITS "AS IS" CONDITION.

### 4.8    City's Title

The City's title to the Premises and the Airport is and always shall be paramount to the interest of Airline in the Premises. Nothing herein contained empowers Airline to commit or engage in any act which can, shall or may encumber the title of the City.

### 4.9    Work on Airline's Premises

4.9.1      Airline shall have the right to perform work (such as planning, design, fabrication, installation, construction, start-up, and testing) only in Airline's Exclusive Use Premises or Preferential Use Premises (if any). The City may fund such work for Airline, provided that the City and Airline enter into an agreement obligating Airline to fully reimburse the City, including financing costs. In addition, the City may, upon Airline's request, delegate to Airline responsibility for the design, construction, and equipping of Capital Improvement Projects elsewhere at the Airport. All such work shall be subject to the terms and conditions of this Agreement, any reimbursement agreement, ground lease or other agreement between Airline and City relating to such work, and all applicable procedures issued by the Commissioner in his or her reasonable discretion in accordance with the terms hereof, including, without limitation, applicable provisions of the City's most current versions of the Design and Construction Manuals.

4.9.2      As set forth in greater detail in any reimbursement agreement, ground lease or other agreement, to the extent applicable to such work between Airline and the City, Airline may not commence such work on its Premises without (a) the City's prior written approval of the plans and proposals relating thereto, which approval shall not be unreasonably

withheld, conditioned, or delayed, and (b) receipt of all necessary City, County, and other governmental approvals, licenses, and permits in connection therewith.

        4.9.3      To the extent the City agrees to reimburse Airline for the costs of such work, Airline and the City shall enter into and comply with the terms set forth in the City's current form of reimbursement agreement, as such agreement may reasonably be revised by the City from time to time, modified to address the nature of specific projects and agreed to by Airline.

        4.9.4      Airline covenants and agrees that it shall keep the Premises and any interest therein and any improvements thereon free and clear of any and all liens in any way arising out the construction, improvement or use thereof by Airline.

Article 5

**ASSIGNMENT AND USE OF SPACE**

## 5.1    **Types of Gate Space**

        5.1.1      Airline acknowledges that no Gate Space at the Airport shall be assigned for any Passenger Carrier's exclusive use. Gate Space shall be designated by the City as either Common Use Gate Space or Preferential Use Gate Space in accordance with and subject to the terms of this Article 5. All of Airline's Preferential Use Gate Space shall be subject to the applicable accommodation and reallocation provisions of this Article 5, regardless of how or when such Gate Space is initially assigned to Airline.

        5.1.2      The City shall only lease Preferential Use Gate Space to Long-Term Signatory Airlines.

        5.1.3      The City shall retain exclusive control of the use of all Common Use Gate Space and manage Common Use Gate Space in accordance with the Terminal Space Use Protocols.

        5.1.4      Airline's use of all Gate Space shall at all times be in compliance with and subject to the Terminal Space Use Protocols as they may be amended from time to time by the City after consultation with the AAAC. In the event of any conflict between this Agreement and the Terminal Space Use Protocols, this Agreement shall prevail.

        5.1.5      Notwithstanding Section 5.1.1, the L-Stinger Gates shall not be subject to the terms of this Article 5 for so long as the L-Stinger Lease remains in effect, unless expressly stated otherwise in this Agreement. If the L-Stinger Lease terminates during the Term of this Agreement then, subject to American Airlines' right of first refusal pursuant to Section 15.21 of the L-Stinger Lease, each of the L-Stinger Gates shall thereafter be assigned by the City as Preferential Use Gate Space as shown in Exhibit D-1.2 subject to the terms of this Article 5 and shall no longer be considered to be L-Stinger Gates for the purposes of this Article 5. In the event that American Airlines exercises its right of first refusal pursuant to Section 15.21 of the

41

L-Stinger Lease, the L-Stinger Gates shall be assigned to American Airlines as Preferential Use Gate Space that, upon such assignment, shall be subject to the terms of this Article 5.

5.2     **Assignment of Preferential Use Gate Space Rights and Conversion of Common Use Gate Space to Preferential Use Gate Space**

5.2.1     Airline acknowledges and agrees that, in accordance with this Agreement, the City must, among other factors, balance the need for Common Use Gate Space to provide opportunities for new entry, expansion of incumbent Passenger Carrier flight activity and operational flexibility, with the desires of Passenger Carriers for Preferential Use Gate Space. Airline further acknowledges that Airline has no right to demand that the City convert Common Use Gate Space into Preferential Use Gate Space and assign it to Airline.

5.2.2     The allocation and assignments of all Preferential Use Gate Space and Common Use Gate Space at the Airport as of the Effective Date and interim milestones are shown on Exhibit D. The Preferential Use Gate Space assigned to and leased by Airline is identified in the Premises Notice.

5.2.3     The City shall have the right, but not the obligation, at any time to convert Common Use Gate Space into Preferential Use Gate Space for assignment to a Long-Term Signatory Airline if (a) the Long-Term Signatory Airline's Gate Space utilization meets or exceeds the average Preferential Use Gate Space utilization of all Long-Term Signatory Airlines, as measured by either Section 5.7.3(a) or Section 5.7.3(b), and (b) such conversion will not unduly impair the City's ability to accommodate incumbent users of Common Use Gate Space or potential new entrant Passenger Carriers on Common Use Gate Space that have committed to operate at the Airport if adequate Gate Space is made available. In converting and leasing such Gate Space to qualifying Long-Term Signatory Airlines, the City shall give preference to Long-Term Signatory Airlines (if any) that do not at such time hold any Preferential Use Gate Space.

5.2.4     Upon the completion of the T-5 Extension and the relocation from the Main Terminal to Terminal 5 of one or more Long-Term Signatory Airlines ("Relocating Airlines"), the City shall allocate Linear Frontage in accordance with Exhibit D-1.3 with such assignments to remain in place for a period of at least twelve (12) months ("Gate Space Ramp-up Period").

5.3     **Annual Redetermination of the Number and Locations of Common Use Gate Space**

5.3.1     Subject to Section 5.3.2, the first annual redetermination of Gate Space shall take effect on October 1, 2021. By April 1, 2021, and by April 1 of each year thereafter during the Term, and subject to Sections 5.3.2 and 5.3.3, the City shall, after consultation with the TFAC, determine and give written notice to all Signatory Airlines of the amount and locations of both Domestic Gate Space and International Gate Space to be reserved for use as Common Use Gate Space, to be effective on October 1 of the same year. The City's determination of the amount and locations of Common Use Gate Space shall take account of the following factors, among others:

(a)     The recommendations of the TFAC, if any.

        (b)     The daily average number of Scheduled Seats and Scheduled Departures at the Airport divided by total Airport Linear Frontage during the preceding calendar year.

        (c)     The flights of Gate Space Requesting Airlines currently accommodated at the Airport on Preferential Use Gates and any requests to relocate the flights of Gate Space Requesting Airlines pursuant to Sections 5.5.6(f) or 5.5.7.

        (d)     The projected daily average number of Scheduled Seats and Scheduled Departures at the Airport divided by total Airport Linear Frontage during the 12-month period the reallocation will take effect.

        (e)     The daily average number of Scheduled Seats and Scheduled Departures processed in all Domestic Common Use Gate Space and all International Common Use Gate Space, respectively, divided by the Linear Frontage associated with such Gate Space during the preceding calendar year.

        (f)     Projected demand for use of Domestic Common Use Gate Space and International Common Use Gate Space during the 12-month period the reallocation will take effect.

        (g)     The need to accommodate new entrant Passenger Carriers or increases in service by Passenger Carriers already serving the Airport.

        (h)     Planned or completed changes in the Terminal Complex.

        (i)     The need to address operational issues or facility imbalances.

        (j)     Other factors affecting operational efficiency (from the perspective of the City, the Signatory Airlines and Non-Signatory Airlines) or the passenger experience at the Airport.

        5.3.2     Upon the completion of the T-5 Extension and the relocation from the Main Terminal to Terminal 5 of one or more Long-Term Signatory Airlines, the City shall cease the annual redetermination of Gate Space currently in process, if any, and shall not initiate the next annual redetermination of Gate Space until April 1 of the year following the end of the Gate Space Ramp-up Period, as defined in Section 5.2.4.

        5.3.3     In determining the amount and locations of both Domestic Gate Space and International Gate Space to be reserved for use as Common Use Gate Space pursuant to Section 5.3.1, the City shall not increase the then-current amount of Common Use Gate Space by more than 138 feet of Linear Frontage for Domestic Common Use Gate Space and 200 feet of Linear Frontage for International Common Use Gate Space unless one or more of the following events occur:

        (a)     the average number of daily Scheduled Operations on Domestic Common Use Gate Space per 138 feet of Linear Frontage during the preceding calendar year exceeds the average number of daily Scheduled Operations on all Domestic Gate Space per 138

feet of Linear Frontage during the preceding calendar year, in which case the City may reserve an amount of additional Domestic Common Use Gate Space reasonably necessary to equalize the average number of daily Scheduled Operations on Domestic Common Use Gate Space with the average number of daily Scheduled Operations on all Domestic Gate Space;

(b)     the average number of daily Scheduled Operations on Preferential Use Gate Space per 138 feet of Linear Frontage during the prior calendar year is less than five (5), in which case the City may reserve an amount of additional Common Use Gate Space reasonably necessary to bring average number of daily Scheduled Operations on Preferential Use Gate Space to five (5).

5.3.4     All remaining Gate Space available for use after the City makes its annual redeterminations of the amount and locations of Common Use Gate Space shall be offered by the City to Long-Term Signatory Airlines for use as Preferential Use Gate Space to be allocated in accordance with Section 5.4.

5.4     **Annual Redetermination of Preferential Use Gate Space Assignments**

5.4.1     If, but only if, as of February 1, 2021 or no later than February 1 of each year thereafter during the Term (a) the City determines under Section 5.3 that the amount or locations of Common Use Gate Space should be changed, or (b) a Long-Term Signatory Airline requests additional Preferential Use Gate Space that would be available to such Signatory Airline if the City made a redetermination of Gate Space assignments under this Section 5.4, then by April 1, 2021 and April 1 each year thereafter during the Term when one or both of these triggering events occur, the City shall determine the Preferential Use Gate Space to be offered to each Long-Term Signatory Airline for the twelve (12) month period beginning October 1 of that year using the following methodology:

(a)     The City shall calculate each Long-Term Signatory Airline's percentage share of total Scheduled Departures for all Long-Term Signatory Airlines based upon Scheduled Operations for the immediately preceding calendar year. In calculating each Long-Term Signatory Airline's percentage share of Scheduled Departures, the City shall include the Scheduled Departures of both (i) the Long-Term Signatory Airline's Affiliates and Alliance Partners operating in Airline's Preferential Use Gate Space and (ii) any Passenger Carrier voluntarily accommodated in Airline's Preferential Use Gate Space under Section 5.5.4(b), but shall exclude any Scheduled Departures of Airline operating in the Preferential Use Gate Space of any of its Affiliates or Alliance Partners.

(b)     The City shall then calculate each Long-Term Signatory Airline's share of Preferential Use Gate Space ("Preferential Use Linear Frontage Share") by multiplying each Long-Term Signatory Airline's percentage share of total Scheduled Departures derived under Section 5.4.1(a) by the total Linear Frontage associated with the Preferential Use Gate Space made available by the City under Section 5.3.2 (including any newly constructed Preferential Use Gate Space that the City plans to make available during the twelve (12) month period after the reallocation will take effect); provided, however, that the Scheduled Operations on and Linear Frontage associated with the L-Stinger Gates (if any) shall be excluded from the calculation of Preferential Use Linear Frontage Shares.

5.4.2    The City shall then, exercising its reasonable discretion and after consultation with the TFAC, assign the amount and location of Preferential Use Gate Space to each Long-Term Signatory Airline based on the following requirements and factors:

(a)    Only Long-Term Signatory Airlines with Preferential Use Linear Frontage Shares equal to or greater than 138 feet shall receive an assignment of Preferential Use Gate Space ("Qualifying Airlines");

(b)    The City shall minimize, to the extent practicable, the difference between each Qualifying Airline's Preferential Use Linear Frontage Share and the amount of Linear Frontage associated with the Qualifying Airline's actual assignment of Preferential Use Gate Space, subject to Section 5.4.2(c); provided, however, that the City's assignment of Preferential Use Gate Space to any Qualifying Airline shall not deviate by more than 69 feet from its Preferential Use Linear Frontage Share without the approval of the Qualifying Airline;

(c)    The City shall also take into account the following factors with respect to assigning locations of Preferential Use Gate Space:

(i)    Maintaining the current locations of each Qualifying Airline's Preferential Use Gate Space;

(ii)    Assigning contiguous Preferential Use Gate Space;

(iii)    Avoiding the assignment of Preferential Use Gate Space that is distant from a Qualifying Airline's other Preferential Use Gate Space, its Gate-related Premises and VIP Lounges;

(iv)    Preservation of hub connectivity;

(v)    Planned or completed changes in the Terminal Complex;

(vi)    The need to address operational issues or facility imbalances; and

(vii)    Other factors affecting operational efficiency (from the perspective of the City, all Signatory Airlines and Non-Signatory Airlines) or the passenger experience at the Airport.

(d)    The City shall also take into account the following factors with respect to assigning the of amount of Preferential Use Gate Space:

(i)    Compatibility of assignments of Preferential Use Gate Space with the configurations of Gates specified in then-current Gate Space Plans in order to avoid assigning Gate Space that cannot be used;  and

(ii)    The compatibility of each Qualifying Airline's fleet with the Gate Space assigned.

5.4.3 Qualifying Airlines shall accept all Preferential Use Gate Space assigned by the City under Section 5.4.2 unless:

(a) the Linear Frontage associated with the Qualifying Airline's assigned Preferential Use Gate Space exceeds the greater of (i) the Linear Frontage specified in its Future Space Commitment or (ii) the Linear Frontage assigned to the Qualifying Airline in the year preceding the effective date of the reallocation, in which case the Qualifying Airline may reject the amount of excess Preferential Use Gate Space and the City will determine the location of excess Preferential Use Gate Space to remove from that Qualifying Airline's assignment; or

(b) a Qualifying Airline requests a reduction and the City elects to allow it based on requests for additional Preferential Use Gate Space from other Long-Term Signatory Airlines pursuant to Section 5.4.6.

5.4.4 Any Preferential Use Gate Space reduced by the City pursuant to Section 5.4.3 shall be reassigned to Qualifying Airlines that request additional Preferential Use Gate Space in accordance with Section 5.4.6(a). In the event the City does not have sufficient Preferential Use Gate Space available for reassignment to all such requesting Qualifying Airlines, the City will reassign the available Preferential Use Gate Space in order of the highest projected Gate Space utilization, as measured by Section 5.7.3(a), after taking into account the City's initial assignment under Section 5.4.2.

5.4.5 Any remaining, unassigned Preferential Use Gate Space will be offered to Long-Term Signatory Airlines that are not Qualifying Airlines in increments of 138 feet, in the order of the largest Preferential Use Linear Frontage Share. Any remaining Preferential Use Gate Space shall be reassigned to and accepted by Qualifying Airlines whose assignment of Linear Frontage under Section 5.4.2 is less than the greater of (a) the Linear Frontage in its Future Space Commitment or (b) the then-current amount assigned to the Qualifying Airline. In making such reassignments, the City shall seek to minimize, to the extent practicable, the difference between such Qualifying Airlines' assigned Linear Frontage and the greater of their Future Space Commitment or then-currently assigned Linear Frontage. In no event shall the City's assignment to such a Qualifying Airline exceed the greater of its Future Space Commitment or the then-current amount assigned to the Qualifying Airline without the Qualifying Airline's approval. Any remaining Gate Space shall remain vacant until the next reallocation of Gate Space.

5.4.6 In the event that a reallocation is triggered pursuant to Sections 5.3 or 5.4, the City shall give written notice of its initial determinations under Sections 5.3 and 5.4.2 to all Signatory Airlines, including Airline, by April 1 of each year in which the City's determination is to take effect. The City's written notice shall include an exhibit displaying the then-current assignments of all Preferential Use Gate Space and the Preferential Use Gate Space being assigned by the City to all Qualifying Airlines for the year the reallocation will take effect according to Section 5.4.2.

(a) A Qualifying Airline shall provide written notice to the City no later than thirty (30) days after the notice provided in Section 5.4.6 is given if (i) the Qualifying

46

Airline rejects or requests a reduction in its assigned Preferential Use Gate Space, pursuant to Section 5.4.3 or (ii) the Qualifying Airline wishes to receive additional Preferential Use Gate Space that may become available in accordance with Section 5.4.4.

(b)  Any Long-Term Signatory Airline that is not a Qualifying Airline and seeking an assignment of Preferential Use Gate Space in accordance with Section 5.4.5 shall provide written notice to the City no later than thirty (30) days after the notice provided in Section 5.4.6 is given.

5.4.7  The City will issue written notice to all Signatory Airlines of its final determinations pursuant to Sections 5.4.1 through 5.4.6 no later than June 1 of the year in which the City's determinations are to take effect and the reallocations shall take effect on October 1 of that year. The City will consult with the TFAC and all affected Passenger Carriers to coordinate any relocations and minimize service disruptions resulting from the reassignment of Gate Space under Sections 5.4.3 through 5.4.5.

5.4.8  If the amount or locations of Preferential Use Gate Space assigned to Airline are changed during the term of this Agreement, Airline may, upon thirty (30) days written notice to the City, terminate its rights to and obligations for those portions of Airline's Gate-related Premises that are no longer proximate to the Preferential Use Gate Space assigned to Airline or no longer needed due to the reduction in Gate Space. Upon Airline's request, the City shall use reasonable efforts to offer Airline substitute Gate-related Premises more proximate to newly assigned Preferential Gate Space assigned to Airline for the remainder of the Term. The reasonable costs of relocating the Preferential Use Gate Space assigned to any Long-Term Signatory Airline, plus the reasonable costs of the displaced Long-Term Signatory Airline's tenant improvements at any substitute Premises, when constructed with the City's consent under Section 4.9 of this Agreement, shall be paid by the City and included in the Total Terminal Revenue Requirement calculated under Section 8.3.1 of this Agreement.

5.4.9  The City shall revise the Premises Notice and Terminal Complex Space Exhibit issued to Airline to reflect the reallocation of any Gate Space under Sections 5.3 or 5.4 and shall issue said revised Premises Notice and Terminal Complex Space Exhibit to Airline when any such reallocation takes effect.

5.5  **City's Right to Accommodate Other Passenger Carriers in Airline's Preferential Use Gate Space**

5.5.1  <u>Objectives</u>.  Airline and the City acknowledge that an important objective of the City is to offer all Passenger Carriers desiring to serve the Airport access to the Airport and to accommodate the needs of Passenger Carriers desiring to introduce or expand service at the Airport. In furthering the objective of providing access to the Airport, including the accommodation of new entrants, this Agreement seeks to (a) provide Signatory Airlines with predictability and stability in the use of operational space at the Airport, (b) provide reasonable accommodation to Passenger Carriers seeking to serve the Airport, and (c) achieve a reasonable balance in the overall utilization of Gate Space, taking into account existing Signatory Airline operations and maximizing passenger convenience.

5.5.2    Airline's Initial Schedule Submission

(a)    The Scheduling Manager shall receive and analyze Initial Schedule Submissions and Gate Space Plans and perform tasks specified for the Scheduling Manager under Section 5.5. Any decisions made by the Scheduling Manager pursuant to this Article 5 shall be made in consultation with and subject to the approval of the City unless otherwise specified in Terminal Space Use Protocols. The City and the Scheduling Manager shall, to the extent permitted by Illinois law, protect Airline's Initial Schedule Submission as proprietary, confidential and non-public business information. However, nothing herein shall prevent the City from complying with the law or court order. In the event that such information is released to the public the City shall not be liable to Airline for damages of any kind related to the disclosure. All costs incurred by the City related to the Scheduling Manager shall be allocated to the Terminal Complex.

(b)    Airline shall submit its Initial Schedule Submission to the Scheduling Manager in the form and on the dates specified in the Terminal Space Use Protocols. The Terminal Space Use Protocols shall specify the information that must be reported in the Initial Schedule Submission. Airline's Initial Schedule Submission shall also include a Gate Space Plan that identifies the range of likely Gate configurations that Airline may use, as further specified in the Terminal Space Use Protocols. Airline shall have scheduling preference, for itself and its Affiliates and Alliance Partners, within its Preferential Use Gate Space under this Section 5.5 with respect to the Periods of Use of all aircraft operations, including RON Activities, and Scheduled Seasonal Service identified in Airline's Initial Schedule Submission, unless the City determines that Airline has demonstrated a pattern of failing to actually operate flights submitted in its Initial Schedule Submission in a manner that impairs the City's ability to accommodate Gate Space Requesting Airlines within Airline's Preferential Use Gate Space.

(c)    Airline's Initial Schedule Submission shall also include information, as specified in the Terminal Space Use Protocols, for all aircraft operations, including RON Activities, and Scheduled Seasonal Service of Airline and its Affiliates that Airline plans to conduct within Common Use Gate Space.

(d)    Any requests for accommodation from Gate Space Requesting Airlines must also be received by the dates specified in the Terminal Space Use Protocols to be considered for accommodation during the next scheduling period as specified in the Terminal Space Use Protocols.

(e)    Airline shall also include with its Initial Schedule Submission information, as specified in the Terminal Space Use Protocols, with respect to Seasonal Service by Airline and its Affiliates that is planned for the next twelve (12) months ("Scheduled Seasonal Service").

(f)    After the submission of Initial Schedule Submissions, the Scheduling Manager shall, pursuant to Section 5.5.4(b), notify all Long-Term Signatory Airlines of any requests for accommodation by a Gate Space Requesting Airline. After receipt of such notice from the Scheduling Manager, Airline may not revise its Initial Schedule Submission, if such revision would have the effect of making unavailable Preferential Use Gate Space that

would otherwise have been available to accommodate a Gate Space Requesting Airline, until the Scheduling Manager has selected a Gate Space accommodating Airline pursuant to Section 5.5.5.

(g)    At any time after its submission to the Scheduling Manager, Airline may submit a written amendment of Airline's Initial Schedule Submission, including its Gate Space Plan, to the Scheduling Manager detailing and highlighting each such revision; provided, however, that such amendment complies with Airline's continuing obligations to accommodate Gate Space Requesting Airlines under Section 5.5.6 and 5.5.7, if any.  Airline agrees that its Initial Schedule Submission and any written amendments to it shall be accurate, submitted to the Scheduling Manager in a timely manner and made in good faith, and that the Scheduling Manager shall be able to rely and act on Airline's Initial Schedule Submission and all written amendments thereto when accommodating one or more Gate Space Requesting Airlines in Airline's Preferential Use Gate Space or accommodating Irregular Operations in accordance with Section 5.5.8.

5.5.3    Periods of Use.  For purposes of this Article 5, Airline's Periods of Use for operations specified in its then-current Initial Schedule Submission, including RON Activities and Scheduled Seasonal Service, shall be determined as specified in the Terminal Space Use Protocols.

5.5.4    Preconditions for Accommodation in Airline's Preferential Use Gate Space

(a)    The Scheduling Manager shall attempt to accommodate Gate Space Requesting Airlines in Common Use Gate Space before scheduling Gate Space Requesting Airline arrivals and departures in any Preferential Use Gate Space.

(b)    Within thirty (30) days after the date when Long-Term Signatory Airlines are required to submit their Initial Schedule Submission under Section 5.5.2(b), the Scheduling Manager shall notify all Long-Term Signatory Airlines currently assigned Preferential Use Gate Space of any requests by Gate Space Requesting Airlines that the Scheduling Manager has not been able to accommodate in Common Use Gate Space.  Such notice shall include the requested times of arrival and associated Periods of Use, aircraft size and International Gate requirements, if any, but shall not include any information regarding destinations served.  At any time during the accommodation process, any Long-Term Signatory Airline may voluntarily seek to accommodate the Gate Space Requesting Airline.  However, the Scheduling Manager shall not be obligated to wait for such voluntary accommodation to be offered before seeking to accommodate a Gate Space Requesting Airline pursuant to this Section 5.5, and a Gate Space Requesting Airline shall not be obligated to accept a Long-Term Signatory Airline's voluntary offer of accommodation.

5.5.5    Accommodation Procedures.    As part of the Initial Schedule Submission process under the Terminal Space Use Protocols, the Scheduling Manager shall have the right, upon reasonable notice to and after consultation with Airline in accordance with the process established in the Terminal Space Use Protocols, to schedule in Airline's Preferential

Use Gate Space arrivals and departures of a Gate Space Requesting Airline at all periods of time for the gauge of aircraft that do not conflict with Airline's Periods of Use as follows:

(a)     The Scheduling Manager shall first review the Initial Schedule Submissions of all Long-Term Signatory Airlines and determine which, if any, Long-Term Signatory Airlines could accommodate the Gate Space Requesting Airline in its Preferential Use Gate Space based on the requested times of arrival and associated Periods of Use, aircraft size and International Gate requirements (if any). In reviewing the Initial Schedule Submissions of Long-Term Signatory Airlines leasing at least 1,380 feet of Linear Frontage, the Scheduling Manager shall include buffer operations of up to ten percent (10%) of each such Long-Term Signatory Airline's aircraft operations in its then-current Initial Schedule Submission at any given time during the day, which shall be excluded from consideration for accommodation.

(b)     If, based on current Initial Schedule Submissions, more than one Long-Term Signatory Airline could accommodate the Gate Space Requesting Airline's flight within their Preferential Use Gate Space, the Scheduling Manager shall select the Long-Term Signatory Airline with the lowest average Gate utilization, as determined in accordance with Section 5.7.3(a) and as most recently reported by TFAC, to accommodate the Gate Space Requesting Airline as a Gate Space Accommodating Airline; provided, however, that if any Long-Term Signatory Airlines could accommodate the Gate Space Requesting Airline in the same terminal where the Gate Space Requesting Airline already conducts operations, the Scheduling Manager shall select such Long-Term Signatory Airline with the lowest average Gate utilization. In the event that no Long-Term Signatory Airline can accommodate a Gate Space Requesting Airline for a full year without disrupting Scheduled Seasonal Service, the Scheduling Manager may select the Long-Term Signatory Airline with the lowest average Gate utilization, as determined in accordance with Section 5.7.3(a) and as most recently reported by TFAC, as the Gate Space Accommodating Airline. Such an accommodation, however, shall be subject to the Gate Space Accommodating Airline's right to use its Preferential Use Gate Space for its Scheduled Seasonal Service ("Seasonal Use Right"). The Scheduling Manager shall commence a scheduling conference with Gate Space Requesting Airline and the Gate Space Accommodating Airline to confirm the actual location of the accommodation based on the Gate Space Accommodating Airline's Initial Schedule Submission and Gate Space Plan and subject to Section 5.5.5(c).

(c)     A Gate Space Accommodating Airline may select its Preferential Use Gate Space for accommodation; provided, however, that the selected Preferential Use Gate Space shall be able to accommodate the size of the Gate Space Requesting Airline's aircraft and, if necessary, shall be Preferential Use International Gate Space; and provided, further, that the Scheduling Manager shall have the right to select available Preferential Use Gate Space other than that selected by the Gate Space Accommodating Airline if the Scheduling Manager reasonably determines, after consultation with the Gate Space Accommodating Airline, that (i) a different selection is warranted due to the proximity to the operations space and other aircraft operations, if any, of the Gate Space Requesting Airline; and the proximity to Common Use Gate Space, or the Preferential Use Gate Space of a Long-Term Signatory Airline other than the Gate Space Accommodating Airline, and (ii) such alternate selection does not unduly disrupt the operations, including Scheduled Seasonal Service, of the Gate Space Accommodating Airline or its Affiliates or Alliance Partners.

(d)     In accommodating the City's right to schedule such operations, the Gate Space Accommodating Airline shall allow and provide for the Gate Space Requesting Airline's use of its podiums at the Preferential Use Gate (excluding proprietary systems) throughout the applicable Period of Use for the Gate Space Requesting Airline's operation or alternatively permit use of the City's podiums and equipment `(including without limitation Common Use Passenger Processing Systems, if any), as may be required for the Gate Space Requesting Airline's efficient use of the Preferential Use Gate Space, subject to Section 5.5.9. The Gate Space Accommodating Airline shall also allow the Gate Space Requesting Airline and its contractors, including its third party service providers, to use the Gate Ramp associated with Airline's Preferential Use Gate Space for its aircraft and ground service equipment to the full extent permitted by Article 3 throughout the applicable Period of Use for the Gate Space Requesting Airline's operation.

5.5.6     Duration of Airline's Accommodation Obligation.     Airline shall accommodate a Gate Space Requesting Airline assigned to Airline's Preferential Use Gate Space until one of the following conditions arises:

(a)     Common Use Gate Space becomes available that is sufficient to accommodate the Gate Space Requesting Airline's flight(s);

(b)     The quarterly Gate Space utilization reports issued by the TFAC demonstrate that another Long-Term Signatory Airline with equal or lower Gate Space utilization, as determined in accordance with Section 5.7.3(a), than Airline has Preferential Use Gate Space which could accommodate the Gate Space Requesting Airline's flight(s) without conflicting with that other Long-Term Signatory Airline's Initial Schedule Submission;

(c)     Airline's accommodation is subject to a Seasonal Use Right pursuant to Section 5.5.2(e), in which case Airline may, upon providing at least sixty (60) days' prior written notice to the Scheduling Manager and the Gate Space Requesting Airline, utilize the Gate Space for the duration of its Seasonal Use Right;

(d)     The Gate Space Requesting Airline discontinues the flight(s) for which it sought accommodation;

(e)     The Gate Space Requesting Airline adjusts the schedule for its flight(s) in a manner that conflicts with Periods of Use in Airline's then-current Initial Schedule Submission; or

(f)     At the time the Airline submits an Initial Schedule Submission, it notifies the Scheduling Manager of a new flight of Airline that could be scheduled within Airline's Preferential Use Gate Space, but only if the Gate Space Requesting Airline's flight can be relocated to another Long-Term Signatory Airline's Preferential Use Gate Space that is available and sufficient to accommodate the Requesting Airline's flight.  In that event, the Scheduling Manager shall notify the Gate Requesting Airline and the other Long-Term Signatory Airline that the Gate Space Requesting Airline's flight will relocated.  If more than one Long-Term Signatory Airline can accommodate the Gate Space Requesting Airline, the Scheduling Manager shall select the Long-Term Signatory Airline with the lowest average Gate utilization,

51

as determined in accordance with Section 5.7.3(a) and as most recently reported by TFAC, to accommodate the Gate Space Requesting Airline. The Long-Term Signatory Airline identified by the Scheduling Manager may select its Preferential Use Gate Space for accommodation as provided in Section 5.5.5(c). Airline shall be responsible for all costs related to the relocation Airline, the Gate Space Requesting Airline and the other Long-Term Signatory Airline, including the costs of relocating Gate-related Premises.

     5.5.7    <u>Changes to the Gate Selected for Accommodation</u>

     (a)    The City and Airline acknowledge and agree that there must be a balance between the Gate Space Requesting Airline's need for stability in its operations and Airline's need to efficiently manage and use its Preferential Use Gate Space and expand its service to the Airport.

     (b)    No more than quarterly, Airline may propose to the Scheduling Manager in writing to relocate an accommodated Gate Space Requesting Airline to another location within its Preferential Use Gate Space, provided that the Gate Space is located in the same terminal and can accommodate the size of the Gate Space Requesting Airline's aircraft.

     (c)    Within thirty (30) days of receiving a written relocation request meeting the conditions of Section 5.5.7(b) from Airline, the Scheduling Manager shall consult with the Gate Space Requesting Airline and shall approve the request unless it unreasonably impedes the operations of the Gate Space Requesting Airline. The Scheduling Manager shall respond to Airline within forty-five (45) days after the Scheduling Manager receives a written relocation request from Airline, or the request shall be deemed approved. If the Scheduling Manager approves the request, the relocation shall take effect no sooner than sixty (60) days after the Scheduling Manager notifies Airline and the Gate Space Requesting Airline of its decision, unless Airline and the Gate Space Requesting Airline agree on an earlier relocation. Airline shall be responsible for all costs related to the relocation of Airline and the Gate Space Requesting Airline, including the costs of relocating Gate-related Premises.

     5.5.8    <u>Daily Gate Assignments</u>

     (a)    <u>Irregular Operations</u>. If an Irregular Operation by Airline, its Affiliate or Alliance Partner interferes with a Gate Space Requesting Airline's use of Airline's Preferential Use Gate Space, Airline shall retain priority in that particular instance, but shall consult with and make commercially reasonable efforts to accommodate the Gate Space Requesting Airline on other Preferential Use Gate Space leased by Airline within the same concourse. Airline and the Gate Space Requesting Airline shall each be responsible for notifying CDA of any such interfering Irregular Operation and request assistance if needed.

     (b)    <u>Period of Use Adjustments During Irregular Operations</u>. During overlapping periods of Irregular Operations by Airline, its Affiliates or Alliance Partners and the Period of Use of a Gate Space Requesting Airline, the Period of Use for arrivals of aircraft shall terminate upon the later of the time period listed in Section 5.5.3 or the completion of the deplaning process, including any required clearance by government authorities for international arriving aircraft. For departures of aircraft, the Period of Use shall be extended if the originating

aircraft is being boarded and actively prepared for departure. In such instances, the extension shall extend only to the completion of the active boarding process.

(c) City's Right to Temporarily Schedule on Preferential Use Gate Space Not Actually Used by Airline. The Scheduling Manager shall have the right on a daily basis, upon reasonable consultation with Airline, if practicable, to schedule Irregular Operations that conflict with Airline's Periods of Use if Airline, its Affiliates or its Alliance Partners are not actually utilizing its Preferential Use Gate Space during the Period of Use for either an operation in Airline's then-current Initial Schedule Submission or for Airline's own Irregular Operation, but only if (a) no Common Use Gate Space within the same Terminal as that Preferential Use Gate Space can accommodate the aircraft size and any FIS requirements of the Irregular Operation and (b) such use by the City does not unduly disrupt Airline's operations.

5.5.9   Charges for Use of Gate Space by Gate Space Requesting Airline.

The City shall charge any Gate Space Requesting Airline that is accommodated in any of Airline's Preferential Use Gate Space the same charges for use of the Gate Space and Airline-owned PLB and equipment, if any, that the Gate Space Requesting Airline would have been required to pay the City for use of Common Use Gate Space and City-owned PLB and City Equipment. The City shall credit such charges against Airline's Terminal Charges. Airline shall not demand any additional payments from the Gate Space Requesting Airline on account of its use of such Gate Space, PLB or equipment of similar functionality to the City-owned Equipment provided within Common Use Gate Space.

5.5.10   Charges to Gate Space Requesting Airline for Failure to Vacate Gate.

The City may charge any Gate Space Requesting Airline that exceeds its allowable Period of Use in accordance with the Terminal Space Use Protocols. The City shall credit or remit such charges to Airline upon receipt.

5.5.11   Gate Space Requesting Airline's Insurance and Indemnification Obligations.

As a condition precedent to the accommodation of a Gate Space Requesting Airline in any of Airline's Preferential Use Gate Space, the Gate Space Requesting Airline shall have executed an agreement substantially in the form of this Agreement, an Affiliate Operating Agreement, or a Non-Signatory Airline Operating Agreement, as applicable, through which the Gate Space Requesting Airline is bound by insurance and indemnification obligations that are substantially similar to the obligations set forth in this Agreement. These insurance and indemnification obligations shall inure to the benefit of Airline as a third-party beneficiary for any period of accommodation, and Airline shall not be required to accommodate a Gate Space Requesting Airline in its Preferential Use Gate Space if the Gate Space Requesting Airline's insurance and indemnification obligations are not satisfied.

5.5.12   Treatment of Gate Space Requesting Airline's Activity.

The Scheduled Operations of a Gate Space Requesting Airline that is voluntarily accommodated under Section 5.5.4(b) shall be counted as a Scheduled Operation for both the

Gate Space Accommodating Airline and the Gate Space Requesting Airline for the purpose of reallocations of Preferential Use Gate Space and any calculation of average Gate Space utilization under this Article 5. The Scheduled Operations of a Gate Space Requesting Airline that is not voluntarily accommodated under Section 5.5.4(b) shall be counted as a Scheduled Operation of only the Gate Space Requesting Airline for the purpose of reallocations of Preferential Use Gate Space and any calculation of average Gate Space utilization under this Article 5.

5.6    **Gate Accommodation and Reassignment During TAP Program Construction**

The City and Signatory Airlines acknowledge the importance of reasonable maintenance of operations during the phasing for the TAP Program. The City and the Signatory Airlines recognize, however, that operational challenges are likely to occur during construction of the TAP Program, and Airline acknowledges the following gate management rights of the City are necessary during TAP Program construction:

5.6.1    Reassignment. In order to facilitate the continued operations of all Passenger Carriers at the Airport and to serve the traveling public, it will be necessary from time to time for the City, in its reasonable discretion, to reassign space assigned to Signatory Airlines, including Gate Space, on an interim, transitional basis during the construction of the TAP Program. The City shall consult with TFAC before reassigning space under this Section 5.6.1 and the costs of any reassignments under this Section 5.6.1 shall be allocated to the Terminal Cost Center. In reassigning any Long-Term Signatory Airline's Preferential Use Gate Space, the City shall maintain, at a minimum, the amount of Linear Frontage assigned to each Long-Term Signatory Airline.

5.6.2    Accommodation. In order to accommodate the needs of all Passenger Carriers for reasonable access to required Terminal Complex facilities, it is anticipated that the City may from time-to-time require Long-Term Signatory Airlines to accommodate other Passenger Carriers, including other Signatory Airlines, in Airline's Preferential Use Gate Space, in accordance with and subject to special construction accommodation protocols adopted by the City after consultation with the TFAC.

5.7    **Terminal Facilities Advisory Committee**

5.7.1    The City shall establish the TFAC to provide advice to the City about the assignment and use of Gate Space and other Terminal Complex facilities throughout the Term, but the TFAC shall not have any decision-making authority.

5.7.2    The airline members of the TFAC shall be one representative selected by each Long-Term Signatory Airline, one representative selected by the Short-Term Signatory Airlines offering domestic passenger service at the Airport, and one representative selected by the Short-Term Signatory Airlines offering only international service at the Airport. The City shall select its own Department of Aviation representatives.

5.7.3    The TFAC shall monitor relevant data compiled by the City showing the utilization of Gate Space and other Terminal Complex facilities by Air Carriers including:

(a)     Airline-by-airline Gate Space utilization (measured on a rolling annual basis by Scheduled Departures per foot of Linear Frontage over the preceding twelve (12) months);

(b)     Airline-by-airline Gate Space utilization (measured on a rolling annual basis by arriving and departing Scheduled Seats per foot of Linear Frontage over the preceding twelve (12) months); and

(c)     Utilization (measured on a rolling annual basis) of Common Use Check-in Space or Baggage Systems in Common Use Baggage Claim Space or Common Use Baggage Make-up Space.

5.7.4     The TFAC shall make utilization data available in quarterly reports to all Passenger Carriers offering or proposing to offer scheduled service at ORD.

5.7.5     The TFAC shall provide advice on operational impacts during construction and help to resolve Terminal Complex facility conflicts arising during the course of construction of the T-5 Extension and TAP Program.

5.7.6     The TFAC shall monitor activity levels that trigger phasing of Additional TAP Program Elements.

5.7.7     The TFAC shall make timely recommendations to the City on the annual redeterminations of Common Use Gate Space and on the locations of Common Use Gate Space and Preferential Use Gate Space under Sections 5.3 and 5.4, during the construction of and after the completion of new passenger terminal facilities.  In making these recommendations, the TFAC shall, among other factors, consider operational efficiency, including adjacencies and the avoidance of split operations (from the perspectives of the City, the Signatory Airlines and any Non-Signatory Airlines), and the customer service and cost implications of its recommendations. The TFAC's recommendations about the amount of Common Use Gate Space to be reserved by the City shall take into account, among other factors, the expected average number of Scheduled Departures and Scheduled Seats to be accommodated within all Gate Space at the Airport during the year the reallocation will take effect.  The final amount and locations of all Common Use Gate Space and Preferential Use Gate Space, however, shall be determined in the City's discretion, after taking account of the recommendations, if any, of the TFAC.

5.7.8     The TFAC shall monitor requests for accommodation made pursuant to Sections 5.5 and 5.6.

5.8     **Accommodation in Space Other than Gate Space**

5.8.1     <u>Priorities for Accommodation in Space Other than Gate Space</u>

(a)     If the City receives a request from a Space Requesting Airline for access to space in the Terminal Complex (other than Gate Space, which are subject to the provisions of Sections 5.1 through 5.6 in this Agreement), the City shall, whenever possible, accommodate such a request by providing access to existing common use or vacant space under the City's control or to space licensed by the City on a month-to-month basis.

(b)     The City shall notify all Signatory Airlines in writing when the City has determined that a Space Requesting Airline cannot be accommodated in common use or vacant space under the City's control or in space licensed by the City on a month-to-month basis, and the Signatory Airlines shall have thirty (30) days from the receipt of such notice by the Signatory Airlines to voluntarily agree to accommodate the Space Requesting Airline. Any such agreements to accommodate a Space Requesting Airline must be in writing and are subject to the City's approval.

(c)     If a Space Requesting Airline is unable to meet its reasonable requirements, as determined by the City, by using common use space, vacant space or month-to-month space made available by the City, or by using space voluntarily made available by Signatory Airlines, the City shall have the right, upon thirty (30) days' written notice to all Short-Term Signatory Airlines, or, if no space is reasonably available from a Short-Term Signatory Airline, then upon thirty (30) days' written notice to all Long-Term Signatory Airlines, to require Airline to accommodate the Space Requesting Airline in space designated by the Airline, subject to review and approval by the City, by allowing the Space Requesting Airline to use Airline's Preferential Use Premises or Joint Use Premises, as applicable, subject to Section 5.8.2; provided, however, that if the Space Requesting Airline is a Signatory Airline, the Space Requesting Airline must show, to the City's satisfaction, that it cannot reasonably accommodate its own expanded service within the Terminal Complex space already subject to its exclusive use or preferential use.

(d)     If more than one Short-Term Signatory Airline or, if no Short-Term Signatory Airline has space reasonably available, more than one Long-Term Signatory Airline have space reasonably available for accommodation, the City shall consult with the TFAC prior to selecting the accommodating Signatory Airline. In making its determination, the City shall use any utilization metrics developed by the TFAC or in the Terminal Space Use Protocols to evaluate relative utilization of Preferential Use Premises subject to this Section 5.8.

(e)     If the City is unable to meet the reasonable requirements of the Space Requesting Airline, as determined by the City, after requiring the Signatory Airlines, including Airline, to accommodate the Space Requesting Airline in their Preferential Use Premises or Joint Use Premises, as applicable, the City may consider whether the reasonable requirements of the Space Requesting Airline could be met in a reasonable, cost-effective way by constructing temporary or permanent new facilities, subject to Article 10.

5.8.2    <u>Accommodation in Preferential Use Premises or Joint Use Premises Other than Gate Space.</u>  The City may not require Airline to accommodate a Space Requesting Airline in Airline's Preferential Use Premises or Joint Use Premises if such accommodation would require Airline, its Affiliates or Alliance Partners to reschedule one or more aircraft operations included in its current Initial Schedule Submission during Airline's Periods of Use. Airline shall otherwise, consistent with its rights to preferential use, accommodate such Space Requesting Airline as requested by the City by providing access to and use of reasonable amounts of its Preferential Use Premises and Joint Use Premises, as applicable; provided, however, that as a condition of accommodation in any of Airline's Preferential Use Premises or Joint Use Premises, the Space Requesting Airline shall have executed an  Airline Use and Lease Agreement, Affiliate Operating Agreement, or Non-Signatory Airline Operating Agreement, as

applicable, through which the Space Requesting Airline is bound by insurance and indemnification obligations that are substantially similar to the obligations set forth in this Agreement. These insurance and indemnification obligations shall inure to the benefit of Airline as a third-party beneficiary for any period of accommodation, and Airline shall not be required to accommodate a Space Requesting Airline in its Preferential Use Premises or Joint Use Premises if the Space Requesting Airline's insurance and indemnification obligations are not satisfied.

5.8.3    <u>Charges for Use of Facilities Other than Gate Space by Space Requesting Airlines.</u>  City shall charge the Space Requesting Airline that is accommodated in any of Airline's Preferential Use Premises or Joint Use Premises the same charges the Space Requesting Airline would have been required to pay the City for use of such a facility or equipment on a common use basis.  The City shall credit such charges against Airline's Terminal Charges.  Airline shall not demand any additional payments from the Space Requesting Airline on account of its use of such space; provided, however, that Airline may charge the Space Requesting Airline for Airline-owned equipment or services that would not be typically available in Common Use Gate Space.

5.8.4    <u>Consolidation of Operations</u>

(a)    If the City is unable otherwise to meet the reasonable requirements of a Space Requesting Airline in accordance with the priorities established in Section 5.8.1, and the City, after consulting with TFAC, determines that Airline is under-utilizing its Preferential Use Premises other than Gate Space or its Joint Use Space, as applicable, the City may, upon not less than one hundred twenty (120) days' written notice to Airline, require Airline to vacate its under-utilized Preferential Use Premises or Joint Use Premises, and consolidate its operations in its remaining Preferential Use Premises or Joint Use Premises, as applicable. The City's determination of Airline's utilization of Preferential Use Premises other than Gate Space or Joint Use Space shall be made in the City's reasonable discretion, after consultation with TFAC and Airline, and may take into account, among other factors, the operational efficiency (from the perspectives of the City, the Signatory Airlines, and any Non-Signatory Airlines) of the Airport, the customer service implications of its determination, the operating and customer service models of the impacted Passenger Carriers and the City's ability to enhance fair and open competition among Air Carriers operating at or desiring to operate at the Airport.

(b)    Airline may request that the City reconsider its determination of underutilization within fifteen (15) calendar days of receipt of the City's notice to consolidate and, if it does so, Airline shall provide reasonable documentation of its need for the Preferential Use Premises or Joint Use Premises, as applicable, that are the subject of the notice.  If the City, after reconsidering its determination, elects to proceed with the consolidation, the City shall give Airline not less than one hundred and five (105) calendar days' notice to vacate such space. The City may either assign the vacated premises to the Space Requesting Airline on a Preferential or Joint Use basis, if the Space Requesting Airline is or becomes a Long-Term Signatory Airline, or deem the vacated premises to be available for common use and assignment to the Space Requesting Airline consistent with the Terminal Space Use Protocols.

(c)    The City shall pay, as an O&M Expense, to Airline its reasonable costs of relocating Airline's furniture, equipment and signage in connection with the

consolidation of Airline's operations, if required by the City under this Section 5.8.4, plus the reasonable costs of Airline's unamortized tenant improvements originally constructed with the City's consent that cannot be relocated.

(d)    The City shall revise the Premises Notice issued to Airline to reflect any consolidation of Airline's operations required by the City under this Section 5.8.4, and shall issue said revised Premises Notice to Airline when any such consolidation takes effect.

### 5.9    City's Use of Airline-Owned PLBs

If any Gate Space assigned to Airline is (a) reassigned by the City pursuant to Section 5.4 and (b) equipped with PLBs owned or controlled by Airline, Airline shall, at the City's request, permit the City to retain and use any such PLBs at such Gate Space for up to one (1) year from the effective date of such reassignment; provided, however, that during any such period the City shall (a) pay Airline the City Equipment Charge for PLBs and associated equipment, and (b) reimburse Airline for Airline's costs to maintain the Airline-owned PLB.  At the conclusion of any such period, the City shall be obligated to supply its own PLBs to service any such Gate Space and Airline shall be required at its own expense to remove its PLBs, unless the parties can reach agreement on the purchase of such PLB by the City.  In addition, the City will require that the Air Carrier assigned the use of the PLB first be trained on the use of such PLB before they are able to use the PLB.

Article 6

## AFFILIATES AND ALLIANCE PARTNERS

### 6.1    Airline's Designation of Affiliates

Subject to the provisions of this Article 6, Airline may designate one or more Affiliates to operate at the Airport.  In the event Airline designates an Affiliate, the following provisions shall apply to Airline and its Affiliates:

6.1.1    Airline's designation of an Affiliate shall not be effective until Airline has first (a) notified the Commissioner in writing, using the form attached to the Affiliate Operating Agreement (Exhibit F, Attachment 1), that Airline intends to designate an Air Carrier as an Affiliate to the extent that the Air Carrier is conducting activity on behalf of Airline at the Airport; (b) ensured that the Affiliate has entered into an Affiliate Operating Agreement with the City in substantially the same form as that attached as Exhibit F; and (c) confirmed for the Commissioner in writing that either: (i) Airline will pay to the City all of the Affiliate's Airport Fees and Charges for activity conducted as an Affiliate of Airline or (ii) Airline will cause its Affiliate to pay to the City all of the Affiliate's Airport Fees and Charges for activity conducted as an Affiliate of Airline.

6.1.2    Airline shall pay or cause its Affiliate to pay to the City all Airport Fees and Charges due to the City on account of the Affiliate's use of any Airport facilities for activity conducted as an Affiliate of Airline.

58

6.1.3    Airline shall submit or shall cause Airline's Affiliate to submit to the City all Monthly Activity Reports detailing each Affiliate's use of any Airport facilities or services as an Affiliate of Airline in accordance with Section 8.19.

6.1.4    Airline shall report and pay or shall cause each of its Affiliates to report and pay to the City any PFCs that they respectively collect as an Affiliate of Airline on account of Enplaned Passengers at the Airport.

6.1.5    Both Airline and the Affiliate shall remain jointly and severally liable to the City for the payment of all Airport Fees and Charges and PFCs, and for the submission of all Monthly Activity Reports, that are due to the City on account of the Affiliate's use of any Airport facilities or services as an Affiliate of Airline.

## 6.2    Applicability of Agreement to Affiliates

For so long as Airline and each of its Affiliates have complied with their payment and reporting obligations under Article 8 and Article 9, then:

6.2.1    Each Affiliate shall have the same rights as Airline to use Airline's Premises, and Assignments and Subleases by Airline to an Affiliate shall not be subject to Section 4.2.2.

6.2.2    The Airport Fees and Charges due on account of each Affiliate's use of Airport facilities or services shall be calculated as if the Affiliate were a Signatory Airline; provided, however, that the Affiliate's activity as an Affiliate of Airline shall be treated as activity of Airline.

6.2.3    Airline and all of its Affiliates shall be treated as a single Signatory Airline for purposes of determining a Majority-In-Interest and each Affiliate's landed weight and payment of Airport Fees and Charges to the City pursuant to Article 8 on account of the Affiliate's use of Airport facilities or services as an Affiliate of Airline shall be treated as landed weight of and payments by Airline for purposes of determining a Majority-in-Interest.

6.2.4    Each Affiliate's activity as an Affiliate of Airline on Airline's Premises shall be treated under Article 5 as activity of Airline for purposes of (a) allocations and reallocations of Airline Premises under Section 5.4.1(a); (b) establishing Airline's Periods of Use under Section 5.5.2; and (c) calculating average utilization under Section 5.7.3.

## 6.3    Designation by More than One Signatory Airline

More than one Signatory Airline may from time to time designate the same Passenger Carrier as its Affiliate, and each such Signatory Airline shall only be responsible for and credited with such Passenger Carrier's operations when such Passenger Carrier operates as such Signatory Airline's Affiliate.

## 6.4    Termination of Status of Affiliate

A Passenger Carrier's status as Affiliate of Airline may be terminated by Airline upon thirty (30) days' prior written notice to the City, provided that Airline's liability to the City for the payment of all Airport Fees and Charges, and PFCs, and the submission of all Monthly Activity Reports, that are due to the City on account of the use of any Airport facilities or services on behalf of Airline by Airline's Affiliates shall survive any termination of Affiliate status; provided, however, that Airline shall only be responsible for such payments and reports as they relate to a terminated Affiliate's operations through the later of: (a) the effective date of the termination of Affiliate status or (b) thirty (30) days after receipt by City from Airline of notice of such termination.

### 6.5    Airline's Designation of Alliance Partners

From time to time, Airline may designate one or more Alliance Partners by notifying the Commissioner in writing, using the Alliance Partner Designation Form attached as Exhibit G and providing reasonable, publicly available documentation of their alliance or codeshare relationship.

### 6.6    Application of Agreement to Alliance Partners

For so long as Airline and each of its Alliance Partners have complied with their payment and reporting obligations under Article 8 and Article 9, then:

6.6.1    Airline may exercise its rights with respect to its Alliance Partners set forth in Sections 3.2.4, 3.2.5, 3.3.5 and 4.2.2.

6.6.2    Each Alliance Partner's activity as an Alliance Partner of Airline on Airline's Premises shall be treated under Article 5 as activity of Airline for purposes of (a) allocations and reallocations of Airline Premises under Section 5.4.1(a); (b) establishing Airline's Periods of Use under Section 5.5.2; and (c) calculating average utilization under Section 5.7.3; provided, however, that if the Alliance Partner's activity is treated as activity of Airline for any of these purposes, such activity shall not also be treated for these purposes as activity of the Alliance Partner in its own right.

6.6.3    Any Alliance Partner's landed weight and payment of Airport Fees and Charges to the City on account of the Alliance Partner's use of Airport facilities or services as an Alliance Partner of Airline shall not be treated as landed weight of and payments by Airline for purposes of determining a Majority-in-Interest.

6.6.4    Airline's designation of an Alliance Partner shall not affect either Airline's or its Alliance Partner's payment or reporting obligations under this Agreement.

### 6.7    Designation by More than One Signatory Airline

No more than one Signatory Airline may from time to time designate the same Passenger Carrier as its Alliance Partner.

### 6.8    Termination of Status of Alliance Partner

A Passenger Carrier's status as Alliance Partner of Airline may be terminated by Airline upon thirty (30) days' written notice to the City.

Article 7

## SUBORDINATION TO BOND INDENTURE AND CREATION OF FUNDS

### 7.1    Definitions

Capitalized words and phrases used in this Article 7 but not in defined Article 1 shall have the meanings set forth in the Bond Indenture or, if not so set forth, shall have their usual and customary meanings.

### 7.2    Subordination to Bond Indenture

7.2.1    In the event of any conflict between this Agreement and the Bond Indenture, the terms and conditions of the Bond Indenture will control.  For example, but not by way of limitation, subject to the terms and provisions of the Bond Indenture, it is mutually understood and agreed that, so long as any bonds, contracts or other obligations treated as Senior Lien Obligations or Junior Lien Obligations which are secured by or payable from Revenues under the Bond Indenture are outstanding, the deposit and application of Airport Revenues, or any casualty or condemnation proceeds, shall be governed by the Bond Indenture, but subject to applicable law.  Except as provided in Section 7.2.2, the City shall not amend, supplement or restate the Bond Indenture in any way that would have a material adverse effect on Air Carriers operating at the Airport without first consulting with the AAAC, unless financial exigencies make it impractical for the City to engage in such consultation.

7.2.2    Airline acknowledges that the City plans to amend the Bond Indenture to require higher percentages of Debt Service Coverage on Senior Lien Obligations, with increases to fifteen percent (15%) effective for Fiscal Year 2019; twenty percent (20%) for Fiscal Year 2020; and twenty-five percent (25%) for Fiscal Year 2021 and subsequent years.

### 7.3    Sufficiency of Airport Revenues

For each Fiscal Year, Airport Fees and Charges, together with other Revenues, shall be at all times sufficient to satisfy (a) the Deposit Requirements of the Senior Lien Master Indenture or any other Bond Indenture and (b) the debt service coverage covenants of the Bond Indenture.

### 7.4    Deposit of Revenues and Creation of Funds

7.4.1    All Revenues derived by the City from the operation of the Airport will be deposited into the Revenue Fund held by the Trustee under the Bond Indenture securing Senior Lien Obligations.  Moneys held in the Revenue Fund shall be disbursed and applied by the Trustee.

7.4.2    The City shall maintain and use the Operation and Maintenance Fund, the Operation and Maintenance Reserve Fund and the Maintenance Reserve Fund in accordance with the Bond Indenture.

7.4.3    The City shall maintain and use a Supplemental O&M Reserve Fund. The City shall deposit into the Supplemental O&M Reserve Fund each year, beginning in Fiscal Year 2019, the amount, if any, required to increase the balance in such Fund (including amounts receivable from such Fund) to the following percentages of total O&M Expenses:

| | |
|---|---|
| 2019: | 3.6% |
| 2020: | 7.2% |
| 2021: | 10.8% |
| 2022: | 14.4% |
| 2023: | 18.0% |
| 2024: | 21.6% |
| 2025 and subsequent years: | 25.0% |

## 7.5    Assignment by the City

The City may assign, in accordance with the Bond Indenture, if applicable, and with the terms of this Agreement, certain of its interests in and pledge certain revenues and receipts under this Agreement as security for payment of the principal of, premium, if any, and interest on obligations issued pursuant to the Bond Indenture.

Article 8

## CALCULATION OF RATES AND CHARGES

## 8.1    Generally

8.1.1    Rate Methodology.  Subject to Section 8.18, the fees and rents to be charged by the City and paid by Airline (and by all other Signatory Airlines) for its use of the Airport from the Effective Date until the expiration or earlier termination of this Agreement shall be calculated in accordance with the City's Financial Accounting Protocols using the rate-setting methods set forth in this Article 8.  In calculating the revenue requirements used to derive each of these kinds of rates and charges, the City shall exclude any cost (net of the cost of collection) that (a) has been reimbursed or covered by any insurance recovery, condemnation proceeds or other third-party payment; (b) has been reimbursed or is required to be reimbursed to the City by an individual Air Carrier in connection with projects undertaken by the City at the request and for the benefit of an individual Air Carrier; or (c) has been paid with PFCs or with federal or state grants received by the City.  The City may, pursuant to Section 9.2.3, add to such revenue requirements any Bad Debt caused by the failure of any Air Carrier to pay fees and rents charged by the City under this Article 8.  Illustrative calculations displaying how rates and charges will be calculated under the methodology set forth in this Article 8 are attached as Exhibit I.

8.1.2    Financial Accounting Protocols.  The City shall promulgate Financial Accounting Protocols after consultation with the AAAC.  The Commissioner may amend the

Financial Accounting Protocols from time to time after consultation with the AAAC. In the event of a conflict between this Agreement and the Financial Accounting Protocols, the terms of this Agreement shall control.

      8.1.3    <u>Airline Consultations on Proposed Rates and Charges</u>. No later than October 1 of each year, the Commissioner shall provide, by electronic mail, each Air Carrier then currently operating scheduled passenger or cargo service at the Airport with a complete copy of the Department of Aviation's then-proposed operating budget and capital plan for the following Fiscal Year and, no later than November 1 of each year, the then-proposed rates and charges, calculated in accordance with this Article 8, for the following Fiscal Year. No later than November 10 of each year, the Commissioner shall consult with the AAAC concerning the then-proposed rates and charges. These annual rate consultations shall provide a reasonable opportunity for the AAAC to review the City's rate calculations, budgetary estimates and cost allocations. No later than December 1 of each year, after giving due consideration to the comments provided by the AAAC, the Commissioner shall make any revisions to the proposed rates and charges as the Commissioner determines, in his or her reasonable discretion, to be consistent with this Article 8 and warranted as a result of consultation with the AAAC or otherwise, and shall provide written notice, by electronic mail, to each Air Carrier then currently operating scheduled passenger or cargo service at the Airport of the new rates and charges to be effective as of January 1 of the following Fiscal Year. A copy of the notice shall be posted on the CDA's website.

## 8.2    Calculation of the Landing Fee

    Airline shall pay Landing Fees for its use of the Airfield based on its aggregate Maximum Gross Landed Weight at the Airport during the Fiscal Year. The Landing Fee effective as of January 1 of each Fiscal Year shall be determined according to the rate-setting method set forth in this Section 8.2.

      8.2.1    <u>Calculation of the Airfield Revenue Requirement</u>. The City shall calculate the Airfield Revenue Requirement by computing the sum of the following budgetary items for each Fiscal Year:

        (a)    Capital Costs allocable to the Airfield; *plus*

        (b)    O&M Expenses allocable to the Airfield; *plus*

        (c)    Allowable Airline Liaison Office Expenses; *plus*

        (d)    Required Deposits (if any) allocable to the Airfield; *minus*

        (e)    Other Airfield Revenues; *minus*

        (f)    Interest Income allocable to the Airfield; *plus or minus*

        (g)    Bad Debt or Bad Debt Recovery allocable to the Airfield; *plus or minus*

(h)     Net losses or revenues from the Fueling System Cost Center; *plus or minus*

(i)     Landing Fee True-ups pursuant to Section 8.17; *minus*

(j)     Net Aeronautical Real Estate Revenue (if any) applied pursuant to Section 8.12.2(a) 8.12.2(a) to reduce Capital Costs allocable to the Airfield; *plus*

(k)     Shortfalls in the Air Service Incentive Program (if any) pursuant to Section 8.15.

8.2.2     <u>Forecast Maximum Gross Landed Weight</u>.  The City shall forecast, based upon estimates provided by Air Carriers and other available information, aggregate Maximum Gross Landed Weight for all aircraft greater than 12,500 pounds that are expected to land at the Airport during the next Fiscal Year.

8.2.3     <u>Calculation of the Landing Fee Rate</u>.  The City shall calculate the Landing Fee rate applicable to all aircraft greater than 12,500 pounds that land at the Airport and are not otherwise exempt from paying Landing Fees under Section 8.2.5 by dividing the Airfield Revenue Requirement by aggregate forecast Maximum Gross Landed Weight.  The Landing Fee rate shall be expressed in dollars and cents (to nearest thousandth) per one thousand pounds of Maximum Gross Landed Weight.

8.2.4     <u>Minimum Landing Fee</u>.  The Landing Fee applicable to any aircraft less than or equal to 12,500 pounds that land at the Airport and are not otherwise exempt from paying Landing Fees under Section 8.2.5 shall be equal to 12,500 pounds times the Landing Fee rate calculated under Section 8.2.3.

8.2.5     <u>Exemptions from Landing Fees</u>

(a)     No Landing Fee shall be due in the event an aircraft departs from the Airport for another destination and is forced to return and land at the Airport because of meteorological conditions, or mechanical or operational problems, or for any similar emergency or precautionary reason.

(b)     No Landing Fee shall be due on account of landings by any aircraft owned and operated by the United States government and its agencies, non-commercial aircraft owned and operated by foreign governments on a flight authorized by the Department of State, or commercial aircraft on any flight dedicated to carrying foreign heads of state and not operating as a commercial flight.  Foreign military aircraft are subject to landing fees calculated under Section 8.2.3.

(c)     The Commissioner may, on an infrequent basis, waive landing fee payments, in his or her discretion, for medical, humanitarian, charity or non-profit events.

8.3     **Calculation of Terminal Rental Rates**

The City shall calculate Terminal Rental Rates for the Main Terminal and Terminal 5 on an equalized basis. Airline shall pay the Terminal Rental Rates applicable to all the Exclusive Use and Preferential Use space (if any) it leases in the Terminal Complex. The Terminal Rental Rates effective January 1 of each Fiscal Year for the Terminal Complex shall be determined according to the rate-setting methods set forth in this Section 8.3.

8.3.1    Calculation of the Total Terminal Revenue Requirement. The City shall calculate the Total Terminal Revenue Requirement by computing the sum of the following budgetary items for the Fiscal Year:

(a)    Capital Costs allocable to the Terminal Complex; *plus*

(b)    O&M Expenses allocable to the Terminal Complex; *plus*

(c)    Required Deposits allocable to the Terminal Complex; *plus*

(d)    Unrecovered Domestic Common Use Gate Costs (if any); *minus*

(e)    Interest Income allocable to the Terminal Complex; *minus*

(f)    Terminal Concession Revenue; *minus*

(g)    Other Terminal Rental Payments; *minus*

(h)    Any remaining balance from the sale of abandoned property or fixtures pursuant to Section 4.5.3; *plus or minus*

(i)    Bad Debt or Bad Debt Recovery allocable to the Terminal Complex; *minus or plus*

(j)    Net Parking and Ground Transportation Revenue (or losses); *minus or plus*

(k)    Net revenue (or losses) allocable to Aeronautical Real Estate or Commercial Real Estate, subject to Sections 8.12and 8.13; *plus*.

(l)    Any amount necessary to meet the Rate Covenant in Section 404 of the Bond Indenture.

8.3.2    Calculation of the Terminal Space Revenue Requirement. The City shall calculate the Terminal Space Revenue Requirement by computing the sum of the following budgetary items for the Fiscal Year:

(a)    Total Terminal Revenue Requirement; *minus*

(b)    Capital Costs and O&M Expenses for City-owned Baggage Claim Systems and City-owned Baggage Make-up Systems not allocable to FIS Facilities (to be recovered through separate charges for the use of City-owned Baggage Claim Systems and City-owned Baggage Make-up Systems); *minus*

(c)    City Equipment Costs not allocable to FIS Facilities (to be recovered through separate City Equipment Charges and Common Use Charges); *minus*

(d)    Capital Costs and O&M Expenses for City-owned Baggage Claim Systems and City Equipment Costs allocable to FIS Facilities (to be recovered through a separate FIS Facility Fee).

8.3.3    <u>Calculation of the Terminal Rental Rate</u>.  In recognition of the differing utility of distinct types of Airline Rented Space, the City shall separately calculate rental rates for two (2) types of Airline Rented Space within the Terminal Complex:  Base Space (consisting of all Airline Rented Space in the Terminal Complex except for Baggage Make-up Space and ramp-level unenclosed storage space) and Discount Space (consisting of Baggage Make-up Space, parts systems conveyance space and ramp-level unenclosed storage space).

(a)    The rental rate per square foot for Discount Space shall be twenty-five percent (25%) less than the rental rate per square foot for Base Space.

(b)    The rental rates per square foot for each of the two (2) types of Airline Rented Space will be calculated so that the aggregate amount chargeable for all types of Airline Rented Space equals the Terminal Space Revenue Requirement.

## 8.4    Exclusive Use Rent

Airline shall pay for its lease of Exclusive Use Space based on the square footage of Exclusive Use Space (if any) leased by Airline as shown in the Premises Notice multiplied, for Base Space (if any), by the Base Terminal Rental Rate and, for Discount Space (if any), by the Discount Terminal Rental Rate.

## 8.5    Preferential Use Gate Rent

Airline shall pay for its lease of Preferential Use Gate Space based on the square footage of the Holdroom Space associated with the Preferential Use Gate Space (if any) leased by Airline as shown in the Premises Notice multiplied by the Base Terminal Rental Rate.

## 8.6    Preferential Use Check-in Rent

Airline shall pay for its lease of Preferential Use Check-in Space based on the square footage of Check-in Space (if any) leased by Airline as shown in the Premises Notice multiplied by the Base Terminal Rental Rate.

## 8.7    Preferential Use and Joint Use Baggage Claim Rent

8.7.1    <u>Preferential Use Baggage Claim Rent</u>.  Airline shall pay for its lease of Preferential Use Baggage Claim Space in the Terminal Complex based on the square footage of Preferential Baggage Claim Space (if any) leased by Airline in the Terminal Complex as shown in the Premises Notice multiplied by the Base Terminal Rental Rate.

8.7.2     <u>Joint Use Baggage Claim Rent</u>.  Airline shall pay for its lease of Joint Use Baggage Claim Space based on the square footage of Joint Use Baggage Claim Space (if any) leased by Airline in the Terminal Complex as shown in the Premises Notice multiplied by the Base Terminal Rental Rate and further multiplied by Airline's respective share of Delivered Arriving Seats on all flights operated by Passenger Carriers utilizing such Joint Use Baggage Claim Space.

## 8.8     **Preferential Use and Joint Use Baggage Make-up Rent**

8.8.1     <u>Preferential Use Baggage Make-up Rent</u>.  Airline shall pay for its lease of Preferential Use Baggage Make-up Space in the Terminal Complex based on the square footage of Preferential Baggage Make-up Space (if any) leased by Airline in the Terminal Complex as shown in the Premises Notice multiplied by the Discount Terminal Rental Rate.

8.8.2     <u>Joint Use Baggage Make-up Rent</u>.  Airline shall pay for its lease of Joint Use Baggage Make-up Space in the Terminal Complex based on the square footage of Preferential Baggage Make-up Space (if any) leased by Airline in the Terminal Complex as shown in the Premises Notice multiplied by the Discount Terminal Rental Rate and further multiplied by Airline's respective share of Outbound Checked Bags for all flights operated by Passenger Carriers utilizing such Joint Use Baggage Make-up Space; provided, however, that if reliable counts of Outbound Checked Bags are unavailable, shares of Joint Use Baggage Make-up Rent shall be based upon each Passenger Carrier's respective share of Delivered Departing Seats for all flights utilizing such Joint Use Baggage Make-up Space.

## 8.9     **Preferential Use and Joint Use City-owned Baggage System Charges**

Airline shall pay for its Preferential Use and Joint Use of City-owned Baggage Make-up Systems and City-owned Baggage Claim Systems according to the rate-setting methods set forth in this Section 8.9.

8.9.1     <u>Preferential Use and Joint Use of City-owned Baggage Make-up Charge</u>.  In addition to the Terminal Rent applicable to any Preferential Use Baggage Make-up Space leased by Airline, Airline shall pay a Preferential Use Baggage Make-up Charge for its use of City-owned Baggage Make-up Systems (if any) that are within Baggage Make-up Space (if any) that is leased by Airline on a Preferential Use basis.  The Baggage Make-up Systems Charge effective January 1 of each Fiscal Year for Airline's Preferential Use of City-owned Baggage Make-up Systems shall be calculated as the sum of budgeted Capital Costs and O&M Expenses (if any) allocable to the City-owned Baggage Make-up Systems leased by Airline for its Preferential Use.  Passenger Carriers leasing Joint Use Baggage Make-up Space shall each pay their pro rata share of the applicable charges for Joint Use City-owned Baggage Make-up Systems based on their respective shares of Outbound Checked Bags utilizing such Systems; provided, however, that if reliable counts of Outbound Checked Bags are unavailable, shares of Joint Use Baggage Make-up Charges shall be based upon each Passenger Carrier's respective share of Delivered Departing Seats for all flights utilizing such Joint Use Baggage Make-up Space.

8.9.2    Preferential Use and Joint Use of City-owned Baggage Claim Charge. In addition to the Terminal Rent applicable to any Preferential Use Baggage Claim Space leased by Airline, Airline shall pay a Preferential Use Baggage Claim Charge for its use of City-owned Baggage Claim Systems (if any) that are within Baggage Claim Space (if any) that is leased by Airline on a Preferential Use basis. The City-owned Baggage Claim Systems Charge effective January 1 of each Fiscal Year for Airline's Preferential Use of City-owned Baggage Claim Systems shall be calculated as the sum of budgeted Capital Costs and O&M Expenses (if any) allocable to the City-owned Baggage Claim Systems leased by Airline for its Preferential Use. Passenger Carriers leasing Joint Use Baggage Claim Space shall each pay their pro rata share of the applicable charges for Joint Use City-owned Baggage Claim Systems based on their respective shares of Delivered Arriving Seats on all flights utilizing such Systems.

## 8.10    Common Use Fees

8.10.1    Domestic Common Use Gate Fees.    Airline shall pay Domestic Common Use Gate Fees for its use of Domestic Common Use Gate Space based on the number of Airline's Total Delivered Seats at Domestic Common Use Gate Space. The Domestic Common Use Gate Fee effective January 1 of each Fiscal Year shall be determined according to the rate-setting method set forth in this Section 8.10.1.

(a)    Calculation of the Domestic Common Use Gate Revenue Requirement. The City shall calculate the Domestic Common Use Gate Revenue Requirement by computing the sum of the following budgetary items:

(i)    the Base Terminal Rental Rate multiplied by the total square footage of Domestic Common Use Holdroom Space; *plus*

(ii)    Capital Costs and O&M Expenses for SET allocable to Domestic Common Use Gate Space; *plus*

(iii)    Capital Costs and O&M Expenses for City Equipment allocable to Domestic Common Use Gate Space.

(b)    Forecast Total Delivered Seats at Domestic Common Use Gate Space. The City shall forecast, based upon estimates provided by Passenger Carriers and other available information, aggregate Total Delivered Seats at Domestic Common Use Gate Space.

(c)    Calculation of the Domestic Common Use Gate Fee. The City shall calculate the Domestic Common Use Gate Fee by dividing the Domestic Common Use Gate Revenue Requirement by aggregate forecast Total Delivered Seats at Domestic Common Use Gate Space; provided, however, that an aggregate amount of no less than the product of 548,000 annual Delivered Seats multiplied by the total number of Domestic Common Use Gates shall be used to calculate the Domestic Common Use Gate Fee.

(d)    Monthly Cap on Domestic Common Use Gate Fees. If (a) Airline has requested from the City, but has been unable to obtain, the assignment of a Preferential Use Gate and (b) the City's Airline's Initial Schedule Submission for Common Use Gate Space demonstrates that Airline's activity on one or more Domestic Common Use Gate Space would

68

meet or exceed the average Preferential Use Gate Space utilization of all Long-Term Signatory Airlines, as measured by either Section 5.7.3(a) or Section 5.7.3(b), Airline's aggregate monthly Domestic Common Use Gate Fees for each such Domestic Common Use Gate shall not exceed what Airline would have been charged if Airline had been able to lease Preferential Use Gate Space for which it would qualify. Domestic Common Use Gate Fees calculated for Airline's use of other Domestic Common Use Gate Space shall not be diminished by such monthly cap.

(e)  Imputed Domestic Common Use Gate Fee. If there is no separately designated Domestic Common Use Gate Space, the City shall calculate the Domestic Common Use Gate Fee to be paid for domestic flights using International Common Use Gate Space or being accommodated on any other Signatory Airline's Preferential Use Gate Space by multiplying the Base Terminal Rental Rate by 2,650 square feet and dividing that product, together with Capital Costs and O&M Expenses for related SET and City Equipment for an individual Common Use Gate, by 548,000 annual Total Delivered Seats.

8.10.2  International Common Use Gate Fees. Airline shall pay International Common Use Gate Fees for its use of International Common Use Gate Space based on the number of Airline's Delivered Departing International Seats and Airline's Delivered Arriving International Seats Without FIS Users at International Common Use Gate Space. The International Common Use Gate Fee effective January 1 of each Fiscal Year shall be determined according to the rate-setting method set forth in this Section 8.10.2. Airline shall pay Domestic Common Use Gate Fees determined according to the rate-setting method set forth in Section 8.10.1 for its use of International Common Use Gate Space for any domestic flights.

(a)  Calculation of the International Common Use Gate Revenue Requirement. The City shall calculate the International Common Use Gate Revenue Requirement by computing the sum of the following budgetary items:

(i)  the Base Terminal Rental Rate multiplied by the total square footage of International Common Use Holdroom Space; *plus*

(ii)  Capital Costs and O&M Expenses for SET allocable to International Common Use Gate Space; *plus*

(iii)  Capital Costs and O&M Expenses for City Equipment allocable to International Common Use Gate Space; *minus*

(iv)  Domestic Common Use Gate Fees (if any) paid for the use of International Common Use Gate Space for domestic flights.

(b)  Forecast Seats at International Common Use Gate Space. The City shall forecast, based upon estimates provided by Passenger Carriers and other available information, aggregate Delivered Departing International Seats and Arriving International Seats Without FIS Users at International Common Use Gate Space.

(c)  Calculation of the International Common Use Gate Fee. The City shall calculate the International Common Use Gate Fee by dividing the International Common

69

Use Gate Revenue Requirement by aggregate forecast Delivered Departing International Seats and Arriving International Seats Without FIS Users at International Common Use Gate Space.

8.10.3    Domestic Common Use Baggage Make-up Fees. Airline shall pay for its use (if any) of Domestic Common Use City-owned Baggage Make-up Systems, based on the number of Airline's Outbound Checked Bags for flights utilizing Domestic Common Use City-owned Baggage Make-up Systems during the Fiscal Year. The Domestic Common Use Baggage Make-up Fee shall be calculated according to the rate-setting method set forth in this Section 8.10.3.

(a)    Calculation of the Domestic Common Use Baggage Make-up Revenue Requirement. The City shall calculate the Common Use Baggage Make-up Revenue Requirement by computing the sum of the following budgetary items:

(i)    the Discount Terminal Rental Rate multiplied by the total square footage of Domestic Common Use Baggage Make-up Space; *plus*

(ii)    Capital Costs and O&M Expenses for Domestic Common Use City-owned Baggage Make-up Systems and any related SET and City Equipment.

(b)    Forecast Outbound Checked Bags for Flights Utilizing Domestic Common Use City-owned Baggage Make-up Systems. The City shall forecast, based upon estimates provided by Passenger Carriers and other available information, aggregate Outbound Checked Bags for flights utilizing Domestic Common Use City-owned Baggage Make-up Systems.

(c)    Calculation of the Domestic Common Use Baggage Make-up Fee. The City shall calculate the Domestic Common Use Baggage Make-up Fee by dividing the Domestic Common Use Baggage Make-up Revenue Requirement by aggregate forecast Outbound Checked Bags for flights utilizing Domestic Common Use City-owned Baggage Make-up Systems.

8.10.4    International Common Use Baggage Make-up Fees. Airline shall pay for its use (if any) of International Common Use City-owned Baggage Make-up Systems, based on the number of Airline's Outbound Checked Bags for flights utilizing International Common Use City-owned Baggage Make-up Systems during the Fiscal Year. The International Common Use Baggage Make-up Fee shall be calculated according to the rate-setting method set forth in this Section 8.10.4.

(a)    Calculation of the International Common Use Baggage Make-up Revenue Requirement. The City shall calculate the International Common Use Baggage Make-up Revenue Requirement by computing the sum of the following budgetary items:

(i)    the Discount Terminal Rental Rate  multiplied by the total square footage of International Common Use Baggage Make-up Space; *plus*

(ii)    Capital Costs and O&M Expenses for International Common Use City-owned Baggage Make-up Systems and any related SET and City Equipment; *minus*

(iii)    International Common Use Baggage Make-up Fees paid for the use of International Common Use Baggage Make-up Systems for domestic flights.

(b)    <u>Forecast Outbound Checked Bags for Flights Utilizing International Common Use City-owned Baggage Make-up Systems</u>.  The City shall forecast, based upon estimates provided by Passenger Carriers and other available information, aggregate Outbound Checked Bags for international flights utilizing International Common Use City-owned Baggage Make-up Systems.

(c)    <u>Calculation of the International Common Use Baggage Make-up Fee</u>.  The City shall calculate the International Common Use Baggage Make-up Fee by dividing the International Common Use Baggage Make-up Revenue Requirement by aggregate forecast Outbound Checked Bags for international flights utilizing International Common Use City-owned Baggage Make-up Systems.

8.10.5    <u>Common Use Baggage Claim Fees</u>.  Airline shall pay for its use (if any) of Common Use City-owned Baggage Claim Systems, based on the number of Airline's Arriving Domestic Seats on flights utilizing Common Use City-owned Baggage Claim Systems during the Fiscal Year.  The Common Use Baggage Claim Fee shall be calculated according to the rate-setting method set forth in this Section 8.10.5.

(a)    <u>Calculation of the Common Use Baggage Claim Revenue Requirement</u>.  The City shall calculate the Common Use Baggage Claim Revenue Requirement by computing the sum of the following budgetary items:

(i)    the Base Terminal Rental Rate multiplied by the total square footage of Common Use Baggage Claim Space; *plus*

(ii)    Capital Costs and O&M Expenses for Common Use City-Owned Baggage Claim Systems and any related SET and City Equipment.

(b)    <u>Forecast Arriving Domestic Seats on flights Utilizing Common Use City-owned Baggage Claim Systems</u>.  The City shall forecast, based upon estimates provided by Passenger Carriers and other available information, aggregate Arriving Domestic Seats on flights utilizing Common Use City-owned Baggage Claim Systems.

(c)    <u>Calculation of the Common Use Baggage Claim Fee</u>.  The City shall calculate the Common Use Baggage Claim Fee by dividing the Common Use Baggage Claim Revenue Requirement by aggregate forecast Arriving Domestic Seats on flights utilizing Common Use City-owned Baggage Claim Systems.

8.10.6    <u>Domestic Common Use Check-in Fees</u>.  Airline shall pay Domestic Common Use Check-in Fees for its use (if any) of Domestic Common Use Check-in Space based on the greater of the number of (a) Check-in Hours that Airline and its Affiliates have been

assigned by the City or (b) Check-in Hours actually used by Airline and its Affiliates. The Domestic Common Use Check-in Fee effective January 1 of each Fiscal Year shall be determined according to the rate-setting method set forth in this Section 8.10.6.

    (a)   <u>Calculation of the Domestic Common Use Check-in Revenue Requirement</u>. The City shall calculate the Domestic Common Use Check-in Revenue Requirement by computing the sum of the following budgetary items:

    (i)   the Base Terminal Rental Rate multiplied by the total square footage of Domestic Common Use Check-in Space; *plus*

    (ii)   Capital Costs and O&M Expenses for SET and City Equipment allocable to Domestic Common Use Check-in Space.

    (b)   <u>Forecast Domestic Common Use Check-in Hours</u>. The City shall forecast, based upon estimated flight schedules provided by Passenger Carriers and other available information, aggregate Domestic Common Use Check-in Hours.

    (c)   <u>Calculation of the Domestic Common Use Check-in Fee</u>. The City shall calculate the Domestic Common Use Check-in Fee by dividing the Domestic Common Use Check-in Revenue Requirement by aggregate forecast Domestic Common Use Check-in Hours.

8.10.7   <u>International Common Use Check-in Fees</u>. Airline shall pay International Common Use Check-in Fees for its use (if any) of International Common Use Check-in Space based on the greater of the number of (a) Check-in Hours that Airline and its Affiliates have been assigned by the City or (b) Check-in Hours actually used by Airline and its Affiliates. The International Common Use Check-in Fee effective January 1 of each Fiscal Year shall be determined according to the rate-setting method set forth in this Section 8.10.7.

    (a)   <u>Calculation of the International Common Use Check-in Revenue Requirement</u>. The City shall calculate the International Common Use Check-in Revenue Requirement by computing the sum of the following budgetary items:

    (i)   the Base Terminal Rental Rate multiplied by the total square footage of International Common Use Check-in Space; *plus*

    (ii)   Capital Costs and O&M Expenses for SET and City Equipment allocable to International Common Use Check-in Space.

    (b)   <u>Forecast International Common Use Check-in Hours</u>. The City shall forecast, based upon estimated flight schedules provided by Passenger Carriers and other available information, aggregate International Common Use Check-in Hours.

    (c)   <u>Calculation of the International Common Use Check-in Fee</u>. The City shall calculate the International Common Use Check-in Fee by dividing the Common Use Check-in Revenue Requirement by aggregate forecast International Common Use Check-in Hours.

8.10.8    Aircraft Parking Fees.  The City may establish, after consultation with the AAAC, reasonable fees for extended and overnight aircraft parking on common use Apron Areas and in remote areas of the Airfield not otherwise exclusively leased by an Air Carrier, including deicing pads.  The City may also establish, after consultation with the AAAC, fees for the use of Common Use hard stands for the loading and unloading of aircraft.

8.11    **FIS Facility Fee**

Airline shall pay FIS Facility Fees for its use of FIS Facilities based on the number of Airline's FIS Users (if any) during the Fiscal Year.  The FIS Facility Fee effective January 1 of each Fiscal Year shall be calculated according to the rate-setting method set forth in this Section 8.11.

8.11.1    Calculation of the FIS Revenue Requirement.  The City shall calculate the FIS Revenue Requirement by computing the sum of the following budgetary items:

(a)    the Base Terminal Rental Rate multiplied by the total square footage of FIS Facilities space; *plus*

(b)    Capital Costs and O&M Expenses for Baggage Claim Systems, SET and City Equipment allocable to FIS Facilities.

8.11.2    Forecast FIS Users.  The City shall forecast, based upon estimates provided by Passenger Carriers and other available information, aggregate FIS Users.

8.11.3    Calculation of the FIS Facility Fee.  The City shall calculate FIS Facility Fee by dividing the FIS Revenue Requirement by aggregate forecast FIS Users.

8.12    **Priorities of Use for Net Aeronautical Real Estate Revenues**

8.12.1    The City shall calculate the amount of Net Aeronautical Real Estate Revenues remaining at the end of each Fiscal Year by computing the sum of the following budgetary items for each Fiscal Year

(a)    Aeronautical Real Estate Revenue; *plus*

(b)    Interest Income allocable to Aeronautical Real Estate; *minus*

(c)    Capital Costs allocable to Aeronautical Real Estate; *minus*

(d)    O&M Expenses allocable to Aeronautical Real Estate; *minus*

(e)    Required Deposits allocable to Aeronautical Real Estate.

8.12.2    The City shall use Net Aeronautical Real Estate Revenues (if any) remaining at the end of each Fiscal Year in the next Fiscal Year according to the following priorities:

(a)     An amount equal to the Pre-Approved Allowances set forth in Sections 1 and 2 of Exhibit O allocable to the Airfield Cost Center for the next Fiscal Year to reduce Capital Costs allocable to the Airfield Cost Center; and

(b)     The remainder (if any) to reduce Capital Costs allocable to the Terminal Cost Center in the next Fiscal Year.

### 8.13    Priorities of Use for Net Commercial Real Estate Revenues

8.13.1     The City shall calculate the amount of Net Commercial Real Estate Revenues remaining at the end of each Fiscal Year by computing the sum of the following budgetary items for each Fiscal Year:

(a)     Commercial Real Estate Revenue; *plus*

(b)     Interest Income allocable to Commercial Real Estate; *minus*

(c)     Capital Costs allocable to Commercial Real Estate; *minus*

(d)     O&M Expenses allocable to Commercial Real Estate; *minus*

(e)     Required Deposits allocable to Commercial Real Estate.

8.13.2     The City shall use Net Commercial Real Estate Revenues (if any) remaining at the end of each Fiscal Year in the next Fiscal Year according to the following priorities:

(a)     To fund Air Service Incentive Programs undertaken pursuant to Section 8.15 and subject to the annual not-to-exceed annual budgets shown in Exhibit Q;

(b)     To retain in each Fiscal Year, Five Million Dollars ($5,000,000) to be used by the City for interim financing or pay-go funding of Approved Projects and Exempt Projects; and

(c)     The remainder (if any) to be used to reduce Capital Costs allocable to the Terminal Cost Center in the next Fiscal Year.

### 8.14    City Equipment Charges

Airline shall pay City Equipment Charges for its use of City Equipment. City Equipment Charges effective January 1 of each Fiscal Year shall be determined on a non-discriminatory, full cost-recovery basis.

### 8.15    Air Service Incentive Program

Notwithstanding any other provision in this Agreement and, in order to enhance and attract new air service to the Airport, the City reserves the right to adopt and implement a program of air service incentives at the Airport, consistent with applicable federal requirements, which may include rates and charges incentives and marketing support ("Air Service Incentive

Program"). The Air Service Incentive Program, if implemented, shall be offered to all eligible Air Carriers on a non-discriminatory basis. Airline acknowledges and expressly agrees that the City may use Net Commercial Real Estate Revenues to fund the full costs of the City's Air Service Incentive Program at the Airport, as provided in Section 8.13.2. The City's not-to-exceed annual budget for its Air Service Incentive Program, for each Fiscal Year during the Term, is attached as Exhibit Q. If Net Commercial Real Estate Revenues are insufficient in any Fiscal Year to fund the anticipated not-to-exceed budget of the City's Air Service Incentive Program in that Fiscal Year, as shown in Exhibit Q, Airline acknowledges and expressly agrees that the City may include any resulting shortfall in the Air Service Incentive Program in the Landing Fee calculated under Section 8.2.1.

### 8.16   Mid-year Adjustments

In order to reduce underpayments or overpayments of Airport Fees and Charges during each Fiscal Year, the City shall review the most recently available information with regard to the amounts actually incurred or realized during such Fiscal Year with respect to Capital Costs, O&M Expenses and levels of Air Carrier activity. If the City determines on the basis of information it is able to accumulate during the course of any Fiscal Year that the budgeted Capital Costs or O&M Expenses or projected levels of Air Carrier activity it has used to calculate the rates and charges set forth in this Article 8 are likely to vary significantly (higher or lower) from actual results, the City may make adjustments to such rates and charges to conform to its revised forecast as of July 1 of such Fiscal Year, and at one, and only one, other time during such Fiscal Year, the City may make adjustments to such rates and charges to conform to its revised forecast if the variance between the budgeted Capital Costs or O&M Expenses or projected levels of Air Carrier activity and actual results is expected to be five percent (5%) or more. The City shall provide the AAAC with at least thirty (30) days advance written notice ("Mid-Year Adjustment Notice") of any adjustments to be made under this Section 8.16. The AAAC may, within five (5) business days of receipt of the Mid-Year Adjustment Notice, request a meeting with the City to review the information that the City used as the basis for an adjustment under this Section 8.16 and if the AAAC does so, the City shall meet with the AAAC within five (5) days of the AAAC's request before making any mid-year adjustments.

### 8.17   Annual True-Up

8.17.1   Adjustments-to-Actual. No later than three hundred sixty five (365) days after the close of each Fiscal Year, the City shall provide to Airline its Final Accounting, covering the Airport's operations for such preceding Fiscal Year. Such Final Accounting shall contain information sufficient to (a) allow the City to recalculate the rates and charges as set forth in this Article 8 on the basis of actual Capital Costs and O&M Expenses, Air Carrier activity and other factors affecting the prescribed calculations (or, if such information is unavailable, on the basis of the City's then-current best estimates) and (b) determine the amount of any overpayment (credit) or underpayment (debit) due to or from Air Carriers for their use of the Airfield and Terminal Complex.

8.17.2   Landing Fee True-Up. The aggregate credit or debit (if any) due to or from all Air Carriers for Landing Fees, shall be applied to the Airfield Revenue Requirement for the following Fiscal Year under Section 8.2.1. If future interpretations of or revisions to federal

income tax laws would, in the opinion of Bond Counsel, permit the City to make settlements of Landing Fees with Airline and other individual Air Carriers by issuing credits or invoicing debits without adversely affecting the tax-exempt character of GARBs issued or to be issued to finance Capital Improvement Projects allocated to the Airfield Cost Center, the City shall offer to amend this Agreement to provide for such settlements, and this Agreement shall be so amended if the City's offer is accepted by a Majority-in-Interest of Long-Term Signatory Airlines for Capital Improvement Projects allocated solely to the Airfield Cost Center.

8.17.3    <u>Settlements of Terminal Charges</u>. For all other Airport Fees and Charges, any resulting credit will be issued to Airline in the form of a check, wire transfer through the Automatic Clearing House ("ACH") or electronic funds transfer ("EFT") (subject to the City's ability to make these payments using EFT or ACH), and any resulting debit will be invoiced to and payable by Airline. If Terminal Charges actually paid by Airline (if any) were greater than the corresponding amounts chargeable to Airline, the City shall remit the amount of such overpayment to Airline within thirty (30) days of the Final Accounting. If Terminal Charges paid by Airline (if any) were less than the corresponding amounts chargeable to Airline, the City shall apply the amount of such deficiency to the account of Airline within thirty (30) days of the Final Accounting, and invoice Airline, which amount shall be due and payable within sixty (60) days of invoice.

8.17.4    <u>Final True-up under this Agreement</u>. For Fiscal Year 2033, the final year of the Term, the City shall make an adjustment-to-actual in accordance with this Section 8.17, and any resulting credit will be issued to Airline and any resulting debits will be invoiced to and payable by Airline notwithstanding the expiration of the Agreement on December 31, 2033.

8.18    **Transition Period Rates and Charges**

8.18.1    <u>Rates from May 12, 2018 through June 30, 2018</u>. Notwithstanding anything to the contrary in this Article 8, the fees and charges to be charged by the City and paid by Airline for its use (if any) of the Airport from May 12, 2018 through June 30, 2018 shall be calculated according to the rate-setting methods set forth in Articles V, VI, XII, XIII and XIV of the Main Terminal Prior Use and Lease Agreement, as amended, and Articles V and VI of the Terminal 5 Prior Use and Lease Agreement, as amended, based upon the space leased by Airline under its Prior Use and Lease Agreement (if any); provided, however, that the City shall not charge Airline any fees or charges for the use of the Fueling System.

8.18.2    <u>Rates from July 1, 2018 through December 31, 2018</u>. The fees and charges to be charged by the City and paid by Airline for its use (if any) of the Airport from July 1, 2018 through December 31, 2018 shall be calculated according to the rate-setting methods in this Article 8; provided, however, that the consultation under Section 8.1.2 and the fees and charges calculated pursuant to Section 8.2 through Section 8.10 shall be based on the period July 1, 2018 through December 31, 2018.

8.18.3    <u>Division of Revenue Requirements in 2018</u>. The fees and charges calculated in accordance with Sections 8.18.1 and 8.18.2 shall be based upon the City's budget for Fiscal Year 2018, with one-half of the total revenue requirement allocated to the period

January 1, 2018 through June 30, 2018 and one-half of the total revenue requirement allocated to the period July 1, 2018 through December 31, 2018.

       8.18.4    <u>Final Accounting for 2018</u>.  Notwithstanding the provisions of Sections 7.07 and 7.09 of Prior Use and Lease Agreements for the Main Terminal and the provisions of Sections 6.06 and 6.08 of Prior Use and Lease Agreements for Terminal 5, Airline agrees that when the City makes its Final Accounting for Fiscal Year 2018, the City shall retain (a) on an aggregate net basis all credits or debits owed to or owed by Airline and all Airline Parties under any Prior Use and Lease Agreement for Terminal Area Charges or Special Revenue Bond Fees and Charges (as those terms are defined in Prior Use and Lease Agreements) and (b) on an aggregate net basis all credits or debits owed to or owed by Airline and all Airline Parties under any Prior Use and Lease Agreement for Landing Fees or Fueling System Fees (as those terms are defined in Prior Use and Lease Agreements).

## 8.19   **Activity Reports**

       8.19.1    <u>Airline Reporting</u>.  Airline shall provide to the City, on or before the 20th day of each and every month, the Monthly Activity Report.  Each Monthly Activity Report shall be in a format prescribed by the City, and shall include at least the following information: (a) the aircraft make, model and series, MGLW and seating capacity of every aircraft type operated by Airline at the Airport; (b) the total MGLW of (i) all passenger aircraft and (ii) all cargo aircraft landing at the Airport; (c) the total number of domestic and international enplaned and deplaned passengers served by Airline at the Airport, including the breakdown of FIS Facility and non-FIS Facility deplaned passengers, revenue and non-revenue passengers; (d) the total amount (in pounds or kilograms) of domestic and international cargo (freight and express) and mail enplaned, deplaned and through by Airline at the Airport; (e) the total number of revenue and non-revenue aircraft operations; (f) total Airline use of Common Use Gate Space by date and time, including Gate, aircraft type ; (g) total number of domestic and international Delivered Arriving and Delivered Departing seats; (h) total number of hours that Airline used each Common Use Ticket Counter for domestic and international flights; (i) total number of Airline's Scheduled Departures, and (j) total number of Airline's Outbound Checked Bags on flights using Common Use Baggage Make-up Space, Joint Use Baggage Make-up Space and Joint Use City-owned Baggage-Make-up Systems.

       8.19.2    <u>Failure to Report</u>.  If Airline fails to provide to the City any Monthly Activity Report in a timely manner, Airline's Airport Fees and Charges due under this Agreement shall be determined by assuming that Airline's activity in any month for which Airline has failed to report its activity equaled Airline's maximum activity during any of the previous twelve (12) months for which Airline submitted a Monthly Activity Report to the City. Any necessary adjustments in Airline's charges shall be calculated after Airline delivers to the City an accurate Monthly Activity Report for the month in question.  Resulting credits or debits shall be applied to the appropriate invoices in the next billing period.

Article 9

## PAYMENT OF RENTALS, FEES AND CHARGES AND SECURITY DEPOSIT

### 9.1    Payment of Landing Fees and Terminal Charges

Beginning on the Effective Date, Airline shall pay to the City, on a monthly basis without invoice, Airport Fees and Charges calculated by the City in accordance with Article 8 as follows:

9.1.1    Not later than the first (1st) day of each month of each Fiscal Year, Airline shall remit to the City the amount of Airline's Fixed Terminal Charges, based on the Terminal Rental Rates then in effect.

9.1.2    Not later than the twentieth (20th) day of each month of each Fiscal Year, Airline shall remit to the City the amount of Airline's Landing Fees and Activity-Based Terminal Charges, together with Airline's Monthly Activity Report described in Section 8.19 on which Airline's payment under this Section 9.1.2 is based; provided, however, that the City reserves the right to use in the future an automated tracking system instead of Airline's Monthly Activity Report to determine the amount of Landing Fees due from Airline; and further provided, that if the City elects to use such an automated tracking system, the City shall consult with the AAAC and implement a reasonable method of reconciling the reports generated by the automated tracking system with Monthly Activity Reports submitted by each Air Carrier and resolving any discrepancies.

### 9.2    Place of Payment; Late Payments

9.2.1    All amounts due from Airline hereunder shall be paid in lawful money of the United States of America, without deduction or set off, to the City of Chicago at the Office of the City's Comptroller or at such other place as may be hereafter designated by the City. Airline shall pay all amounts payable by Airline hereunder by either check, wire transfer or electronic funds transfer ("EFT") or Automatic Clearing House ("ACH"), subject to the City's ability to receive these payments.

9.2.2    Any amount which is not paid within five (5) business days of when due and, if appropriate, when invoiced and such invoice is received by Airline, shall bear an annualized interest charge from its due date at a rate three percent (3%) higher than the "US Prime Rate" as published in the Wall Street Journal or similar successor index of national recognition as determined by the Commissioner.

9.2.3    Amounts due to the City from any Air Carrier under an Airline Use and Lease Agreement or Non-Signatory Airline Operating Agreement may be included in the calculation of Airport Fees and Charges hereunder when more than ninety (90) days past due and reasonably deemed by the City to be uncollectible after the City has made commercially reasonable efforts to recover such unpaid amounts taking into account application of any available security deposits both prior to and after the expiration of such ninety (90) day period and any such unpaid amounts subsequently collected shall be used to reduce the requirement for the applicable cost center.

9.3     **Security Deposits**

9.3.1     Delivery and Use of Security Deposit

    (a)     In the event that Airline fails to timely pay or take the necessary action to define the correct amount due for Terminal Charges or Landing Fees as required pursuant to Section 9.1 within ten (10) calendar days of receiving the City's written notice pursuant to Section 18.4 and to the AAAC Representative of late or incomplete payment more than twice within any twelve (12) month consecutive period, Airline shall provide to the City within sixty (60) days of receiving notice of the third late payment, and the City's written demand, a security deposit equal to the following (the "Security Deposit"):

    (i)     Airline's estimated Landing Fees for three (3) months (as determined on the basis of Airline's and its Affiliate(s), if applicable, published schedule as of that date and the actual Landing Fee Rate effective as of that date), *plus*

    (ii)     Airline's estimated Terminal Charges (including Affiliate's, if applicable) for three (3) months.

    (b)     The Security Deposit shall be in the form of a surety bond the terms of which are acceptable to the City or a letter of credit meeting the requirements set forth in Section 9.3.1(c) to secure Airline's performance and observance of Airline's obligations under this Agreement.

    (c)     The City may deduct from the Security Deposit an amount equal to: (i) any sums payable to the City under this Agreement; (ii) all reasonable sums, if any, that the City expends as the result of an Event of Default; and (iii) an amount equal to the City's reasonable costs of recovering possession, reletting Airline's Premises, and any and all other damages legally recoverable by the City, together with reasonable out-of-pocket costs and expenses incurred by the City, upon the occurrence of an Event of Default. In any such event, Airline shall again meet the Security Deposit requirement set forth in Section 9.3.1(a) above within seven (7) days from its receipt of such written notice; provided that if Airline does not so meet the Security Deposit requirement in a timely manner, the City shall be entitled to set-off such Security Deposit against the next ensuing payments by Airline of Airport Fees and Charges until such Security Deposit is complete. Once triggered, the Security Deposit requirements of this Section 9.3 shall continue until Airline demonstrates payment performance by having eighteen (18) consecutive months of on-time payments, at which time Airline may request the Security Deposit be returned and at such time the Security Deposit requirement shall be waived and any outstanding Security Deposit returned to Airline.

9.3.2     Letter of Credit Requirements

    (a)     For a Security Deposit in the form of a letter of credit, such letter of credit shall be an irrevocable commercial standby letter of credit for the amount of the Security Deposit in form and substance reasonably acceptable to the City that meets the following criteria:

(i)    the letter of credit shall provide for its continuance for at least one year from issuance and for automatic extension for additional periods of at least one year from initial expiry date and each subsequent expiry date, unless the issuer of the letter of credit gives the City notice of its intention not to renew such letter of credit not less than sixty (60) days before such expiry date (a "Nonrenewal Notice");

(ii)    the letter of credit shall be payable upon the City's presentation of the original of such letter of credit together with a sight draft to the issuer, accompanied by the City's signed statement that the City is entitled to draw on such letter of credit without further notice to Airline and hold the proceeds thereof;

(iii)    the letter of credit shall be issued by a commercial bank reasonably satisfactory to the City which maintains a branch in Chicago, Illinois, provided that the Commissioner and the City Comptroller may jointly agree to waive the requirement set forth above that such financial institution maintain a branch in Chicago, for presentment for payment:

(1)    that is chartered under the laws of the United States or any state thereof, or the District of Columbia;

(2)    that is insured by the Federal Deposit Insurance Corporation;

(3)    whose long-term, unsecured and unsubordinated debt obligations are rated by at least two of Fitch Ratings Ltd. ("Fitch"), Moody's Investors Service, Inc. ("Moody's) and Standard & Poor's Ratings Services ("S&P") or their respective successors (the "Rating Agencies") with ratings of not less than A- from Fitch, A3 from Moody's and A- from Standard & Poor's (the "Long-Term LC Issuer Requirements"); and

(4)    whose short-term rating from at least two Rating Agencies is not less than F2 from Fitch, P-2 from Moody's and A-2 from S&P (the "Short-Term LC Issuer Requirements" and, together with the Long-Term LC Issuer Requirements, the "LC Issuer Requirements").

(iv)    If at any time the LC Issuer Requirements are not met, or if the financial condition of such issuer changes in any other materially adverse way, then Airline shall within ten (10) days of written notice from the City deliver to the City a replacement letter of credit which otherwise meets the requirements of this Agreement and that meets the LC Issuer Requirements (and Airline's failure to do so shall, notwithstanding anything in this Agreement to the contrary, constitute an Event of Default for which there shall be no notice or grace or cure periods being applicable thereto other than the aforesaid ten-day period).

(b)    The letter of credit shall remain in effect until the date which is thirty (30) days after the Term. If Airline shall hold over possession of the Premises pursuant to Section 4.6, then Airline shall ensure that the letter of credit is extended to cover a period which is not less than thirty (30) days after the expiration of any holdover period.

(c)     The City shall consent to reduce or release such letter of credit when and as this Agreement would entitle Airline to any reduction or release of the Security Deposit.

### 9.3.3     Use of Letter of Credit

If any of the following occurs, then the City may draw upon the balance of the letter of credit in an amount equal to the aggregate amount of the Security Deposit this Agreement then requires:  (A) the issuer delivers a Nonrenewal Notice that such issuer no longer intends to maintain a branch in Chicago, Illinois and Airline fails to deliver a replacement letter of credit that complies with this Agreement within thirty (30) days after Airline receives the Nonrenewal Notice (for purposes of which, the parties shall reasonably cooperate to facilitate the simultaneous exchange of the old letter of credit for the new letter of credit); (B) the happening of any instance in which the criteria set forth in Section 9.3.2(a) are not met; or (C) if the remaining term of the letter of credit is at any time less than thirty (30) days, but Airline has not delivered an extension or renewal of such letter of credit for at least one year.

### 9.4     Right to Contest; No Abatement or Set-off

9.4.1     Airline's payment to the City, and the City's acceptance from Airline, of any payment amount hereunder shall not preclude either Airline or the City from questioning, within six (6) months from the date of Airline's receipt of the Final Accounting, the accuracy of any statement on the basis of which such payment was made, or preclude the City from making, within such period, any claim against Airline for any additional amount payable by Airline under this Agreement, or preclude Airline from making, within such period, any claim against the City for any credit for any excess amount paid by Airline under this Agreement; provided, however, that the City shall not be limited by such six-month period if Airline shall have intentionally underreported its activity used in calculating any payment due by Airline under this Agreement.

9.4.2     Notwithstanding the foregoing, Airline shall not abate, suspend, postpone, set-off or discontinue any payments of Airport Fees and Charges which it is obligated to pay hereunder.

### 9.5     Airline Books and Records

9.5.1     Airline shall maintain or make available upon reasonable notice books (including documents or papers in physical or electronic form), records and accounts which are directly pertinent to this Agreement, including those relevant to the determination of any Airport Fees and Charges, each such item of information to be maintained at a minimum, until the later of seven (7) years from the date of creation or three (3) years after final payment is made, or for a longer period if necessary for pending litigation.

9.5.2     If such books, records and accounts are not maintained at Airline's offices in Chicago, Illinois, or at the Airport office, Airline shall in any case maintain such books, records and accounts within the United States or Canada, and Airline shall promptly furnish the Commissioner, the City's Chief Financial Officer (or, if there is no such officer, the City's Comptroller), the Federal Aviation Administration or the U.S. Comptroller General with all information reasonably requested by them with respect to such books, records and accounts.

The Commissioner, the City Chief Financial Officer (or, if there is no such officer, the City's Comptroller), the Federal Aviation Administration or the U.S. Comptroller General, and such persons as may be designated by them, shall each have the right, at all reasonable times, subject to prior written notice to Airline, to examine and make copies of such books, records and accounts. If the requested books, records and accounts are not made available at the Airport, and the City or its auditors are required to travel elsewhere to review them, the City may require that Airline reimburse the City for the reasonable costs of such review of Airline's books, records and accounts, provided that the City demonstrates an underpayment of five percent (5%) or more.

9.6     **City Books and Records**

The City shall follow such procedures and keep and maintain such books, records and accounts as may be necessary or appropriate under the provisions of this Agreement. Such books (physical and electronic), records and accounts shall contain all items affecting the computation of Airport Fees and Charges, recorded in accordance with generally accepted accounting principles. Airline shall have the right, at any reasonable time during the City's regular business hours and at its own expense, to examine, make copies of, and take extracts from such books, records and accounts.

Article 10

**CAPITAL IMPROVEMENT PROJECTS**

10.1     **Previously Approved Projects**

10.1.1     The City may proceed with any Capital Improvement Project approved under Prior Use and Lease Agreements ("Previously Approved Projects"), which may include design, construction and equipping, as further detailed in Exhibit J, without further Majority-in-Interest review under Section 10.8, but subject to the project oversight procedures in Sections 10.1.2 and 10.9. Previously Approved Projects shall not be subject to any conditions that are not expressly specified in Exhibit J, including without limitation any conditions placed on a majority-in-interest approval under a Prior Use and Lease Agreement, any other agreement with a Signatory Airline or any other document or representation by the City that previously purported to place a condition on the project.

10.1.2     The City may, subject to Section 10.9, modify a Previously Approved Project without further review by the Majority-in-Interest unless:

(a)     At the time the City receives construction bids for the Previously Approved Project, the total estimated Project Costs of the Previously Approved Project exceed one hundred and ten percent (110%) of the total Project Costs estimated for the project in Exhibit J, as escalated from January 1, 2018 by the then-current Construction Cost Index; or

(b)     The modification will result in a material change in project functionality as described in the applicable MII ballot.

82

If either of these events occurs, the City may proceed with the Previously Approved Project only if, after submitting the project for Majority-in-Interest review pursuant to Section 10.8, the project is not disapproved by a Majority-in-Interest.

### 10.2    Pre-Approval of the Phase I TAP Elements

10.2.1    The TAP Program is described in Exhibit K. The first phase of the TAP Program consists of several discrete elements ("Phase I TAP Elements") as further specified in Exhibit L. Exhibit L also contains procedures for the allocation and reallocation of soft costs and a program-wide design and construction contingency as well as the use of a program-wide management reserve. The total Project Costs of the Phase I TAP Elements approved by Airline are Six Billion Eighty-Three Million Sixty-Three Thousand Dollars ($6,083,063,000) ("TAP Budget"), as further specified in Exhibit L. The City shall proceed with the design, construction and equipping of each of the Phase I TAP Elements without further review by the Majority-in-Interest, subject to Sections 10.2.2 and 10.9.

10.2.2    The City may, subject to Section 10.9, modify a Phase I TAP Element without further review by the Majority-in-Interest unless any of the following occur:

(a)    At the time the City receives construction bids for the modified Phase I TAP Element, the current estimates of total Project Costs for all Phase I TAP Elements, including all soft costs and design and construction contingencies as well as the use of the management reserve, exceed the TAP Budget, as escalated from January 1, 2018 by the then-current Construction Cost Index for any Phase I TAP Element that has not reached substantial completion; or

(b)    The modification will result in a Change in Project Scope Requiring MII Review, as specified in Exhibit L.

If either of these events occurs, the City may proceed with the modified Phase I TAP Element only if, after submitting the proposed modifications for Majority-in-Interest review pursuant to Section 10.8, the modifications are not disapproved by a Majority-in-Interest.

10.2.3    The approved Phase I TAP Elements described in Exhibit L include a western employee parking and screening facility. If it is a Long-Term Signatory Airline, Airline shall meet with the City and other Long-Term Signatory Airlines no later than December 31, 2022 to evaluate the expansion of the parking and screening facility to include passenger parking and screening, taking into consideration, among other factors, (i) the implications for Passenger Carriers' operations, (ii) air quality conditions at the Airport and surrounding areas, the need for emission reductions or other actions to improve air quality and the feasibility, impacts and costs of mitigation measures, other than an expansion of the western parking and screening facility, to improve air quality, (iii) the expected utilization of such an expanded facility, (iv) the costs of such a facility and (v) the feasibility of expanding the facility. After meeting with the Long-Term Signatory Airlines, the City may submit a plan for the expanded parking facility for Majority-in-Interest review; provided, however, that the City may at any time after December 31, 2022 fund and allocate to appropriate Cost Centers the costs of the following planning and design activities for the expanded facility: planning, environmental review and up to thirty

percent (30%) design; provided, however, that these planning, environmental review and up to thirty percent (30%) design costs shall not exceed Forty Million Dollars ($40,000,000).

10.3     **Additional TAP Elements**

10.3.1     Exhibit M describes Additional TAP Elements and, where applicable, Additional TAP Element Triggers. Subject to Sections 10.3.2 and 10.3.4, the City may proceed with the design, construction and equipping of each Additional TAP Element that includes an Additional TAP Trigger without further review by the Majority-in-Interest if:

(a)     The Additional TAP Element Trigger(s) specified for the project in Exhibit M have been met for any three (3) consecutive years, which may occur before or after the O'Hare Global Terminal ("OGT") and O'Hare Global Concourse ("OGC"), as defined in Exhibit L, are complete and in service;

(b)     There are no airspace or airfield capacity constraints that would diminish the utility of the Additional TAP Element;

(c)     The OGT and OGC are complete and in service;

(d)     The City does not plan any modifications of the Additional TAP Element that would result in a Change in Project Scope Requiring MII review, as specified in Exhibit M; and

(e)     The City first provides the Executive Working Group with documentation that the conditions in Sections 10.3.1(a) through (d) have all been met and consults with the Executive Working Group on the estimated timing of the Additional TAP Element.

10.3.2     Within twelve (12) months of the substantial completion of the OGT and OGC, the City shall meet with the Long-Term Signatory Carriers to:

(a)     Determine whether Additional TAP Element Triggers in Exhibit M should be revised downward. Any such revisions to the Additional TAP Element Triggers proposed by the City shall be subject to review by the Majority-in-Interest in accordance with Sections 10.8.2 and 10.8.3 and, if not disapproved, shall replace the Additional TAP Element Triggers in Exhibit M; and

(b)     Discuss the Additional TAP Elements in Exhibit M that do not include triggers and determine whether Additional TAP Element Triggers should be adopted or the projects should otherwise proceed. Any additions of Additional TAP Element Triggers or proposals to proceed with an Additional TAP Element that does include Additional TAP Element Triggers that are proposed by the City shall be subject to review by the Majority-in-Interest in accordance with Sections 10.8.2 and 10.8.3.

10.3.3     After satisfying the requirements specified in Sections 10.3.1 or 10.3.2, the total Project Costs for the Additional TAP Element specified in Exhibit M shall be added to

the TAP Budget and the Additional TAP Element shall be subject to the requirements of Sections 10.2.2 and 10.9.

    10.3.4      Notwithstanding anything to the contrary in this Section 10.3:

    (a)      Airline acknowledges that the City may include environmental review of Project 13, "Completion of Consolidated APM and Utility Tunnel and installation of APM – Eastern and Western Section," described in Exhibit M, Additional TAP Elements, as part of TAP Phase I environmental review without further review by the Majority-in-Interest. The City may commence environmental review for Additional TAP Elements other than Project 13 and preliminary design for all Additional TAP Elements prior to July 1, 2023 only if such environmental review and preliminary design have been submitted for review and not disapproved by a Majority-in-Interest; thereafter, the City may commence environmental review and preliminary (up to thirty percent (30%)) design for all Additional TAP Elements without further review by the Majority-in-Interest.

    (b)      The City shall, to the extent permitted by the PFC Act and 14 CFR Part 158, Appendix A and subject to Section 16.5.3, utilize available PFCs to fund environmental review and preliminary design for Additional TAP Elements, including the Automated People Mover. For the avoidance of doubt, to the extent the City is unable to use PFCs to fund environmental review and preliminary design for Additional TAP Elements, including the Automated People Mover, the City may recover the resulting Airline Rate-Based Capital Costs.

    10.3.5     <u>Federal Approval of TAP.</u> The TAP Program as described in Exhibit K, including the Phase I TAP Elements described in Section 10.2 and the Additional TAP Elements described in this Section 10.3, is subject to final approval by the FAA, which may require modifications to the TAP Program and mitigation to address project impacts, including environmental and historic property impacts. Any such modifications or mitigation shall be exempt from Majority-in-Interest review under this Article 10; provided, however, any such modifications or mitigation shall be reviewed and accepted by the Executive Working Group as set forth in the EWG Protocols; and further provided that the aggregate costs of such modifications and mitigation shall not exceed Fifty Million Dollars ($50,000,000).

## 10.4    Other Pre-Approved Projects in the City's Capital Improvement Program (CIP)

    10.4.1     Airline agrees that the City may proceed with the design, construction and equipping of each of the Capital Improvement Projects described in Exhibit N ("Pre-Approved CIP Projects") without further review by the Majority-in-Interest, subject to Sections 10.4.2 and 10.9.

    10.4.2     The City may, subject to Section 10.9, modify a Pre-Approved CIP Project without further review by the Majority-in-Interest unless:

    (a)      At the time the City receives construction bids for the Pre-Approved CIP Project, the total estimated Project Costs of the Pre-Approved CIP Project exceeds one hundred and ten percent (110%) of the total Project Costs estimated for the project in Exhibit N, as escalated from January 1, 2018 by the then-current Construction Cost Index; or

(b)     The modification will result in a material change in project functionality.

If either of these events occurs, the City may proceed with the Pre-Approved CIP Project only if, after submitting the project for Majority-in-Interest review pursuant to Section 10.8, the project is not disapproved by a Majority-in-Interest.

### 10.5    Pre-Approved Allowances

10.5.1     The City may implement, and fund and finance, Capital Improvement Projects within the categories and limits of the Pre-Approved Allowances specified for each year in Exhibit O and allocate the costs of all such projects to the appropriate Airline-Supported Cost Centers.

10.5.2     At least sixty (60) days prior to each Fiscal Year, the City shall present to the Executive Working Group a list of projects to be implemented, and funded or financed, in the following year with Pre-Approved Allowances. After consultation, the City shall take into consideration any recommendations from the Executive Working Group before finalizing the list of such projects the City decides will be undertaken during the Fiscal Year and funded or financed within the limits of the Pre-Approved Allowances. At any point during the Fiscal Year, the City may alter the projects to be implemented and funded with Pre-Approved Allowances after consultation with the Executive Working Group, provided that the projects stay within the categories and limits specified in Exhibit O.

10.5.3     Any unused or unencumbered portion of an annual, recurring Pre-Approved Allowance for a given Fiscal Year must be encumbered within the following two (2) Fiscal Years, or will be forfeited; *provided*, however, that actual encumbrances and expenditures for any Fiscal Year shall not be greater than two hundred percent (200%) of that Fiscal Year's Pre-Approved Allowance. The Pre-Approved Allowance for Infrastructure Reliability may be used throughout the Term in the reasonable discretion of the City.

### 10.6    Majority-in-Interest Review of New Projects

10.6.1     Prior to proceeding, the City must submit to the Long-Term Signatory Airlines for Majority-in-Interest review under Section 10.8 Capital Improvement Projects that are not Approved Projects, Exempt Projects or projects funded with Pre-Approved Allowances ("New Projects"). The City may proceed with a New Project unless the project is disapproved by a Majority-in-Interest pursuant to Section 10.8.

10.6.2     If a New Project is not disapproved by a Majority-in-Interest, the City, after consultation with the Executive Working Group, may modify the New Project without further review by the Majority-in-Interest unless:

(a)     At the time the City receives construction bids for the New Project, the total estimated Project Costs of the New Project exceed one hundred and ten percent (110%) of the total Project Costs estimated for the project pursuant to Section 10.8.1, as escalated from the date the City submits the project for review under Section 10.8.1 by the then-current Construction Cost Index; or

(b)    The modification will result in a Change in Project Scope Requiring MII Review, as specified in the proposal submitted for Majority-in-Interest review under Section 10.8.1.

If either of these events occurs, the City may proceed with the New Project only if, after submitting the project for Majority-in-Interest review pursuant to Section 10.8, the project is not disapproved by a Majority-in-Interest.

### 10.7    Capital Improvement Projects Exempt from Majority-In-Interest Review

10.7.1    A Capital Improvement Project that is not an Approved Project or funded with Pre-Approved Allowances, but meets any one or more of the conditions set forth below shall be exempt from Majority-in-Interest review ("Exempt Project"):

(a)    Capital Improvement Projects that will not increase the amount of Airline Rate-Based Capital Costs and with estimated annual Airline Rate-Based O&M Expenses of less than One Million Dollars ($1,000,000) per project or Five Million Dollars ($5,000,000) cumulatively per year as escalated annually from January 1, 2018 to the estimated DBO of the Project by the then-current Consumer Price Index for All Urban Consumers for Chicago.

(b)    Capital Improvement Projects supported by federal and state grants that will fund at least seventy-five percent (75%) of the estimated Project Costs, provided that the total estimated Airline Rate-Based Project Costs of the project do not exceed Ten Million Dollars ($10,000,000) per project as escalated from January 1, 2018 by the then-current Construction Cost Index.

(c)    Special facility projects or other Capital Improvement Projects to construct new or enlarge or improve existing Premises of a Signatory Airline, provided that the Signatory Airline fully and directly funds the Project Costs and any associated O&M Expenses using any funds available to the Signatory Airline, including without limitation funds received by the Signatory Airline from state or federal grants.

(d)    Capital Improvement Projects necessary to comply with the requirements of federal, state and local agencies, including compliance with any applicable statutes, regulations, orders, certification requirements and FAA Advisory Circulars, building codes and local regulations of general application.

(e)    Capital Improvement Projects to settle claims or lawsuits, satisfy judgments, or comply with judicial or administrative orders arising from or related to the ownership, operation and maintenance of the Airport.

(f)    Capital Improvement Projects to repair or replace Airport property damaged or destroyed by fire, weather or other casualty, to a condition functionally equivalent to when the property was damaged or destroyed, provided that the City uses commercially reasonable efforts to obtain insurance proceeds and apply such proceeds, if any, to fund or offset the costs of the project.

(g)     Capital Improvement Projects of an emergency nature, which in the reasonable judgment of the City, if not undertaken, would substantially impair the current operation of the Airport.

(h)     Capital Improvement Projects necessary, in the reasonable judgment of the City, for public and employee safety or security.

10.7.2     This Article 10 shall be subordinate to the requirements of 49 U.S.C. § 40117(f).  No Capital Improvement Project shall be subject to Majority-in-Interest review under this Article 10 to the extent such project is fully financed by PFCs or PFC-backed bonds. However, any Capital Improvement Project that includes Airline Rate-Based Project Costs may be subject to Majority-In-Interest review to the extent of those Airline Rate-Based Project Costs, unless otherwise exempt from Majority-In-Interest review.

10.7.3     The City shall notify all Long-Term Signatory Airlines in writing of any proposed Exempt Project under this Section 10.7.  Except in the case of an emergency or if necessary for safety or security pursuant to Sections 10.7.1(g) and 10.7.1(h), such notice shall be given at least forty-five (45) days prior to incurring Airline Rate-Based Project Costs on the Exempt Project.  The notice shall contain a statement as to why it is an Exempt Project.  Airline, if a Long-Term Signatory Airline, may submit comments to the City within thirty (30) days of the City delivering such notice.  The City shall give due consideration to any such comments. The City shall present the proposed Exempt Project at the next meeting of the Executive Working Group.  After such meeting, the City may commence the Exempt Project.  Airline shall use commercially reasonable efforts to take such action as the City may reasonably request to enable the City to implement Exempt Projects in a timely and cost-effective manner.

10.8     **Method of Obtaining Majority-in-Interest Approval**

10.8.1     Whenever the City shall be required to submit a Capital Improvement Project to the Long-Term Signatory Airlines for Majority-in-Interest review under this Article 10, the City shall submit a written proposal to Airline if Airline is a Long-Term Signatory Airline that includes the following:

(a)     The current purpose, scope and definition for the project, including any modifications if the project was previously approved;

(b)     A list of Changes in Project Scope Requiring MII Review;

(c)     The currently anticipated schedule;

(d)     The current funding plan, cost center(s) to which Project Costs will be allocated, and estimated total Project Costs and Airline Rate-Based Project Costs; and

(e)     The currently projected impact on Airport Fees and Charges.

10.8.2     The City shall submit the written proposal under Section 10.8.1 to Airline at least forty-five (45) days prior to incurring Airline Rate-Based Project Costs on the Capital Improvement Project, and notify the chair of the AAAC that the written proposal has

been submitted to all Long-Term Signatories. A Capital Improvement Project shall be deemed to be approved if (a) a Majority-in-Interest approves it, or (b) the City is not notified in writing by the chair of the AAAC within thirty (30) days of delivery of the City's written proposal that a Majority-in-Interest has disapproved the City's proposal. Such written notification to the City shall include the written disapproval of each Long-Term Signatory Airline that disapproved the proposal. A conditional approval, disapproval of a portion of the proposal or counter-proposal delivered by the Long-Term Signatory Airlines' representative shall be deemed to be an approval of the entire Capital Improvement Project.

        10.8.3    The City shall promptly notify Airline if the Capital Improvement Project has been disapproved or deemed approved by the Majority-in-Interest.

        10.8.4    In the event that Majority-in-Interest review is required for an increase in total Project Costs under Sections 10.1.2(a), 10.2.2(a), 10.4.2(a) or 10.6.2(a), the increase in total Project Costs requested by the City shall be added to the total estimated Project Costs for the purpose of evaluating future increases in Project Costs, unless a Majority-in-Interest disapproves the City's request. For example, if the City, after Majority-in-Interest approval, modifies a New Project with an original estimate of $1,000,000 in total Project Costs in a way that increases total Project Costs by $300,000, the new estimate of total Project Costs shall be $1,300,000 and further Majority-in-Interest review will not be required unless costs are further increased by more than $130,000. Additionally, in the event that Majority-in-Interest review is required for an increase in total Project Costs under Section 10.2.2(a), the increase in total Project Costs requested by the City shall be added to the TAP Budget, unless a Majority-in-Interest disapproves the City's request.

## 10.9   **Project Implementation**

        10.9.1    <u>The Executive Working Group.</u> The Executive Working Group shall consist of City representatives selected by the City and the following Signatory Airline representatives: one representative selected by each Long-Term Signatory Airline ("Long-term Signatory Airline Representatives"), and one representative selected by the Signatory Airlines offering only international passenger service at the Airport that are not Alliance Partners of a Long-Term Signatory Airline ("International Airlines Representative") (collectively, "Signatory Airline Representatives"). The City and the Signatory Airlines may change their representatives at their discretion. The International Airlines Representative may be a third party selected by the Signatory Airlines offering only international passenger service at the Airport that are not Alliance Partners of a Long-Term Signatory Airline.

        10.9.2    <u>Procedures for Executive Working Group Determinations.</u> The City and the Executive Working Group shall develop EWG Protocols for establishing standing meetings, advance delivery of materials, provision for remote participation, rules governing general and special meetings, quorum requirements and technical working groups for design and construction review on behalf of the Executive Working Group.

        10.9.3    <u>City Presentations to the Executive Working Group.</u> For each Approved Project, the City shall make three presentations to the Executive Working Group:

      (a)    30% Design Completion. The City shall provide an updated estimate of total Project Costs and Airline Rate-Based Project Costs and report any changes to project scope or schedule.

      (b)    60% Design Completion. The City shall provide an updated estimate of total Project Costs and Airline Rate-Based Project Costs and report any changes to project scope or schedule.

      (c)    90% Design Completion. The City shall provide an updated estimate of total Project Costs and Airline Rate-Based Project Costs and report any changes to project scope or schedule.

      10.9.4    The Executive Working Group shall meet at least once every month, but may meet more frequently as needed. At such meetings, the Executive Working Group shall:

      (a)    Review the status of all Approved Projects and Pre-Approved Allowances;

      (b)    Consult concerning modifications to Previously Approved Projects, Phase I TAP Elements, Additional TAP Elements, Pre-Approved CIP Projects and New Projects that change the scope of any project or increase its estimated total Project Costs;

      (c)    If the City's presentations to the Executive Working Group under Section 10.9.3 demonstrate that the updated estimates for an Approved Project will increase total Project Costs beyond the cost review thresholds specified in Sections 10.1.2(a), 10.2.2(a), 10.4.2(a) or 10.6.2(a), then the Signatory Airline Representatives may make recommendations to the City to modify the project to reduce costs. If the City rejects the recommendations, the City may continue with the design process; provided, however, that for CIP Projects and New Projects, if at 60% Design Completion or 90% Design Completion the project is more than fifty percent (50%) over the estimate for total Project Costs provided in Exhibit N or in the proposal for a New Project under Section 10.8.1, then the Signatory Airline Representatives may require the City to seek Majority-in-Interest review before advancing the design of the project. Determinations under this Section 10.9.4(c) shall be made by Signatory Airline Representative for Signatory Airlines that, during the previous Fiscal Year, together accounted for at least fifty percent (50%) of the total Maximum Gross Landed Weight of all Signatory Airlines with Signatory Airline Representatives. In the event of a tie, the City shall continue with the design process.

      (d)    After the award of a construction contract for any Approved Project, consult concerning proposed increases in total Project Costs exceeding one hundred and ten percent (110%) of the total Project Costs estimated for the project in Exhibit J, Exhibit M, Exhibit N, or the proposal submitted by the City pursuant to Section 10.8.1 and recommend alternatives to the Commissioner to minimize the proposed cost increases;

      (e)    Pursuant to Section 10.5.2, consult concerning the City's list of Capital Improvement Projects to be implemented and funded with Pre-Approved Allowances for the upcoming Fiscal year; and

(f)     Create working groups or subcommittees, consisting of City and Signatory Airline representatives, to review specific issues and make recommendations to the Executive Working Group.

(g)     Engage an Air Carrier facilities representative through the Airline Liaison Office to consult with the City to review the development and status of Capital Improvement Projects. The costs of the facilities representative shall be paid by the City and allocated to the Terminal Cost Center.

10.9.5     General Implementation Provisions

(a)     Airline shall use commercially reasonable efforts to take such action as the City may reasonably request to enable the City to implement Approved Projects, projects funded with Pre-Approved Allowances and Exempt Projects in a timely and cost-effective manner.

(b)     The City shall use commercially reasonable efforts to complete Approved Projects, projects funded with Pre-Approved Allowances and Exempt Projects in a manner that minimizes materially adverse impacts on Airline's operations and use and occupancy of the Premises.

(c)     Airline acknowledges and agrees that the City may delegate responsibilities to Airline for the design, construction and equipping of Approved Projects, projects funded with Pre-Approved Allowances and Exempt Projects; provided, however, that all construction and equipping of Approved Projects shall be done in a good and workmanlike manner, and that the City shall retain the power and authority to enforce all terms and provisions of all design, construction and equipment contracts all as may be further specified in a reimbursement agreement between Airline and the City in accordance with Section 4.9.3.

(d)     The City shall consult with Airline designated technical representatives, if requested by Airline, in the implementation of the TAP Program, Approved Projects, projects funded with Pre-Approved Allowances, and Exempt Projects.

10.9.6     Project Financing.

The City and Airline acknowledge and agree that it is the best interest of both parties to minimize total financing costs and that the timing of bond issuance relative to expenditures, market conditions and issuance costs, among other factors, shall be considered by the City when issuing bonds to finance Approved Projects.

10.10  **PFC Priorities**

10.10.1   To the full extent permitted by the PFC Act and 14 CFR Part 158, Appendix A and subject to Section 16.5.3, the City agrees to use all PFC funds collected by the City that are not, as of the Effective Date, already committed to PFC-eligible projects through applications approved by the FAA, and including PFC funds collected by the City in the event that Congress authorizes an increase in the current maximum PFC of $4.50 per passenger, for

one or more the following, as reasonably determined by the City and without regard to any priority:

        (a)     To fund any PFC eligible project with estimated total Project Costs of Five Million Dollars ($5,000,000) or less on a pay-go-basis.

        (b)     To fund the APM on a pay-go basis or through PFC-backed bonds, subject to Section 10.3 and to the extent the project is PFC eligible.

        (c)     To pay an aggregate amount of not less than Seven Hundred Thirty Million Dollars ($730,000,000) for annual debt service for Phase I TAP Elements to the extent that they are PFC eligible.

        (d)     To retain the PFC funds for future use on PFC-eligible projects as approved by the FAA.

## Article 11

## ADDITIONAL OBLIGATIONS OF THE AIRLINE AND THE CITY

### 11.1   Operation, Maintenance, Replacement and Repair

      11.1.1    The City shall, in accordance with the Facilities Maintenance Protocols, operate, maintain and keep in good repair, expending such amounts for O&M Expenses as may be reasonably necessary therefor, all of the public areas, public facilities, Common Use Premises and City Equipment at the Airport, except as otherwise provided in Section 11.1.2.

      11.1.2    Airline shall, in accordance with the Facilities Maintenance Protocols, be responsible for and shall perform or cause to be performed, maintenance and repair of its Exclusive Use Premises, Preferential Use Premises including any City Equipment within its Preferential Use Premises, and equipment owned by Airline at the Airport. Airline shall, at all times:

        (a)     keep all fixtures, equipment and personal property in a clean, safe, sanitary and orderly condition and appearance;

        (b)     maintain all fixtures, equipment and personal property owned by Airline and its Exclusive Use Premises and Preferential Use Premises in good condition (reasonable wear and tear excepted) and perform all ordinary repairs, replacements and inside painting, such repairs, replacements and painting by Airline to be of a quality and class not inferior to the original material and workmanship;

        (c)     for any equipment installed in or on the Exclusive Use Premises and Preferential Use Premises that is purchased using the proceeds of any financing sponsored by the City, repair, maintain and replace such equipment as is necessary to assure that at the end of the term hereof the fair market value of such equipment and its remaining useful life will be consistent with, and sufficient to establish for applicable tax and accounting purposes, ownership of such equipment by the City; and

(d) either directly or through a Contractor (which Contractor shall obtain a City permit), dispose of its garbage, debris and other waste materials (excluding snow and ice).

If the performance of any of the foregoing maintenance, repair, replacement or painting obligations of Airline requires work to be performed near an active taxiway or runway or where safety of Airport operations might be involved, Airline shall post guards or erect barriers or other safeguards at such locations as required and approved by the City and the FAA. Compliance with such requirements shall not relieve Airline from its liability for the safe performance of its obligations under this Agreement.

11.1.3    Airline shall maintain its assets at the Airport and City facilities for which it has responsibility to maintain all in accordance with the Facilities Maintenance Protocols to provide a safe, functional and compliant operating environment, and thereby protect the environment and the health of the traveling public and other users of the Terminal Complex. The City shall maintain Common Use Premises, City Equipment and other facilities at the Airport for which it has responsibility to maintain all in accordance with the Facilities Maintenance Protocols.

11.1.4    The City may, upon Airline's request, agree on terms satisfactory to the City to allow Airline to assume responsibility for the maintenance of City-owned Baggage Claim Equipment and City-owned Baggage Make-up Equipment in Airline's Preferential Use Premises.

11.2    **Taxes, Licenses and Permits**

11.2.1    Subject to Section 11.2.2, Airline shall pay or cause to be paid any and all taxes and shall obtain or cause to be obtained any and all licenses, permits, certificates and other authorizations required by any governmental authority in connection with the operations or activities performed by Airline at the Airport, including any and all taxes and other charges in connection with Airline's lease, use or occupancy of the Premises. Airline may contest any such taxes as provided in Section 13.1.2(b).

11.2.2    The City shall pay as an O&M Expense any and all applicable taxes or special assessments which may be levied or assessed upon the Premises, except, however, any taxes associated with or assessed on any personal property or leasehold interests of Airline located on such Premises shall be the obligation of Airline and, as such, shall be paid by Airline and not by the City.

11.2.3    Airline shall not permit a lien or encumbrance to attach to the Premises or the Airport by reason of any failure to pay taxes for which it is responsible.

11.3    **Performance by the City upon Failure of Airline**

If Airline or its Affiliate, Alliance Partner, Contractor, or Sublessee (a) fails to perform for a period of thirty (30) days after written notice from the City to Airline and its AAAC Representative in accordance with Section 18.4 any obligation required under this Article 11; or (b) if the obligation cannot be performed within thirty (30) days and Airline has failed to initiate corrective action within the thirty (30) days of the City's notice or fails to diligently pursue such

corrective action once initiated, then the City may perform such obligation of Airline (or its Affiliate, Alliance Partner, Contractor or Sublessee) without further notice and charge Airline for the costs of its performance plus an administrative fee of fifteen percent (15%); provided, however, that if Airline's (or its Affiliate, Alliance Partner, Contractor or Sublessee's) failure to perform any such obligation endangers the health or safety of persons or the safety of operations at the Airport and the City so states in its notice to Airline, the City may perform such obligation of Airline (or its Affiliate, Alliance Partner, Contractor or Sublessee) without waiting thirty (30) days after its notice if Airline does not take prompt action to address the issue after City has given such notice and charge Airline for its costs of its performance plus an administrative fee of twenty-five percent (25%). For any notices relating to this Section 11.3, the parties agree that written notice (in the forms provided in Section 18.4) is required but that the City may, at its option, provide supplemental notice by electronic mail to Airline and its AAAC Representative.

### 11.4 Utilities

11.4.1 Airline shall be solely responsible for paying all utilities provided to Airline, its Contractors, agents and employees at the Premises to the extent such utilities are metered or otherwise calculated to identify usage by Airline, its contractors, agents and employees at the Premises, provided that such metering or calculation is applied to Air Carriers on a non-discriminatory basis throughout the Airport.

11.4.2 The City shall provide or cause to be provided the following utility services to the Premises in reasonable amounts and at pressures appropriate for airline operations: water, electricity, gas, fire suppression systems, sewage outlets, heating, ventilation and air conditioning. The City shall reasonably determine the points in the Premises where such services will be made available to Airline, after consultation with Airline. In the event Airline desires to change the points of supply by the City, the expense of making such changes or alterations shall be at the sole cost of Airline. Any additional utility services requested by Airline and not otherwise provided by the City shall be provided only with the City's approval and shall be subject to separate tariffs imposed, if any, by the applicable utility.

11.4.3 Except where, and to the extent, caused by any willful and wanton act of the City, its agents, employees, contractors, officers, directors or predecessors in interest, Airline expressly waives any and all claims against the City for damages arising or resulting from failures or interruptions of utility services or any failure of performance by an independent party providing utility services to the Premises, including electricity, gas, water, plumbing, sewage, telephone, communications, heat, ventilation, air conditioning, or for the failure or interruption of any public or passenger conveniences.

### 11.5 City Ownership of Airport

Airline agrees and irrevocably elects, with respect to itself and any successors in interest under this Agreement it will not claim depreciation or an investment credit for purposes of federal income taxes with respect to any portion of the Airport except an improvement or project that has been solely financed by Airline.

Article 12

## CONSORTIUM

### 12.1    Equipment and Services Consortium

The City acknowledges that a group of Air Carriers may choose to form an Equipment and Services Consortium. In such event, the City will negotiate in good faith in an effort to reach an agreement with the Equipment and Services Consortium pursuant to which the Consortium would operate and maintain certain specified equipment and perform specified services at the Airport.

Article 13

## INDEMNIFICATION AND INSURANCE

### 13.1    Indemnification

13.1.1    Airline agrees to defend, indemnify and hold harmless the City Indemnified Parties to the maximum extent allowed by applicable statutes and case law, from and against any and all Claims, including payments of claims of liability resulting from any injury or death of any person or damage to or destruction of any property, arising out of or relating to:

(a)    the tortious acts or omissions of Airline or its Associated Parties;

(b)    Airline's or its Associated Party's use or occupancy of the Airport and the Premises;

(c)    the violation by Airline of this Agreement or of any law, ordinance, regulation or court order affecting the Airport; or

(d)    suits of whatever kind or nature alleging violations of any federal or state laws as a result of any actions taken by Airline or its Associated Parties, or Airline's failure to comply with obligations imposed upon Airline or its Associated Parties, pursuant to this Agreement;

and Airline will, at its own cost and expense, defend all such claims, demands and suits, whether frivolous or not. To the extent City Indemnified Parties reasonably expend any cost and expense, including attorney fees, in investigating or responding to such claims, demands and suits, Airline will reimburse the City Indemnified Parties for all such costs and expense, subject to Section 13.1.7.

13.1.2    Without limiting the foregoing, Airline also agrees to defend, indemnify and hold harmless the City Indemnified Parties:

(a)     from and against any and all claims or liability for compensation under any workers' compensation statute arising out of the injury or death of any employee of Airline. Airline shall cause its licensees and Contractors to maintain in effect at all times workers' compensation insurance as required by law; and

(b)     from, and to assume all liability for, and to pay, all taxes and assessments for payment of which the City may become liable and which by law may be levied or assessed on the Premises occupied by Airline pursuant to this Agreement (excluding those taxes which are the City's responsibility pursuant to Section 11.2.2), or which arise out of the operations of Airline or by reason of Airline's occupancy of its Premises. However, Airline may, at its own risk, cost and expense, and at no cost to the City, contest, by appropriate judicial or administrative proceedings, the applicability or the legal or constitutional validity of any such tax or assessment, and the City will, to the extent permitted by law, execute such documents as are necessary to permit Airline to contest or appeal the same. Airline shall be responsible for obtaining bills for all of said taxes and assessments for which Airline is responsible directly from the taxing authority and shall promptly deliver to the City copies of receipts of payment. In the event the City receives any tax billings, it will forward said billings to Airline as soon as practicable.

13.1.3     Without limiting the foregoing, Airline shall cause any Contractor to agree to protect, defend, indemnify and hold the City Indemnified Parties free and harmless from and against any and all claims, damages, demands, and causes of action of all kinds including claims of property damage, injury or death, in consequence of granting the relevant Contract or arising out of or being in any way connected with the Contractor's performance under this Agreement except for matters shown by final judgment to have been caused by or attributable to the negligence of any City Indemnified Party to the extent prohibited by 740 ILCS 35/1 *et seq.* The indemnification provided herein shall be effective to the maximum extent permitted by applicable statutes. To the extent Contractor fails to defend any and all claims, demands or suits against the City Indemnified Parties including claims by any employee, Contractors, agents or servants of Contractor even though the claimant may allege that a City Indemnified Party is or was in charge of the work or that there was negligence on the part of a City Indemnified Party, Airline shall be responsible for such defense. To the extent City Indemnified Parties reasonably expend any cost and expense, including attorney fees, in investigating or responding to such claims, demands and suits, Airline will reimburse the City Indemnified Parties for all such costs and expense, subject to Section 13.1.7. "Injury" or "damage," as such words are used in this Section 13.1 shall be construed to include injury, death or damage consequent upon the failure of or use or misuse by Contractor, its subcontractors, agents, servants or employees, of any scaffolding, hoist, cranes, stays, ladders, supports, rigging, blocking or any and all other kinds of items of equipment, whether or not the same be owned, furnished or loaned by the City. Notwithstanding Airline's obligation to cause any Contractor to agree to the requirements set forth in this Section 13.1.3 Airline's failure to cause Contractor to do so shall not constitute a breach hereof, provided that Airline performs all such actions Contractor would have been required to perform under this Section 13.1.3, including indemnifying and defending the City, itself.

13.1.4     The City shall notify Airline as soon as practicable of each Claim in respect of which indemnity may be sought by the City against Airline hereunder, setting forth the

particulars of such Claim, and shall furnish Airline with a copy of all judicial filings and legal process and any correspondence received by the City related thereto.

13.1.5    The City shall be invited to attend and participate in all meetings (including those related to settlement) and to appear and participate in all judicial proceedings related to any Claim against the City, provided that the City shall bear the costs of its participation to the extent such participation is not in furtherance of the City's defense of any such Claim.  The City shall approve the terms of any settlement which requires the City to perform or refrain from performing any action, provided that such approval will not be unreasonably withheld if a settlement includes a full and unconditional release for City Indemnified Parties.

13.1.6    Without limiting the generality of any other provision hereof, Airline shall reimburse the City for the cost of any and all reasonable attorney's fees and investigation expenses and any other reasonable costs incurred by the City in the investigation defense and handling of said suits and claims and in enforcing the provisions of this Agreement.

13.1.7    Notwithstanding the provisions of this Section 13.1, in the event that the City and Airline mutually agree or a court of competent jurisdiction determines by a final order that (a) a City Indemnified Party's negligence is at least fifty-one (51%), or (b) a City Indemnified Party's willful and wanton misconduct is any percentage, of the total fault which proximately caused the Claims, Airline's obligation to indemnify the City for amounts to be paid in connection with the Claims shall be limited to the amount attributable to Airline's and its Associated Parties' proportionate share of the total fault which proximately caused the Claims. The City and Airline agree, however, that this Section 13.1.7 is not intended to obviate or lessen in any way Airline's duty to defend the City Indemnified Parties; provided, however, that to the extent the City and Airline mutually agree or a court of competent jurisdiction rules that the Claims were the result of the sole negligent act or omission or the willful and wanton misconduct of a City Indemnified Party, the City shall reimburse Airline for its proportionate share of the costs of defense, including, but not limited to, attorneys' fees and court costs.  For the avoidance of doubt, the City shall reimburse Airline for all defense costs Airline incurred with respect to defending the City Indemnified Parties against Claims to the extent that the City and Airline mutually agree or a court of competent jurisdiction rules that such Claims were the result of the sole negligent act or omission of a City Indemnified Party.

13.1.8    Notwithstanding the provisions of this Section 13.1, Airline's indemnification obligations for Environmental Claims are set forth in Section 14.7.

13.1.9    The foregoing express obligation of indemnification shall not be construed to negate or abridge any other obligation of indemnification running to the City or a City Indemnified Party that would exist at common law or under other provisions of this Agreement, and the extent of the obligation of indemnification shall not be limited by any provision of insurance undertaken in accordance with this Agreement.

13.1.10    Subject to Section 13.1.7, Airline shall be liable for any loss or damage to any personal property or equipment of Airline, its agents, servants, employees, officials, or independent contractors.

13.1.11    Airline waives the right of contribution against the City Indemnified Parties, subject to Section 13.1.7, and subrogation against the City Indemnified Parties.

13.1.12    In the event that Airline is accommodated by another Signatory Airline pursuant to Article 5, Airline's indemnification obligations under this Section 13.1 to the City and City Indemnified Parties shall also apply to the accommodating Signatory Airline to the extent of Airline's use of the accommodating Signatory Airline's space.

13.1.13    This Section 13.1 shall survive expiration or early termination of this Agreement.  Airline understands and agrees that any insurance protection furnished by Airline pursuant to Section 13.2 shall in no way limit Airline's responsibility to indemnify and hold harmless the City under the provisions of this Agreement.

13.2    **Insurance**

13.2.1    <u>Insurance Coverage Required</u>.  Airline shall procure and maintain at all times, at Airline's own expense, the types of insurance specified below, with insurance companies having an AM Best rating of A- or better, financial size rating of IV or better; or for those insurance companies not subject to AM Best's rating (a) an equivalent financial strength rating from S&P or (b) as determined by the City in its sole discretion, a similar nationally or internationally recognized reputation and responsibility, or as reasonably approved by the City, covering all operations under this Agreement performed by Airline.  The kinds and amounts of insurance required are as follows:

(a)    <u>Workers' Compensation and Employer's Liability Insurance</u>.  Workers' Compensation Insurance, as prescribed by Applicable Law, covering all employees who are to provide a service under this Agreement with statutory limits.  Such insurance shall include Employer's Liability Insurance coverage with limits of not less than $1,000,000 each accident; $1,000,000 disease-policy limit; $1,000,000 disease-each employee.  Coverage shall include other states endorsement, alternate employer and voluntary compensation, when applicable.

(b)    <u>Commercial General/Airline Liability Insurance (Primary and Umbrella)</u>.  Commercial General/Airline Liability Insurance or equivalent coverage with limits of not less than $750,000,000 per occurrence and in the aggregate for war risks and allied peril, for Air Carriers using passenger aircrafts with 100 seats or more and $500,000,000 per occurrence and in the aggregate for war risks and allied peril, for Air Carriers using passenger aircrafts with less than 100 seats for bodily injury (including death), personal injury, property damage liability, and aircraft liability (including passengers), including a $25,000,000 sublimit for personal injury to non-passengers.  Such insurance shall include but not be limited to: all premises and operations, products/completed operations, war risk and allied peril liability (including terrorism), liability for any auto (owned, non-owned and hired) including liability for vehicles on the restricted access area of the Airport, including but not limited to baggage tugs, aircraft pushback tugs, air stair trucks and belt loaders, mobile equipment, hangar keepers liability, cargo liability, explosion, collapse, underground, separation of insureds, defense, independent contractors (if commercially available), liquor liability and blanket contractual liability (not to include Endorsement CG 21 39 or equivalent).

98

The City shall be named as an additional insured on the policy and coverage shall be at least as broad as that afforded the named insured. Also, in the event that a Signatory Airline accommodates Airline pursuant to Article 5, such Signatory Airline shall be named as an additional insured on the policy and coverage shall be at least as broad as that afforded the named insured. The additional insured coverage shall not have any limiting endorsement or language under the policy such as but not limited to, Airline's sole negligence or the City vicarious liability. Airline's insurance shall be primary without right of contribution by any other insurance or self-insurance maintained by the City.

To the extent Airline relies on excess or umbrella insurance to satisfy the requirements of this Section (ii) or (iii), any such policy shall follow form and be no less broad than the underlying policy, shall cover the term of underlying policy without interruption, and shall include a drop down provision with no gap in policy limits.

   (c) <u>Automobile Liability Insurance (Primary and Umbrella)</u>. When any motor vehicles are used in connection with work to be performed by or on behalf of Airline, Airline shall provide Automobile Liability Insurance with limits of not less than $10,000,000 per occurrence combined single limit, for bodily injury and property damage for any auto including owned, non-owned or hired autos; provided, however, that Airline may reduce the foregoing amount to $1,000,000 per occurrence combined single limit so long as Airline's Commercial General/Airline Liability Insurance or equivalent coverage includes excess auto liability. The City and any Signatory Airline accommodating Airline pursuant to Sections 5.5 or 5.6 shall be named as an additional insured on a primary, non-contributory basis.

   (d) <u>All Risk Builders Risk Insurance</u>. When Airline undertakes any construction at the Airport, including improvements, betterments or repairs, Airline shall provide or cause its Contractor to provide All Risk Blanket Builder's Risk Insurance to cover the materials, equipment, machinery and fixtures that are or will be part of the permanent facility. Coverage extensions shall include boiler and machinery, earthquake and flood.

   (e) <u>All Risk Property Insurance</u>. All Risk Property Insurance shall be maintained at replacement cost valuation basis covering all loss, damage, or destruction for Airline's improvements and betterments on the Premises and personal property in Airline's care, custody and control at the Airport. Coverage shall include but not limited to boiler and machinery, earthquake, flood, sprinkler leakage, debris removal and business interruption and extra expense. The City and any Signatory Airline accommodating Airline pursuant to Sections 5.5 or 5.6 shall be named as a loss payee, as their interests may appear. Airline shall be responsible for all loss or damage to personal property owned, rented or used by Airline.

   (f) <u>Professional Liability</u>. When any architects, engineers, project managers, construction managers or other professional consultants perform work in connection with this Agreement, Professional Liability Insurance covering acts, errors or omissions shall be maintained by such architects, engineers, project managers, construction managers or other professional consultants with limits of not less than $2,000,000; provided, however, that design and construction architects, engineers, project managers, construction managers or other professional consultants who perform work with respect to any construction project undertaken by Airline pursuant to this Agreement the cost of which is in excess of $50,000.000 shall be

maintained with limits of not less than $5,000,000. When policies are renewed or replaced, the policy retroactive date shall coincide with, or precede, start of work on the contract. A claims made policy that is not renewed or replaced shall have an extended reporting period of at least two (2) years.

        (g)    <u>Pollution Liability Insurance</u>. Pollution Liability Insurance shall be provided covering bodily injury, property damage, clean-up and other losses caused by pollution conditions or incidents including any Release, Discharge, or Disposal of a Hazardous Substance or Other Regulated Material with limits of not less than $10,000,000 per pollution condition or loss and $10,000,000 annual aggregate. Coverage shall include but not be limited to: response to and remediation of new, preexisting, known and unknown on-site and off-site pollution conditions and incidents, emergency response costs, repairs, removals, abatement, corrective actions, transportation, contractual liability and defense. When policies are renewed, the policy retroactive date shall coincide with, or precede, start of work in connection with the Agreement. A claims-made policy which is not renewed or replaced shall have an extended reporting period of two (2) years. The City and any Signatory Airline accommodating Airline pursuant to Sections 5.5 or 5.6 is to be named in the policy as an additional insured.

Coverage shall also include but not be limited to (a) underground and above ground storage tank(s) owned or operated by Airline or its Associated Parties including any on site integral piping or dispensing equipment at the Airport and (b) any structural controls (above-ground or below-ground) used to treat sanitary sewer waste and storm water runoff operated by Airline or Associated Parties on the Premises, as set forth in Section 14.1.6 (Environmental Article).

As an alternative to obtaining Pollution Liability Insurance, Airline may provide for reasonable limits of self-insurance as agreed with the City against the environmental risks that would be covered by a third-party insurer providing Pollution Liability Insurance. If Airline self-insures against such environment risks, Airline shall make available its financial statement on-line. All amounts paid to the City by Airline on account of any self-insurance program shall be deemed insurance proceeds for purposes of this Agreement.

13.2.2  <u>Additional Requirements</u>

        (a)    <u>Evidence of Insurance</u>. Airline will furnish the Commissioner and any Signatory Airline accommodating Airline pursuant to Sections 5.5 or 5.6, with original Certificates of Insurance (or copies thereof) and a copy of the additional insured endorsements where applicable evidencing the coverage required to be in force on the date of this Agreement, as well as renewal Certificates of Insurance and additional insured endorsements, or such similar evidence, if the coverages have an expiration or renewal date occurring during the term of this Agreement. Airline shall submit evidence prior to the Effective Date. The receipt of a certificate or other insurance evidence does not constitute an agreement by the City that the insurance coverage required in this Agreement has been fully met or the insurance policies indicated on the certificate or other evidence of insurance provided are in compliance with all the Agreement requirements. Failure of the City to obtain certificates or any other insurance evidence from Airline showing compliance with these requirements of the Agreement is not a waiver by the City of any requirements for Airline to obtain and maintain the specified coverages. Airline shall

advise all insurers of the Agreement provisions regarding insurance. The City in no way warrants that the insurance required herein is sufficient to protect Airline for liabilities that may arise from or relate to the Agreement. The City reserves the right to inspect complete, certified policy copies (or electronic copies thereof) of any required insurance at a mutually agreed location within the State of Illinois within ten (10) days of the City's written request.

(b)     <u>Failure to Maintain Insurance</u>.    The insurance hereinbefore specified shall be carried during the term of this Agreement. Failure to carry or keep such insurance in force shall constitute a violation of the Agreement and an Event of Default under Section 17.1. To the extent there is such a failure, the City shall provide written notice thereof and Airline shall have fifteen (15) business days to cure such failure, after which the City may exercise any remedy in Article 17 or any other remedies under this Agreement until proper evidence of insurance is provided.

(c)     <u>Notice of Cancellation, Material Change and Non-Renewal</u>. Airline shall  provide for thirty (30) days' advance  notice to the City in the event coverage required in this Agreement (except coverage for war and allied peril risk for which Airline shall provide seven (7) days' advance notice or such other period as may be agreed by the City and Airline) has substantially changed, canceled, or non-renewed. Upon the earlier of Airline's receipt of a cancellation notice for non-payment of premium or Airline's knowledge thereof, Airline shall provide immediate notice to the City of such cancellation or impending cancellation with Airline's written plan for curing such non-payment and preventing non-payment of premiums thereafter.

(d)     <u>Insurance Required of Contractors, Affiliates and Sublessees</u>.    In each contract with any Contractor, Affiliate or Sublessee, Airline shall require such Contractor, Affiliate or Sublessee to obtain insurance coverages to adequately cover risks associated with any such Contractor, Affiliate or Sublessee that are reasonably appropriate in their limits and other terms and conditions to the nature of the contract and standard in the industry within which such Contractors, Affiliate or Sublessee practices. Such coverages shall insure the interests of the City, its employees, elected officials, agents and representatives including naming the City of Chicago as an additional insured on an additional insured form acceptable to the City. Airline is also responsible for ensuring that each Contractor, Affiliate and Sublessee has complied with the required coverage and terms and conditions outlined in this Section 13.2.2. When requested by the City, Airline shall provide, or cause to be provided, to the City certificates of insurance and copies of additional insured endorsements or such other evidence of insurance, acceptable in form and content to the City. The City reserves the right to inspect complete, certified policy copies (or electronic copies thereof) of any required insurance at a mutually agreed to location within the State of Illinois within ten (10) days of the City's written request. Failure of any Contractor, Affiliate or Sublessee to comply with required coverage and terms and condition outlined herein will not limit Airline's liability or responsibility hereunder.

(e)     <u>No Limitation as to Airline's Liabilities</u>.    Airline expressly understands and agrees that any insurance coverages and limits furnished by Airline shall in no way limit Airline's liabilities and responsibilities specified within this Agreement or by Applicable Law.

(f)     Waiver of Subrogation.  Airline waives and shall cause its insurers to waive, and Airline shall cause each of its Contractors, Affiliate and Sublessors and each of Contractor's, Affiliate's and Sublessor's insurers to waive, their respective rights of subrogation against the City Indemnified Parties for recovery of damages to the extent these damages are covered by the following insurance obtained by Airline pursuant to this Agreement; (1) Worker's Compensation and Employer's Liability Insurance; (2) Commercial General/Airline Liability Insurance (primary and umbrella); (3) Automobile Liability Insurance; (4) All Risk Blanket Builder's Risk Insurance; and (5) All Risk Property Insurance.  With respect to the waiver of subrogation for Worker's Compensation and Employer's Liability Insurance, Airline shall obtain an endorsement equivalent to WC 00 03 13 to effect such waiver.

In the event the insurers of Airline, or the insurers of any Contractor, Affiliate or Sublessor, should seek to pursue contribution or a subrogation claim against the City, Airline shall be responsible to pay all cost of defending such claims, including actual attorney's fees of counsel of the City's choosing, subject to Section 13.1.7.

(g)     Airline Insurance Primary.  Airline expressly understands and agrees that any insurance maintained by the City shall apply in excess of and not contribute with insurance provided by Airline under this Agreement.  All insurance policies required of Airline under this Agreement shall be endorsed to state that Airline's insurance policy is primary and not contributory with any insurance carried by the City.

(h)     Insurance Limits maintained by Airline.  If Airline maintains higher limits than the minimum required herein, the City requires and shall be entitled to coverage for the higher limits maintained by Airline.  Any available insurance proceeds in excess of the specified minimum limits of insurance and coverage shall be available to the City, as their interest may appear.

(i)     Joint Venture or Limited Liability Company.  If Airline is a joint venture or limited liability company, the insurance policies must name the joint venture or limited liability company as a named insured.

(j)     Other Insurance obtained by Airline.  If Airline desires additional coverages, Airline shall be responsible for the acquisition and cost.

(k)     Self-Insurance of Airline.  Airline may not self-insure any portion of any limit of primary coverage required hereunder unless specifically permitted under this Section 13.2 or otherwise permitted by the City in extraordinary circumstances.  It is understood that in any instance in which Airline is permitted to and chooses to self-insure a portion of the limit of primary coverage required hereunder, Airline, as a self-insurer, has the same duties and obligations to the City (*e.g.* obligation to provide a defense for covered claims) and to the City's liability insurer(s) as a primary liability insurer has to excess insureds and excess insurers under a standard ISO policy form even though Airline's self-insurance is not on a standard ISO form.  For purposes of this subsection, self-insurance shall not be construed to include deductibles that apply on a per-occurrence basis.

(l)    City's Right to Modify.   The City maintains the right, based on commercially reasonable standards, to modify, delete, alter or change the requirements set forth under this Section 13.2 with thirty (30) days' prior written notice to Airline.

### 13.3    City's Insurance

The City shall maintain in force during the Term commercial general liability and property insurance relating to its ownership, maintenance, use and occupancy of the Airport as determined by and as required by the Bond Indenture and Applicable Laws.

Article 14

## ENVIRONMENTAL MATTERS

### 14.1    Airline Representations, Warranties, and Covenants

Airline represents, warrants, and covenants the following with respect to its use of the Airport pursuant to this Agreement:

14.1.1    Airline has obtained and throughout the term of this Agreement shall regularly maintain and timely update all applicable licenses, permits, registrations and other authorizations and approvals required under Environmental Laws, and shall provide any notices required under Environmental Laws, for conducting its operations at the Airport during the term of this Agreement. Airline shall ensure that its Associated Parties obtain, maintain and update all applicable licenses, permits, registrations and other authorizations required by Environmental Law pertaining to its and their use of and operations at the Airport.

14.1.2    Airline shall comply, and shall ensure that its Associated Parties comply, with all applicable Environmental Laws pertaining to its and their use of and operations at the Airport.

14.1.3    Airline shall not conduct its operations at the Airport during the Term of this Agreement in such a manner so as to cause, unlawfully allow or contribute to, and shall ensure that its Associated Parties do not cause, unlawfully allow or contribute to:

(a)    any Release, Discharge or Disposal of any Hazardous Substance or Other Regulated Material at the Airport, unless authorized by an Environmental Law;

(b)    any violation of any applicable Environmental Law as a result, in whole or in part, of the use by or operations of Airline or its Associated Parties at the Airport;

(c)    any Release, Discharge or Disposal in violation of any applicable Environmental Law which is a contributing cause of the City exceeding any terms, conditions or effluent limits of any NPDES permit or individual storm water discharge permit issued to the City, Multi-Sector General Permit, Municipal Separate Storm Sewer System permit, or any applicable federal or State of Illinois effluent limitation guideline, or standard of the MWRD;

103

(d)     any Release, Discharge or Disposal to soil or Waters at, underlying, or adjacent to the Airport in violation of any applicable Environmental Law; or

(e)     any emissions to the air in violation of any applicable Environmental Law that results in an exceedance of an applicable emission standard at the Airport or of any terms or conditions of any of Airline's air permits.

14.1.4     Airline shall, and shall ensure that its Associated Parties, handle, use, store, Dispose of, transport, or otherwise manage, any Hazardous Substance or Other Regulated Material at the Airport during the Term of this Agreement in a lawful manner. Without limiting the foregoing, Airline shall not conduct and shall ensure that its Associated Parties do not conduct any operations or activities involving the use or application of ethylene glycol, propylene glycol, or any other substance in de-icing or anti-icing at any location at the Airport except in accordance with all applicable Environmental Laws and in compliance with any de-icing policies and practices as may be adopted by the City in consultation with Airline.

14.1.5     Airline shall be, and shall ensure that its Associated Parties are, responsible for the proper transportation and Disposal of all Hazardous Substances or Other Regulated Material generated by Airline or its Associated Parties, or resulting from Airline's use, activities, and operations, at the Airport during the term of this Agreement, including those activities and operations conducted by its Associated Parties.  In such cases, in the event a signature as "Generator" is required on waste manifests, waste profile sheets or generator's certifications of non-special waste, Airline shall ensure that either Airline or its appropriate Associated Party(ies) signs such documents.  Airline shall be responsible for the proper removal, transportation, and Disposal of Hazardous Substances or Other Regulated Material confiscated by the Transportation Security Agency or the City, but only with respect to such Hazardous Substances or Other Regulated Material obtained from Airline's passengers' checked baggage.

14.1.6     Airline shall be, and shall ensure that its Associated Parties are, responsible for the maintenance of any structural controls (above-ground or below-ground), as defined below, used to treat sanitary sewer waste and storm water runoff operated by Airline or its Associated Parties on the Premises during the term of this Agreement. Maintenance frequencies for any such structural controls shall be established by Airline in a reasonable manner in accordance with industry standards and applicable Environmental Law to ensure effective operation of such controls and to prevent failures of such controls that could result in the Discharge, Release or Disposal of pollutants in violation of any applicable Environmental Law. Airline shall ensure that environmental records required to be kept by applicable law, including the O'Hare SWPPP, are maintained on-site for a period of three (3) years, unless a different document retention requirement is provided by applicable law.  Structural controls to be maintained by Airline shall include, but not be limited to: oil/water separators (both storm and sanitary sewer), grease traps, sand traps, diversion valves, shut-off valves, storm sewer drain filters, trench drains, catch basins, rain gardens, and retention/holding ponds and any other structural controls.  Airline shall remove and properly Dispose of any Waste in said designated structural controls maintained by Airline prior to vacating the Premises.

14.1.7     Airline shall be, and shall ensure that its Associated Parties are, responsible for the maintenance of any air pollution control equipment required by any

applicable Environmental Law operated by Airline or its Associated Parties on the Premises during the term of this Agreement. Maintenance frequencies for any such air pollution control equipment shall be established by Airline in a reasonable manner in accordance with industry standards, the provisions of applicable air permits and applicable Environmental Law to ensure effective operation of such equipment and to prevent failures of such equipment that could result in the emission of pollutants in violation of any applicable Environmental Law. Airline shall ensure that environmental records required to be kept by applicable law are maintained on-site for a period of three (3) years, unless a different document retention requirement is provided by applicable law. The air pollution control equipment units to be maintained by Airline shall include, but are not limited to: scrubbers, filters, adsorbers, condensers, precipitators, and other equipment. Airline shall remove and properly Dispose of any Waste in said designated air pollution control equipment operated by Airline prior to vacating the Premises.

14.1.8    If Airline or its Associated Parties cause, unlawfully allow or contribute to a Release, Discharge, or Disposal of a Hazardous Substance or Other Regulated Material at the Airport in violation of any applicable Environmental Law that is above any applicable reportable quantity, emission standard or effluent guideline set forth in any applicable Environmental Law including the O'Hare Spill Response Guide, Airline shall report such Release, Discharge or Disposal to the appropriate governmental authorities in compliance with applicable Environmental Law, including the O'Hare Spill Response Guide. Airline shall ensure that its Associated Parties report any Release or Discharge in violation of any applicable Environmental Law to the appropriate governmental authorities, in compliance with applicable Environmental Law, if the operations of said third party cause, unlawfully allow or contribute to a Discharge or Release of a Hazardous Substance or Other Regulated Material in violation of any applicable Environmental Law that is above any reportable quantity set forth in any applicable Environmental Law.

14.1.9    Airline acknowledges that the City is subject to certain NPDES permits, state and federal storm water regulations, federal and state effluent limitation guidelines, and MWRD standards for operations at the Airport. Airline shall conduct operations and activities at the Airport, including but not limited to de-icing, anti-icing, and construction, and shall ensure that its Associated Parties conduct operations and activities at the Airport in compliance with applicable Environmental Laws. Airline acknowledges that its reasonable cooperation is necessary to ensure Airport's compliance with any applicable NPDES storm water permits and effluent limitation guidelines under Environmental Laws. Airline shall minimize the exposure to storm water of materials generated, stored, handled, or used by Airline or its Associated Parties at the Airport including Hazardous Substances or Other Regulated Material, by implementing and requiring implementation of certain written "Best Management Practices" as defined by and required under Environmental Laws, and shall make them available to the City upon reasonable request. Airline further acknowledges that any effluent limitation guidelines in any NPDES storm water discharge permit issued to the City and timely provided to Airline applicable to Airline are incorporated by reference into this Agreement to the extent affecting Airline's operations at or use of the Airport or operations or activities conducted on its behalf at the Airport, or necessitating Airline's reasonable cooperation to assure the City's compliance therewith. The City shall provide advance notice to Airline of and a reasonable opportunity to comment on, and shall otherwise endeavor to negotiate reasonable and cost effective terms and conditions of, any permits issued to the City which may affect Airline's operations at or use of

the Airport or operations or activities conducted on its behalf at the Airport, or which may necessitate Airline's reasonable cooperation to assure the City's compliance therewith.

14.1.10    Airline or its Associated Parties shall cooperate with the City, as reasonably requested from time to time by the City, to ensure that Airline's operations at or use of the Airport will not unreasonably interfere with the City's implementation of its Chicago O'Hare International Airport Wildlife Hazard Management Plan to reduce wildlife hazards at the Airport.

14.1.11    Airline, prior to vacating or surrendering any portion of its Premises for any reason, shall:

(a)    remove and Dispose of any and all trash, debris, or Waste generated by Airline or its Associated Parties;

(b)    remove any and all above-ground containers and non-permanent structural controls owned by Airline or its Associated Parties, including, but not limited to, removable filters, grates and above-ground tanks located on Airline's Premises, unless Airline and the City agree otherwise; and

(c)    comply with applicable Environmental Laws regarding the closing or removal from service of any underground or aboveground tanks, vessels, and containers operated or owned by Airline or its Associated Parties and located on Airline's Premises, provided, however, that Airline shall have no such obligation with respect to any airport hydrant fuel system maintained by an airport fueling consortium.

14.1.12    Airline understands and acknowledges that certain of its and the City's future capital projects at the Airport may require review or approval by the FAA, the United States Environmental Protection Agency ("USEPA"), or the Illinois Environmental Protection Agency ("IEPA"), pursuant to requirements imposed upon the Airport or the City. If requested by the City, Airline shall reasonably cooperate with the City in its preparation of such submittals as are required of the City by FAA, USEPA, or IEPA, or their successor agencies, in connection with Airline's future capital projects or in connection with the City capital projects at the Airport which benefit Airline.

14.2    **Right of Entry to Perform Environmental Inspections and Sampling**

14.2.1    The City and its contractors and other agents shall have the full right to enter any part of the Premises, at all reasonable times and in the City's sole discretion, for the purpose of conducting an inspection, assessment, investigation, regular inspection, or regulatory compliance audit of Airline's operations thereon, or any other party's use and operations, including operations of Airline's Associated Parties.  The City and its authorized agents may take samples and perform tests as needed, including but not limited to soil borings, ground water monitoring, and collection of samples of air, soil, water, groundwater, Hazardous Substances or Other Regulated Material Releases, and Discharges, at the City's expense.  The City will provide seventy-two (72) hours' advance written notice of any City inspection, assessment, investigation, regular inspection, or regulatory compliance audit of Airline's operations thereon, or any other party's use and operations, including operations of Airline's Associated Parties or intrusive City

sampling to Airline, except in emergencies, when advance notice shall not be required. Airline shall have the right to accompany the City when any such inspection or sampling is performed, provided that the City is not required to unreasonably delay its inspection or sampling to enable Airline to be present. Airline shall have the right to obtain, at Airline's expense, split samples and City shall promptly provide copies of all analytical results of such sampling, including any non-privileged reports.

14.2.2    Airline shall cooperate, and shall ensure that its Associated Parties cooperate, in allowing prompt, reasonable access to the City to conduct such inspection, assessment, audit, sampling, or tests. In the exercise of its rights under this Section, the City shall not unreasonably interfere with the authorized use and occupancy of the Premises by Airline or Airline's Associated Parties. Airline remains solely responsible for its environmental, health, and safety compliance, notwithstanding any City inspection, audit, or assessment.

### 14.3    Information to be Provided to the City

14.3.1    If Airline receives any written notice, citation, order, warning, complaint, claim or demand regarding Airline's use of, or operations at, the Premises during the term of this Agreement or other property at the Airport used by Airline pursuant to this Agreement that is not legally privileged, made confidential by applicable law, or protected as trade secrets:

(a)    concerning any alleged Release, Discharge or Disposal of a Hazardous Substance or Other Regulated Material by Airline or by its Associated Parties; or

(b)    alleging that Airline or any of its Associated Parties is the subject of an Environmental Claim or alleging that Airline or any Associated Party is, or may be, in violation of any Environmental Laws; or

(c)    asserting that Airline or any such third party as identified in Section (i) and (ii) above is liable for the cost of investigation or remediation of a Release or Discharge;

Airline shall promptly, but not later than five (5) business days after Airline's receipt, inform the City in writing of same, including a copy of such notice received by Airline.

14.3.2    Airline shall simultaneously provide to the City copies of its submittals of any non-privileged reports or notices required under Environmental Laws to any governmental agency regarding:

(a)    Airline's or its Associated Parties' alleged failure to comply with any Environmental Laws at the Premises or other property at the Airport used by Airline pursuant to this Agreement, or

(b)    any Release or Discharge arising out of the past or present operations at or use of the Premises or other property at the Airport used by Airline or its Associated Parties pursuant to this Agreement.

14.3.3    In connection with any matter arising under Section 14.3.1 above, Airline shall make available, within ten (10) business days of Airline's receipt of the City's written request, subject to document retention requirements provided by applicable law, the non-privileged documents that Airline has submitted to any governmental agency pertaining to the environmental compliance status of Airline's operations at or use of the Premises or other property at Airport used pursuant to this Agreement by Airline, including without limitation any and all non-privileged records, permits, permit applications, test results, sample results, written or electronic documentation, studies, or other documentation regarding environmental conditions or relating to the presence, use, storage, control, Disposal, or treatment of any Hazardous Substance or Other Regulated Material by Airline or its Associated Parties at the Premises or other property at the Airport used by Airline pursuant to this Agreement.

### 14.4    Airline's Environmental Response and Compliance Obligations

14.4.1    Without limiting the indemnity obligations of Section 14.7, if, during the term of this Agreement, Airline or any of its Associated Parties causes, unlawfully allows or contributes to a Release, Discharge, or Disposal of a Hazardous Substance or Other Regulated Material (including, but not limited to those which contaminate or pollute any air, soil, Waters, storm sewer, detention basin, other stormwater infrastructure, or conveyance system) in violation of any applicable Environmental Law that is above any applicable reportable quantity, emission standard or effluent guideline set forth in an applicable Environmental Law including the O'Hare Spill Response Guide, at any portion of the Airport or adjacent Waters, in connection with their operations at the Premises or at other property at the Airport used by Airline pursuant to this Agreement, Airline shall perform or shall cause to be performed, consistent with the provisions of Section 14.5, the following:

(a)    notify the O'Hare Communications Center ("OCC") of such Release, Discharge, or Disposal as required by and in accordance with the O'Hare Spill Response Guide and applicable Environmental Laws;

(b)    report such Release, Discharge, or Disposal to appropriate governmental agencies as required by and in accordance with applicable Environmental Laws;

(c)    promptly Respond to the Release, Discharge, or Disposal of a Hazardous Substance or Other Regulated Material, as required by applicable Environmental Laws;

(d)    promptly take all further actions required under Environmental Laws to abate any threat to human health or the environment;

(e)    promptly undertake any further removals, remediation, or corrective actions as are required by Environmental Laws or a governmental agency exercising its authorized regulatory jurisdiction under Environmental Laws, to remedy any such Release, Discharge or Disposal of a Hazardous Substance or Other Regulated Material, and any resulting impacts; and

(f)    promptly obtain documentation of the approval of the closure of such Release, Discharge, or Disposal from the governmental agency(ies) with regulatory

jurisdiction as such may be issued under Environmental Laws, and provide such documentation to the City.

        14.4.2    Any remedial or other activity undertaken by Airline under this Article shall not be construed to impair Airline's rights, if any, to seek contribution or indemnity from any person, consistent with the terms and limitations of this Agreement, including Section 14.7, below.

        14.4.3    Airline shall not be responsible under this Section 14.4 for a Discharge, Release, or Disposal to the extent caused by another Air Carrier that the City has compelled Airline to accommodate pursuant to Sections 5.5 and 5.6.

### 14.5    Investigation, Remediation, or Corrective Action Process

        Before commencing any subsurface soil, surface water, stormwater, or groundwater investigations, removals, remediation, or corrective actions that Airline or Airline's Associated Parties are required to perform at the Airport under this Agreement, including any such actions mandated in Section 14.4, and except for immediate removal actions required by Environmental Laws and otherwise undertaken pursuant to Section 14.4, Airline shall promptly provide any proposed plans for such investigations, removals, remediation, or corrective actions to the City for approval in accordance with applicable Environmental Laws, which shall not be unreasonably withheld or conditioned. The work shall be performed in a diligent manner consistent with the time(s) prescribed by Environmental Laws and relevant governmental authorities and at Airline's expense, and the City shall have the right to review and inspect all such work at any time using consultants and representatives of the City's choice, at the City's expense. Specific cleanup levels for any environmental removals, remediation or corrective actions shall comply with applicable Environmental Laws, with commercial and industrial remediation standards being applied to such actions consistent with the use of the Airport for such purposes. Airline may also utilize institutional controls and other engineered barriers as part of any removals, remediation or corrective actions to the extent authorized by Environmental Laws and approved by the City in writing, which shall not be unreasonably withheld. In the event deed recordation by the City is necessary for the utilization of commercial and industrial remediation standards or other controls as part of any removals, remediation or corrective actions or any other costs and expenses are incurred in connection with the use of such standards or controls Airline shall reimburse the City for all deed recordation fees and reasonable attorneys' fees incurred in connection with such recordation. Airline shall, at Airline's own cost and expense, have all tests performed, and reports and studies prepared, and shall provide such information to any governmental agency as may be required by applicable Environmental Laws, with a copy simultaneously provided to the City. This obligation includes but is not limited to any requirements for a site characterization, site assessment, remediation objectives report, remedial action plan, and remedial action completion report that may be necessary to comply with applicable Environmental Laws.

### 14.6    The City's Rights to Ensure Airline's Compliance with Environmental Response and Compliance Obligations

14.6.1    If, as is reasonably determined by the City, Airline, Airline's Associated Parties or their Associated Parties:

(a)    do not take appropriate Response actions required by applicable Environmental Laws in response to a Release, Discharge or Disposal for which it is responsible under Section 14.4, within the time(s) prescribed by such Environmental Law(s) and relevant governmental authorities; or

(b)    do not perform or complete reporting, notifications, investigations, removals, remediation, corrective actions, or closure actions for which it is required under Section 14.4 within the time(s) prescribed by applicable Environmental Laws and relevant governmental authorities, or within the time reasonably necessary to enable the City to meet its obligations under Environmental Laws (subject to the condition that, in the case of both Sections 14.6.1(a) above and this 14.6.1(b), the City must first provide reasonable advance written notice to Airline of Airline's failure to comply with such obligations and a reasonable opportunity for Airline to cure such failure to comply by Airline initiating or recommencing any such actions consistent with required schedules (including exercising its legal right to reasonably and in good faith challenge such alleged obligation to comply), but in any event not to exceed forty-five (45) days, except in emergency circumstances in which such advance notice is not possible), then the City or its authorized contractor, in addition to its rights and remedies described elsewhere in this Agreement and otherwise available at law, in equity, or otherwise, may, at its election, upon reasonable notice, enter the affected area, and take whatever action the City reasonably deems necessary to meet Airline's obligations under Environmental Laws, within the time required under such Environmental Laws, consistent with the requirements of Section 14.4. In addition to notice and opportunity to cure as set forth in this Section 14.6.1(b), the City shall provide Airline with its plan to perform such work for Airline's review and comment at least seven (7) business days before the commencement of such work, which comments shall be reasonably considered by the City, except in emergency circumstances where such advance notice is not possible. Such action taken by the City consistent with the requirements of this Agreement shall be at Airline's expense plus administrative expenses of the greater of Five Hundred Dollars ($500.00) or 25% of all costs incurred by the City, including but not limited to reasonable attorneys' and consultants' fees and expenses, monetary fines and penalties, litigation costs or costs incurred in anticipation of litigation, expert witness fees, and expenses of investigation, removal, remediation, or other required plan, report, or Response action performed in accordance with applicable Environmental Laws.

14.6.2    Except as set forth in Section 14.6.3, below, if the City cannot identify with commercially reasonable effort any of the parties causing, unlawfully allowing, contributing to or responsible for a Release, Discharge, or Disposal at or from the Airport requiring the completion of appropriate Response actions as provided in Section 14.4.1, then City shall provide reasonable advance written notice to Airline of its intention to take actions, to the extent of Airline's obligations for such actions as provided in Section 14.4.1, to report, repair, contain, investigate, remove, correct or remediate such Release, Discharge, or Disposal consistent with the requirements of Section 14.4. Airline shall thereafter be afforded a reasonable opportunity (not to exceed forty-five (45) days) to commence such actions or provide the City with information on the identity of the party or parties causing, contributing to, or responsible for such Release, Discharge, or Disposal, which information shall be considered in good faith by the City

and, as appropriate, shall provide a basis for the City's pursuit of any responsible parties consistent with the provisions of Section 14.6.1. In addition to the above written notice, the City shall provide Airline with its plan to perform such actions for Airline's review and comment at least seven (7) business days before the commencement of any work (except in emergency circumstances in which such advance notice is not possible), which comments shall be reasonably considered by the City, after which the costs of such actions, if implemented by the City, shall be allocated by the City to Airline-Supported Cost Centers.

14.6.3    In the event a Release or Discharge, or Disposal in violation of Environmental Law which occurred prior to the Effective Date is encountered on any portion of Airline's Preferential Use Premises that Airline also leased as the equivalent of Exclusive or Preferential Use Premises under its Prior Use and Lease Agreement, Airline shall be deemed to be responsible for all costs incurred in connection with such contamination, including investigation, removal, remediation, or other required plan, report, or Response action, unless Airline provides clear evidence demonstrating that another party is fully responsible. This presumption shall not apply to any portion of Airline's Preferential Use Space not previously leased by Airline under its Prior Use and Lease Agreement.

14.6.4    Nothing in this Section 14.6 is intended or shall be construed so as to prevent the City or Airline from exercising, in their reasonable discretion, any rights granted or available elsewhere in this Article, in this Agreement, or by law.

14.7    **Environmental Indemnification and Reimbursement**

14.7.1    Notwithstanding any other provision to the contrary, Airline agrees to indemnify, defend, and hold harmless the City, its past and present elected and appointed officials, officers, agents and employees ("Environmental Indemnitees"), from and against any and all Environmental Claims resulting from:

(a)    the breach by Airline of any representation or warranty made in this Article; or

(b)    the failure of Airline to meet its obligations under this Article, whether caused or unlawfully allowed by Airline or any third party under Airline's direction or control; or

(c)    documented loss by any Environmental Indemnitee(s) from any Environmental Claim, to the extent caused, unlawfully allowed or contributed to by the unauthorized Release, Discharge, or Disposal of a Hazardous Substance or Other Regulated Material by Airline or by its Associated Parties or the failure of Airline or any Associated Party to comply with applicable Environmental Laws in connection with the operations of Airline or its Associated Parties at the Premises or at other property at the Airport used by Airline pursuant to this Agreement, during the term of this Agreement;

14.7.2    Notwithstanding the provisions of this Section 14.7, in the event that the City and Airline mutually agree or a court of competent jurisdiction determines by a final order that an Environmental Indemnitee's negligence or willful and wanton misconduct is at least fifty-one (51%) of the total fault which proximately caused the Environmental Claims,

Airline's obligation to indemnify the Environmental Indemnitee for amounts to be paid in connection with the Environmental Claims shall be limited to the amount attributable to Airline's and its Associated Parties' proportionate share of the total fault which proximately caused the Environmental Claims. The City and Airline agree, however, that this Section 14.7.2 is not intended to obviate or lessen in any way Airline's duty to defend the Environmental Indemnitees; provided, however, that to the extent the City and Airline mutually agree or a court of competent jurisdiction rules that the Environmental Claims were the result of the sole negligent act or omission or the willful and wanton misconduct of an Environmental Indemnitee, the City shall reimburse Airline for its proportionate share of the costs of defense, including, but not limited to, attorneys' fees and court costs. For the avoidance of doubt, the City shall reimburse Airline for all defense costs Airline incurred with respect to defending the City Indemnified Parties against Claims to the extent that the City and Airline mutually agree or a court of competent jurisdiction rules that such Claims were the result of the sole negligent act or omission of a City Indemnified Party.

      14.7.3    The City shall provide Airline with prompt notice of any Environmental Claims to allow Airline the opportunity to properly and effectively respond to or otherwise defend such Environmental Claims. Airline shall, at its own cost and expense, defend all Environmental Claims whether frivolous or not. In the event the City undertakes any action, including but not limited to investigations, removals, remediation, or corrective actions with respect to any Environmental Claims in response to the failure of Airline to defend such Environmental Claims as Airline deems appropriate in its reasonable judgment, Airline shall reimburse the City, upon written demand by the City, for all reasonable and documented costs that the City incurs in association with such action, including but not limited to consultants' fees, contractors' fees, reasonable attorneys' fees and expenses of investigation, removal, Response, remediation, or corrective action.

      14.7.4    Except to the extent set forth in Section 14.7.2, above, Airline waives the right of contribution and subrogation against the Environmental Indemnitees in connection with Environmental Claims set forth in Sections 14.7.1 and 14.7.3, above.

      14.7.5    Regardless of the date of termination of this Agreement, the indemnifying party's representations, obligations and liabilities under this Article shall continue as long as the indemnified party bears any liability or responsibility under this Article or the Environmental Laws.

      14.7.6    Any claims for environmental matters shall be subject to this Section 14.7 and shall not be subject to the General Indemnity provision of Section 13.1 in this Agreement.

14.8    **Limitations**

Except pursuant to Sections 14.6.2 and 14.6.3, Airline's obligations under this Article shall not apply to: (a) any Release, Discharge or Disposal, or Hazardous Substances or Other Regulated Materials that existed at the Airport prior to Airline's or its corporate predecessor(s)'s initial occupancy or operations at such area(s) of Release, Discharge or Disposal, or Hazardous Substances or Other Regulated Materials at the Airport, provided that neither Airline or its

corporate predecessor(s) nor any other party under Airline's or its corporate predecessor(s)'s direction or control, or conducting operations or activities on its or their behalf caused, unlawfully allowed or contributed to such Release, Discharge or Disposal, or Hazardous Substances or Other Regulated Materials, or caused, unlawfully allowed or contributed to a subsequent Release, Discharge or Disposal of such pre-existing Hazardous Substances or Other Regulated Materials; or (b) Releases, Discharges, or Disposal that migrate onto, into, or from the Premises or the Airport and that were not caused, unlawfully allowed or contributed to by Airline or its corporate predecessor(s) or third parties under Airline's or its corporate predecessor(s)'s direction or control or conducting operations or activities on its or their behalf; or (c) Releases, Discharges, or Disposal on, at, or from the Airport not caused, unlawfully allowed or contributed to by Airline or its corporate predecessor(s) or by its or their Associated Parties, or any other party under Airline's or its corporate predecessor(s)'s direction or control.

14.9    **Baseline Environmental Site Inspection**

Prior to Airline's initial occupancy of, use of, or operations at the Premises, the City shall have the opportunity to perform, at its own expense, an Initial Walk-Through of the Premises regarding the environmental condition of the Premises and their state of compliance with Environmental Laws and produce an Initial Walk-Through report. The City shall provide Airline with an opportunity to participate in the walk-through and review and comment upon the conclusions and findings of the Initial Walk-Through report. In the event pre-existing environmental conditions are encountered, the provisions of Section 14.4 shall apply, except that the provision in Section 14.4.1 limiting Airline's obligations to incidents during the term of this Agreement shall not apply.

14.10    **Concluding Environmental Site Inspection**

At least sixty (60) days prior to vacating or surrendering the Premises or any portion of them for any reason, Airline shall provide the City with access to perform a Concluding Walk-Through in order to determine the environmental condition of the Premises or that part of the Premises being vacated, and their state of compliance with the requirements of Section 14.1.11. City shall provide Airline with an opportunity to participate in the walk-through. If the Concluding Walk-Through reveals that Airline has not removed all trash, containers, tanks, structures, debris, residue, and other items, materials and Waste for which Airline or anyone operating on its behalf is responsible as required by Section 14.1.11, or has otherwise failed to comply with the requirements of Section 14.1.11, the City will share its Concluding Walk-Through report and any relevant photographs with Airline. Airline will remove or correct any items to the extent not in compliance with the requirements of Section 14.1.11 within five (5) business days of receipt of said report and photographs or such longer period of time as reasonably requested by Airline to perform the corrective actions. Airline shall leave facilities and equipment being surrendered or vacated by Airline in a state of good repair. However, tanks, structures and other items and materials owned by Airline may revert to the City upon agreement of Airline with the City accepting such tanks, structures and other items and materials in an "as is, where is" condition.

14.11   **Airline's Hazardous Substance-Related Equipment and Fixtures**

Any fixed tanks, pumps, chemical or Hazardous Substance or Other Regulated Material containers, pipelines, lines, and equipment or other such fixtures installed by or on behalf of Airline shall at all times remain the property of Airline, and ownership of or responsibility for such equipment shall not pass to the City by virtue of such equipment being installed at the Premises, except pursuant to the agreement of the City and Airline. No such equipment shall be installed without the written consent of the City.

### 14.12  Waiver

Any waiver of any provision of this Article, or any delay by the City in the enforcement of any right hereunder, shall neither be construed as a waiver, nor create an expectation of non-enforcement of that or any other provision or right. In order to be effective, any waiver of any right, benefit, or power hereunder must be in writing and signed by an authorized representative of the City, it being intended that no waiver shall be implied by the City's conduct or failure to act. Any specific written waiver shall be applicable only to the particular facts and circumstances thereby addressed and shall not be of any effect with respect to future events, even if any of said future events involve substantially similar circumstances. Any remedies provided for in this Article shall be cumulative and in addition to, and not in lieu of, any other remedies available to the City elsewhere in this Agreement, at law, in equity, or otherwise.

### 14.13  Notice for Environmental Matters

With respect to those provisions of this Article 14 which expressly require the City to provide written notice to Airline, electronic mail to the designated Airline representative will satisfy such requirement. Airline's representative for receiving environmental notices is designated in the general Notices provisions in Section 18.4.

### 14.14  Survival of Environmental Provisions

Unless specifically stated elsewhere herein, the provisions of this Article, including the representations, warranties, covenants and indemnities of Airline, are intended to and shall survive termination of this Agreement.

Article 15

DAMAGE, DESTRUCTION AND CONDEMNATION

### 15.1  Damage to, Destruction or Condemnation of Airport

If the Airport or any portion thereof shall be damaged or destroyed or is taken as a result of an eminent domain proceeding, all insurance proceeds or proceeds resulting from eminent domain proceedings, as the case may be, shall be applied as provided below:

15.1.1    the City may, at its option, replace, repair, rebuild or restore such portion of the Airport to substantially the same condition as that which existed prior to such damage, destruction or taking, with any alterations and additions as the City may determine; or

114

15.1.2    the City may, at its option, apply such proceeds to redeem any outstanding GARBs; provided, however, that GARBs may be redeemed only if such damage, destruction or condemnation is of property the acquisition of which was funded with the proceeds of GARBs, and if: (i) the Airport has been restored to substantially the same condition as it had been prior to such damage, destruction or taking; or (ii) the City has determined, in its reasonable discretion, that the portion of the Airport damaged, destroyed or taken is not necessary to the operation of the Airport.

The City shall use reasonable efforts to notify Airline of the City's determination whether to proceed pursuant to Section 15.1.1 or Section 15.1.2 within six (6) months of the date of such damage, destruction or taking.  Notwithstanding anything in this Section 15.1 to the contrary, proceeds resulting from such damage, destruction or taking will be applied consistent with the Bond Indenture.

### 15.2    Untenantable Conditions

15.2.1    If the Premises occupied by Airline hereunder, or any substantial portion thereof, are damaged, destroyed or taken as result of an eminent domain proceeding and thereby rendered untenantable, then, after consultation with Airline, the City shall replace, repair, rebuild or restore such Premises to substantially the same condition as that which existed prior to such damage, destruction or taking, with any alterations and additions as the City and Airline determine, in all cases subject to the City's right to operate the Airport.

15.2.2    In addition, if the Premises occupied by Airline hereunder, or any substantial portion thereof, are damaged, destroyed or taken as result of an eminent domain proceeding and thereby rendered untenantable, then, unless the City provides Airline with alternative Premises reasonably satisfactory to Airline, (a) Airline shall not be obligated to pay Airport Fees and Charges for such untenantable portion during such time as it remains untenantable, and (b) if such untenantable portion remains untenantable for more than one (1) year, Airline shall be entitled, upon forty-five (45) days' prior written notice to the City, to delete such untenantable portion from its Premises Notice; provided that there shall be no abatement or reduction of Airport Fees and Charges or deletion from its Premises Notice at any time where the untenantable condition is caused by the willful or negligent act or omission of Airline or its Associated Parties.

Article 16

## COMPLIANCE WITH LAWS AND RULES

### 16.1    Airport Rules

Airline shall comply, and, to the maximum extent Airline has the legal power to do so, shall cause its agents, employees, guests, invitees and Contractors to comply, with all Airport Rules.

### 16.2    Observance and Compliance with Laws

16.2.1    Airline shall comply, and to the maximum extent Airline has legal power to do so, shall cause its agents, employees, Contractors and licensees to, observe and comply with, and pay all taxes and obtain all licenses, permits, certificates and other authorizations required by, all applicable federal, state, county and municipal laws, statutes, ordinances and executive orders, including all rules, regulations and directives of the Federal Aviation Administration. Airline agrees to make a part of and incorporate into this Agreement, by reference or by setting forth at length, at the option of the City, any and all statutes, rules and regulations and any assurances and covenants required pursuant thereto which may now or hereafter be required by the Federal Aviation Administration or other federal, state, county or municipal agency. To the extent applicable, Airline shall comply with the provisions of Exhibit P, "Compliance with Laws," which may be amended by the Commissioner.

16.2.2    The City shall operate and maintain the Airport in a reasonably prudent manner and in accordance with Applicable Laws.

16.2.3    Airline shall operate and maintain the Premises in a reasonably prudent manner and in accordance with Applicable Laws; provided, however, that this provision shall not be construed as a waiver by Airline to challenge a local law, rule, regulation or ordinance that is pre-empted by State or Federal law.

16.2.4    Notwithstanding anything herein to the contrary, references herein to a statute or law shall be deemed to be a reference to (i) such statute or law as may be amended from time to time, (ii) all regulations, rules, executive orders, policies and instructions pertaining to or promulgated pursuant to such statute or law, and (iii) all future statutes, laws, regulations, rules, executive orders, policies and instructions pertaining to the same or similar subject matter.

### 16.3    Subordination to Sponsor's Assurance Agreement

This Agreement shall be subordinate and subject to the terms of any "Sponsor's Grant Assurances" or like agreement that has been or may be furnished by the City to the United States of America, its boards, commissions, or agencies, including without limitation the FAA, or that is required by Applicable Laws, as a condition precedent to receiving federal financial assistance for development of the Airport and other Airport programs and activities.

### 16.4    Agreements with the United States

This Agreement is subject and subordinate to the provisions of any agreement heretofore or hereafter made between the City and the United States, the terms and execution of which have been or may be required to enable or permit the transfer of rights or property to the City for airport purposes, or the expenditure of federal grant funds for Airport improvement, maintenance or development. Airline shall reasonably abide by the requirements of agreements entered into between the City and the United States, as applicable to Airline, and shall consent to amendments and modifications of this Agreement if required by such agreements or if required as a condition of the City's entry into such agreements.

### 16.5    PFC Act and Assurances

16.5.1 Notwithstanding anything to the contrary in this Agreement, no provision of this Agreement shall impair the authority of the City to impose a Passenger Facility Charge or to use the Passenger Facility Charge revenue as provided in the Aviation Safety and Capacity Expansion Act of 1990, 49 U.S.C. § 40117 (the "PFC Act").

16.5.2 Airline acknowledges that the City has given to the United States of America, acting by and through the FAA, certain assurances set forth in the PFC Act and implementing regulations at 14 C.F.R. Part 158 ("PFC Assurances"), and Airline agrees that this Agreement shall be subordinate and subject to the PFC Assurances.

16.5.3 In the event that the FAA or its successors require any modifications or changes in this Agreement as a condition precedent to the collection of PFCs or otherwise complying with the PFC Act, Airline shall not withhold its consent to such amendments, modifications, revisions, supplements or deletions of any of the terms, conditions or requirements of this Agreement as may reasonably be required to collect PFCs or comply with the PFC Act. The City agrees to provide Airline with advance written notice of any provisions that would adversely modify material terms of this Agreement.

16.6 **PFCs to be held in Trust for the City**

16.6.1 Airline shall hold the net principal amount of all PFCs that are collected by Airline or its agents on behalf of the City pursuant the PFC Act and the rules and regulations thereunder (14 C.F.R. Part 158, the "PFC Regulations") in trust for the City. For purposes of this Section 16.6, net principal amount shall mean the total principal amount of all PFCs that are collected by Airline or its agents on behalf of the City, reduced by all amounts that Airline is permitted to retain pursuant to Section 158.53(a) of the PFC Regulations.

16.6.2 In the event that Airline fails to make payments of PFCs to the City in accordance with the PFC Regulations, the City may require Airline to establish a PFC trust account pursuant to this Section 16.6.2. In the event the City requires Airline to establish a PFC trust account, and notwithstanding Section 158.49 of the PFC Regulations, upon receipt of PFCs that are collected by Airline or its agents on behalf of the City, Airline shall establish, and shall deposit the net principal amount of such PFCs in, an interest-bearing trust account for the City's benefit (the "Trust Account"). The Trust Account shall be held in the name of Airline as trustee for the City; provided that the City and Airline mutually agree to terms upon which amounts may be withdrawn from such account upon the joint direction of the City and Airline. If the City and Airline do not so agree, the Trust Account shall be held by an independent third party bank trustee, in which event such trustee's fees shall be payable by the City. The City shall have the right to select such trustee subject to the approval of Airline, which approval will not be unreasonably withheld. The Trust Account shall be separate from and not commingled with all other Airline funds, including PFCs collected on behalf of other airports. In accordance with Section 158.51 of the PFC Regulations, any amounts required to be remitted to the City under such section shall be paid in any event by Airline, as trustee, or by such third party bank trustee, to the City on or before the date specified in such section first out of the net principal amount, then, to the extent of any deficiency, by Airline, out of income earned thereon and then, by Airline, out of any available funds of Airline. Funds in the Trust Account shall be invested solely in instruments issued or guaranteed by the United States government or any of its

agencies, commercial paper rated A1 or P1 or better by, respectively, Standard & Poor's Rating Services or Moody's Investors Service, Inc., or federally insured bank certificates of deposit. Any income earned on funds in the Trust Account on or prior to the date of required remittance to the City shall be the property of Airline and shall be paid directly to Airline. Any income earned on funds in the Trust Account after the date of required remittance to the City shall be the property of the City and shall be paid immediately to the City and applied to the interest income in the O'Hare Passenger Facility Charge Revenue Fund.

16.6.3    Upon the determination of a United States bankruptcy court in a final non-appealable order that a trust account is not required to establish the City's absolute right immediately to receive all PFCs collected for the City and held by Airline, Section 16.7.2 shall no longer apply.

16.6.4    In the absence of additional regulations governing the treatment of refunds, any refunds of PFCs due to passengers as a result of changes of itinerary shall be paid proportionately out of the net principal amount attributable to such PFCs and the amount that Airline was permitted to retain under Section 158.53(a) of the PFC Regulations attributable to such PFCs. Airline hereby acknowledges that the net principal amount of all PFCs collected on behalf of the City shall remain at all times the property of the City, except to the extent of amounts refunded to passengers pursuant to the preceding sentence (which shall remain the property of the City until refunded and become the property of the passenger upon and after refund). Other than the amounts that Airline is entitled to retain pursuant to Section 158.53 of the PFC Regulations, Airline shall be entitled to no compensation.

## 16.7    Security and Payment of Fines for Violation of Federal Regulations

16.7.1    Airline acknowledges that security is of primary importance at the Airport and that security requirements are likely to change during the Term. Airline, its officers, employees, representatives, agents, servants, subtenants, consultants, contractors, successors, assigns and suppliers and those under its control, shall comply with security measures (a) required of Airline by the FAA or the TSA or by the City in accordance with applicable requirements of the FAA or the TSA or their authorized successor(s) or (b) contained in any Airport master security plan approved by the FAA or the TSA or their authorized successor(s). Airline shall comply, at its own expense, with the TSA's security requirements applicable to Airline at the Airport including, but not limited to, employee security training, badging, criminal background checks, access control, screening and inspections. Airline shall cooperate with the TSA on all security matters.

16.7.2    Compliance with such security measures and requirements shall not relieve Airline of its responsibility for maintaining proper security for the above-noted items, nor shall it be construed as limiting in any manner Airline's obligations with respect to all applicable federal laws and regulations and its duty to undertake reasonable action to establish and maintain secure conditions at and around the Premises. To comply with TSA requirements, Airline hereby agrees to execute a reasonable exclusive area agreement pursuant to 49 C.F.R. 1542.111 with the City in form and substance which is reasonably acceptable to the parties. Airline accepts security responsibility to use best efforts to prevent unauthorized access to the Premises. Airline shall be responsible for preventing unauthorized persons from gaining access to the

restricted areas of the Airport through the Premises during times and to the extent that Airline has control of the Premises.

16.7.3    Airline understands and agrees that security requirements may affect Airline's Air Transportation Business operations and costs. Airline shall be strictly liable for the payment of any fines assessed by the City or the payment of (or reimbursement of City for any payments of) any civil penalties assessed against City or Airline relating to security and resulting from the negligence or intentional acts of omission or commission of Airline's officers, employees, representatives, agents, servants, subtenants, consultants, contractors, successors, assigns and suppliers and those under its control, and Airline shall be solely and fully responsible for any and all breaches of security and the consequences thereof resulting from the negligence or intentional acts of omission or commission of its officers, employees, representatives, agents, servants, subtenants, consultants, contractors, successors, assigns and suppliers and those under its control.

16.7.4    The City may impose and Airline agrees to pay a reasonable non-discriminatory cost-based user fee, if any, for the privilege of using identification cards or badges to gain access to the Airport security access control system.

## 16.8    No Exclusive Rights

Nothing contained in this Agreement shall be deemed to grant to Airline any exclusive right or privilege within the meaning of 49 U.S.C. § 40103(e) with respect to activity at the Airport, except that, subject to the terms and provisions of this Agreement, Airline shall have the right to exclusive possession of any Exclusive Use Premises made available to Airline under this Agreement.

## 16.9    Federal Tax and Securities Laws

16.9.1    Airline, upon the City's request, shall provide to the City such information and certifications as the City may require to maintain the tax-exempt status of the interest on GARBs.

16.9.2    Airline, upon the City's request, shall provide to the City such information as the City may reasonably request in writing in connection with the offering, sale and remarketing of GARBs to enable the City to comply with the requirements of the federal securities laws and to comply with the City's continuing disclosure requirements under SEC Rule 15c2-12, as it may be amended from time to time, provided, however, that Airline may, in lieu of providing the requested information, direct the City to an Airline or SEC website where the requested information is then currently available.

## 16.10    Anti-Scofflaw

Airline hereby represents and warrants and shall cause each of its Contractors to represent and warrant, that Airline or such Contractors, as the case may be, is not in violation of Section 2-92-380 of the Municipal Code, and further agrees that, in the event of any such violation, the City shall be entitled to set off from those amounts invoiced by Airline an amount

equal to the amount of any fines or penalties owed to the City, subject to those exceptions stated in the Municipal Code.

### 16.11  Ethics

Airline hereby represents and warrants and shall cause each of its Contractors to represent and warrant that Airline or such Contractors, as the case may be, is not in violation of Chapter 2-156 of the Municipal Code.

### 16.12  Inspector General

Airline understands and will abide by the provisions of Chapter 2-56 of the Municipal Code. Airline acknowledges and agrees that it shall be the duty of Airline and its sub-licensees, Contractors and all their officers, directors, agents, partners and employees to cooperate with the Inspector General of the City in any investigation or hearing undertaken pursuant to Chapter 2-56 of the Municipal Code. All contracts and other agreements must inform the parties of this provision and require understanding and compliance with it.

### 16.13  Business Relationships With Elected Officials, Municipal Code Section 2-156-030(b)

Airline understands and will abide by the provisions of Section 2-156-030 of the Municipal Code, as applicable. Pursuant to Municipal Code Section 2-156-030(b), it is illegal for any elected official of the city, or any person acting at the direction of such official, to contact, either orally or in writing, any other city official or employee with respect to any matter involving any person with whom the elected official has a business relationship that creates a financial interest on the part of the official, or the domestic partner or spouse of the official, or from whom or which he has derived any income or compensation during the preceding twelve months or from whom or which he reasonably expects to derive any income or compensation in the following twelve months or to participate in any discussion in any city council committee hearing or in any city council meeting or to vote on any matter involving the person with whom an elected official has a business relationship that creates a financial interest on the part of the official, or the domestic partner or spouse of the official or from whom or which he has derived any income or compensation during the preceding twelve months or from whom or which he reasonably expects to derive any income or compensation in the following twelve months. Violation of Municipal Code Section 2-156-030(b) by any elected official with respect to this Agreement at the request or direction of Airline will be grounds for termination of this Agreement. The term "financial interest" is defined as set forth in Municipal Code Section 2-156-080.

Municipal Code Section 2-156-010(l) defines a "financial interest" as an interest held by an official or employee that is valued or capable of valuation in monetary terms with a current value of more than $1,000.00, provided that such interest shall not include: (1) the authorized compensation paid to an official or employee for any office or employment; or (2) a time or demand deposit in a financial institution; or (3) an endowment or insurance policy or annuity contract purchased from an insurance company; or (4) any ownership through purchase at fair market value or inheritance of the shares of a mutual fund corporation, regardless of the value of

or dividends on such shares, if such shares are registered on a securities exchange pursuant to the Securities Exchange Act of 1934, as amended; or (5) any ownership through purchase at fair market value or inheritance of not more than one-half of one percent of the outstanding common stock of the shares of a corporation, or any corporate subsidiary, parent or affiliate thereof, regardless of the dividends on such shares, if such shares are registered on a securities exchange pursuant to the Securities Exchange Act of 1934, as amended.

### 16.14   City of Chicago Hiring Plan (Shakman Accord)

The City is subject to the May 31, 2007 Order entitled "Agreed Settlement Order and Accord" and the June 16, 2014 "City of Chicago Hiring Plan" (the "2014 City Hiring Plan") entered in *Shakman v. Democratic Organization of Cook County*, Case No 69 C 2145 (United States District Court for the Northern District of Illinois). Among other things, the Agreed Settlement Order and Accord and the 2014 City Hiring Plan prohibit the City from hiring persons as governmental employees in non-exempt positions on the basis of political reasons or factors.

Airline is aware that City policy prohibits City employees from directing any individual to apply for a position with Airline, either as an employee or as a contractor, and from directing Airline to hire an individual as an employee or as a contractor. Accordingly, Airline must follow its own hiring and contracting procedures, without being influenced by City employees.

### 16.15   No Waste Disposal in Public Way, Municipal Code Section 11-4-1600(E)

Airline warrants and represents that it has not violated and is not in violation of the following sections of the Municipal Code (collectively, the "Waste Sections"):

- 7-28-390 Dumping on public way;
- 7-28-440 Dumping on real estate without permit;
- 11-4-1410 Disposal in waters prohibited;
- 11-4-1420 Ballast tank, bilge tank or other discharge;
- 11-4-1450 Gas manufacturing residue;
- 11-4-1500 Treatment and disposal of solid or liquid;
- 11-4-1530 Compliance with rules and regulations required;
- 11-4-1550 Operational requirements; and
- 11-4-1560 Screening requirements.

During the period while this Agreement is executory, Airline's violation of the Waste Sections, whether or not relating to this Agreement, constitutes a breach of and an event of default under this Agreement. Such breach and default entitles the City to all remedies under the Agreement, at law or in equity.

This Section 16.15 does not limit Airline's duty to comply with Applicable Law.

### 16.16   Visual Artists Rights Act Waiver

Airline shall not install any object in the Airline's Premises or elsewhere in the Airport that constitutes a work of visual art as defined in 17 U.S.C. § 101 (the "Artwork") unless and

until Airline has both (a) obtained prior written approval of the Commissioner to install the Artwork and (b) provided the City with a written waiver from the author of the Artwork, in form and substance reasonably satisfactory to City, waiving any and all rights in the Artwork that may be granted or conferred under 17 U.S.C. § 106A and 17 U.S.C. § 113(d). Airline covenants that it will obtain a written waiver of all rights under 17 U.S.C. § 106A and 17 U.S.C. § 113(d) as necessary from any employees, contractors, subcontractors, subtenants or artists.

### 16.17   Boarding And Deplaning Assistance To Passengers With Disabilities

Airline shall comply, at its own expense, with all Applicable Laws relating to the boarding or deplaning of passengers with disabilities, including, but not limited to, 49 U.S.C. § 41705 and 14 C.F.R. § 382.

Article 17

## DEFAULT, TERMINATION AND CHANGE OF LEASE TERM

### 17.1   Events of Default

Each of the following shall be an "Event of Default" under this Agreement:

17.1.1    Airline shall become insolvent (as such term is defined under Section 101 of the Federal Bankruptcy Code); or shall fail to pay its debts generally as they mature; or shall take the benefit of any present or future federal or state insolvency statute; or shall make a general assignment for the benefit of creditors.

17.1.2    Airline shall file a voluntary petition in bankruptcy or a petition or answer seeking an arrangement of its indebtedness under the Federal Bankruptcy Code or under any other law or statute of the United States or of any state thereof; or consent to the appointment of a receiver, trustee, custodian, liquidator or other similar official, of all or substantially all of its property; or an order for relief shall be entered by or against Airline under any chapter of the Federal Bankruptcy Code.

17.1.3    By order or decree of a court, Airline shall be adjudged bankrupt or an order shall be made approving a petition filed by any of its creditors or by any of its stockholders, seeking its reorganization or the restructuring of its indebtedness under the Federal Bankruptcy Code or under any other law or statute of the United States or any state thereof and such order or decree shall not be stayed or vacated within sixty (60) days of its issuance.

17.1.4    A petition under any chapter of the Federal Bankruptcy Code or an action under any federal or state insolvency law or statute shall be filed against Airline and shall not be dismissed or stayed within sixty (60) days after the filing thereof.

17.1.5    By or pursuant to, or under authority of any legislative act, resolution or rule, or any order or decree of any court or governmental board, agency or officer, a receiver, trustee, custodian, liquidator or other similar official shall take possession or control of all or

substantially all of the property of Airline and such possession or control shall continue in effect for a period of sixty (60) days.

      17.1.6     Airline shall become a corporation in dissolution.

      17.1.7     The letting, license or other interest of or rights of Airline hereunder shall be transferred to, pass to or devolve upon, by operation of law or otherwise, any other person, firm, corporation or other entity, by, in connection with or as a result of any bankruptcy, insolvency, trusteeship, liquidation or other proceedings or occurrence described in Sections 17.1.1 through 17.1.5.

      17.1.8     Airline shall fail to duly and punctually pay any Airport Fees and Charges required to be paid hereunder or shall fail to make payment of any other sum required to be paid to the City pursuant to this Agreement on or prior to the date such payment is due and shall continue to remain unpaid ten (10) business days after written notice has been provided to Airline by the City or, with respect to any amount for which no payment date is provided herein, then ten (10) business days after written notice of the amount of such payment has been given to Airline or an invoice for such payment has been submitted to Airline.

      17.1.9     Airline shall fail to keep, perform and observe any promise, covenant or other provision of this Agreement for a period of thirty (30) days after written notice specifying such failure and requesting that it be remedied is given to Airline by the City; provided, however, that any such failure which can be remedied, but which cannot with due diligence be remedied within such thirty (30) day period, shall not give rise to the City's right to exercise remedies under this Agreement if corrective action is instituted by Airline within such thirty (30) day period and diligently pursued until the failure is remedied.

      17.1.10     Any lien shall be filed against the Premises or any portion thereof resulting from any act or omission of Airline, and shall not be discharged or bonded over within thirty (30) days after written notice from the City, unless Airline shall within the aforesaid thirty (30) days furnish the City such security as the Commissioner in his or her reasonable discretion determines to be adequate to protect the interests of the City.

      17.1.11     Other than during a time of force majeure, Airline shall discontinue its Air Transportation Business at the Airport, other than for seasonal suspension of service or low frequency service, for a period of thirty (30) consecutive days or for a period of sixty (60) nonconsecutive days whenever occurring in the aggregate in any Fiscal Year or, after exhausting or abandoning any further appeals, Airline shall be prevented for a period of thirty (30) consecutive days by action of any governmental agency other than the City from conducting its Air Transportation Business at the Airport.

      17.1.12     Other than during a time of force majeure, Airline shall cease using or abandon substantially all of its Premises for a period of thirty (30) days, and Airline has not commenced use or re-occupied its Premises within thirty (30) days after notice from the City.

      17.1.13     Airline shall make any purported Assignment or Sublease without the consent of the City (to the extent required), as set forth in Section 4.2, and which has not been remedied within thirty (30) days after notice from the City to Airline.

17.1.14    Airline shall fail to maintain its corporate existence or to remain duly qualified to do business in the State of Illinois or Airline shall dissolve or otherwise dispose of all or substantially all of its assets or shall consolidate with or merge into another corporation; provided, however, that it shall not be an Event of Default if Airline consolidates with or merges into another corporation as permitted under Section 4.2.8.

17.1.15    To the extent applicable, Airline shall fail to meet any of Airline's security deposit requirements set forth in Section 9.3.

17.1.16    Airline shall fail to transmit to the City PFCs on a timely basis in accordance with the PFC Regulations or shall fail to comply with the provisions of Sections 16.5 and 16.6.

17.1.17    Airline shall violate the Waste Sections of the Municipal Code or MCC 2-156-018, "Duty to report corrupt or unlawful activity" as set forth in Article 16 and Exhibit P; provided, however, that the Commissioner may provide for a reasonable cure period appropriate to the violation.

17.1.18    Airline shall fail to maintain insurance as required by this Agreement, including the cure period provided in Section 13.2.2(b).

17.2    **Termination by the City**

17.2.1    Whenever an Event of Default has occurred and is continuing, the City may, at its option, upon thirty (30) days' prior written notice of such Event of Default:

(a)    terminate this Agreement and the lettings, licenses and other rights of Airline hereunder, without discharging any of Airline's obligations hereunder, including but not limited to Airport Fees and Charges, and, at the City's further option, exclude Airline from its Premises;

(b)    without terminating this Agreement, exclude Airline from its Premises and use commercially reasonable efforts to lease such Premises to another airline for the account of Airline, holding Airline liable for all Airport Fees and Charges and other payments due hereunder up to the effective date of such leasing and for the excess, if any, of Airport Fees and Charges and other amounts payable by Airline under this Agreement for the remainder of the term of this Agreement over the rentals and other amounts which are paid by such new airline under such new agreement; or

(c)    without terminating this Agreement, request that Airline cease performing any work it may perform pursuant to Section 4.9.

17.2.2    In addition, the City may, from time to time, take whatever action at law or in equity appears necessary or desirable to collect Airport Fees and Charges and any other amounts payable by Airline hereunder then due and thereafter to become due, and to enforce the performance and observance of any obligation, agreement or covenant of Airline under this Agreement.  For the avoidance of doubt, the City may seek an order for specific performance by Airline of any obligation pursuant to this Agreement, perform said obligations itself or take other

actions to mitigate losses that may result from Airline's failure to perform and, if the City takes such actions, City may charge Airline for the City's costs plus a 15% administrative fee.

17.2.3    All rights and remedies given to the City in this Agreement and all rights and remedies given to the City by law, shall be cumulative and concurrent.    No termination of this Agreement or the taking or recovering of the Premises shall deprive the City of any of the City's remedies or actions against Airline for Airport Fees and Charges or for damages or for the breach of any covenant herein contained, nor shall the bringing of any action for Airport Fees and Charges or breach of covenant, or the resort to any other remedy herein provided for the recovery of Airport Fees and Charges be construed as a waiver of the right to obtain possession of the Premises.

17.2.4    In no event shall this Agreement or any rights or privileges hereunder be an asset of Airline under any bankruptcy, insolvency or reorganization proceedings.

17.2.5    To the extent consistent with and permitted under the United States Bankruptcy Code or similar debtor relief laws, if Airline seeks protection under the United States Bankruptcy Code or similar debtor relief laws, or is currently operating under the protection of the United States Bankruptcy Code or other similar debtor relief laws, Airline will comply with every provision of this Agreement as and when required under this Agreement, including without limitation performing any required remediation relating to any environmental matter pursuant to Airline's obligations under Article 14 which arose prior to or arises during the course of Airline's bankruptcy case.  No Air Carrier will be allowed to assume this Agreement without performing any required remediation as part of the cure of any Event of Default under this Agreement.

17.3    **Change of Lease Term**

17.3.1    Notwithstanding the provisions of Sections 2.3 and 2.4, upon the occurrence of an Event of Default described in Sections 17.1.1, 17.1.10, 17.1.11, 17.1.12, 17.1.13, 17.1.14, 17.1.15, or 17.1.16, the City may notify Airline that the term of this Agreement shall convert to month-to-month, commencing five (5) days after such notice and terminating upon thirty (30) days' written notice from the City to Airline, or from Airline to the City.

17.3.2    The conversion of the term of this Agreement pursuant to this Section 17.3 shall not discharge any of Airline's obligations hereunder nor affect any of the City's other remedies set forth herein.

17.4    **Pursuit of Remedies Against Defaulting Air Carriers**

A default by any Air Carrier (other than Airline) in the payment of Airport Fees and Charges pursuant to Article 9 or indemnification payments may, if not cured, result in a greater amount of Airport Fees and Charges payable by Airline than would otherwise have been required.  Accordingly, the City shall diligently pursue all remedies deemed appropriate by the City against any such defaulting Air Carrier on behalf of and for the benefit of non-defaulting Air Carriers, including Airline, and shall give due consideration to any comments submitted to the City by Airline with respect to the pursuit of such remedies.

125

17.5    **Agreement to Pay Attorneys' Fees and Expenses**

In the event Airline defaults under this Agreement and the City employs attorneys or incurs other expenses for the collection of Airport Fees and Charges or any other amounts due hereunder, or for the enforcement or performance or observance of any obligation or agreement on the part of Airline herein contained, Airline shall, on demand, pay to the City the reasonable fees and expenses of such attorneys and any such other reasonable expenses incurred by the City as a result of such default.

17.6    **Force Majeure**

17.6.1    If either party shall be delayed or hindered in or prevented from the performance of any act required under this Agreement by reason of strikes, lockouts, labor disputes (all of which shall be subject to Section 18.15), inability to procure labor or materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, terrorism, war, fire or other casualty, or other reason of a similar nature beyond the reasonable control of the party delayed in performing work or doing acts required under this Agreement, performance of such act shall be excused for the period of the actual delay attributable to such causes, and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay (any such delay, an "Unavoidable Delay"). This Section 17.6.1 shall not be applicable to Airline's obligations to procure insurance or to pay Airport Fees and Charges, or any other sums, moneys, costs, charges or expenses required to be paid by Airline. If any provision of this Agreement negates or limits the period of any force majeure or Unavoidable Delay extension, such provision shall override this Section 17.6.1 and Airline shall give the City notice of any Unavoidable Delay within a reasonable time (not to exceed one (1) year) following the occurrence of the delaying event.

17.6.2    The City shall be under no obligation to supply any service if and to the extent and during any period that the supplying of any such service or the use of any component necessary therefor shall be prohibited or rationed by any Applicable Laws.

Article 18

**GENERAL PROVISIONS**

18.1    **Agreement Not to Grant More Favorable Terms**

During the Term, and subject to Section 8.15, the City agrees not to enter into any lease, contract, or other agreement directly or indirectly with any other Air Carrier conducting operations at the Airport that contains fees and charges or other terms more favorable to such Air Carrier than the fees and charges and other terms under this Agreement, unless the City also makes those more favorable terms available to Airline. The provisions of this Section 18.1 shall in no way limit, impair, or interfere with the City's ability to enter into any lease, contract, or other agreement with any party that is not an Air Carrier.

18.2    **No Partnership or Agency**

Nothing herein contained is intended or shall be construed to in any respect create or establish any relationship other than that of licensor and licensee or lessor and lessee, and nothing herein shall be construed to establish any partnership, joint venture or association or to make Airline the general representative or agent of the City for any purpose whatsoever.

### 18.3    No Personal Liability

No member, director, officer, elected official or employee of either party to this Agreement shall be charged personally or held contractually liable by or to the other party under any term or provision of this Agreement, or because of any breach thereof or because of its or their execution or attempted execution thereof.

### 18.4    Notices

Except as otherwise expressly provided hereunder, all notices and other communications provided for under this Agreement shall be in writing and shall be: (a) mailed; (b) personally delivered, including via overnight courier; or (c) to the extent expressly permitted elsewhere in this Agreement for a specific notice or as mutually agreed by parties, sent by electronic mail with electronic receipt, to the City and Airline at the following addresses:

> If to the City, to:
>
> Commissioner
> Chicago Department of Aviation
> Chicago O'Hare International Airport
> 10510 West Zemke Road
> Chicago, IL  60666
> CDACommissioner@cityofchicago.org
>
>
> With a copy to:
>
> General Counsel
> Chicago Department of Aviation
> Chicago O'Hare International Airport
> 10510 West Zemke Road
> Chicago, IL  60666
> CDAGeneralCounsel@cityofchicago.org

If to Airline for all notices, except pursuant to Sections 4.3 (City's Right of Entry), 11.3 (Performance by City upon Failure of Airline), 14.13 (Notice for Environmental Matters) or 18.8 (Service of Process) of this Agreement, to:

> United Airlines, Inc.
> 233 South Wacker Drive
> Chicago, IL 60606
> Attn: Vice President – Corporate Real Estate

With a copy:

United Airlines, Inc.
233 South Wacker Drive
Chicago, IL 60606
Attn: General Counsel

If to Airline for notices on environmental matters pursuant to Section 14.13, to:

United Airlines, Inc.
233 South Wacker Drive
Chicago, IL 60606
Attn: Vice President – Corporate Real Estate

With a copy:

United Airlines, Inc.
233 South Wacker Drive
Chicago, IL 60606
Attn: General Counsel

If to Airline pursuant to Section 4.3 (City's Right of Entry) or Section 11.3 (Performance by City upon Failure of Airline) of this Agreement, to:

Mike Hanna – Vice President, Chicago Hub
United Airlines, Inc.
Chicago O'Hare International Airport
10000 West O'Hare Avenue
Mezzanine Level, Terminal 1, Concourse B
Chicago, IL 60666
mike.hanna@united.com

With a copy to AAAC Representative:

Sandra Widerborg – Director – Airport Affairs
United Airlines, Inc.
233 South Wacker Drive
Chicago, IL 60606

Or, with respect to any notice given pursuant to this Section 18.4, to such other person or address as either the City or Airline may hereafter designate by written notice to the other in accordance with this Notices section. Except as otherwise expressly provided hereunder, any notice or communication under this Agreement shall be deemed to have been given or made: (a) if a messenger or courier service is used, when delivered to the addressee; (b) if sent by mail

(certified or by other method with tracking and confirmation receipt), upon receipt, or upon attempted delivery where delivery is refused or mail is unclaimed five (5) days after being deposited in the mails, postage prepaid and properly addressed; and (c) if sent by electronic mail, upon receipt by either party of a written reply or electronic receipt). Airline agrees to provide City with any changes to its notice information, including electronic mail addresses, within five (5) business days of such change.

With respect to Section 18.8 (Service of Process) of this Agreement, Airline hereby designates as its agent in Chicago, Illinois;

> CT Corporation System
> 208 South LaSalle Street
> Suite 814
> Chicago, IL 60604

### 18.5    Entire Agreement

This Agreement, including the attached Exhibits and endorsements, constitutes the entire agreement of the parties on the subject matter hereof. The parties intend that this Agreement shall be the final expression of their agreement with respect to its subject matter, and may not be contradicted by evidence of any prior or contemporaneous written or oral agreements or understandings. The parties further intend that this Agreement shall constitute the complete and exclusive statement of its terms, and that no extrinsic evidence whatsoever (including prior drafts of the Agreement) may be introduced in any judicial, administrative or other legal proceeding involving this Agreement.

### 18.6    Amendment

Except as otherwise expressly provided herein, the provisions of this Agreement may be amended only by a written agreement signed by the City and Airline.

### 18.7    Applicable Law

This Agreement shall be deemed to have been made in, and shall be construed in accordance with, the laws of the State of Illinois.

### 18.8    Authorization to Operate; Consent to Service of Process and Jurisdiction

18.8.1    Airline represents that it is a corporation organized and existing under the laws of the state shown on the signature page hereof. Airline warrants that it is, and throughout the term of this Agreement it will continue to be, duly qualified to do business in the State of Illinois.

18.8.2    All judicial proceedings brought by the City against Airline with respect to this Agreement may be brought in any court of competent jurisdiction having situs within the boundaries of the federal court district of the Northern District of Illinois including any of the courts within Cook County, and by execution and delivery of this Agreement, Airline accepts, for itself and in connection with its properties, generally and unconditionally, the

nonexclusive jurisdiction of the aforesaid courts, and irrevocably agrees to be bound by any final judgment rendered thereby from which no appeal has been taken or is available. Airline hereby designates and appoints the representative designated in Section 18.4 as its agent in Chicago, Illinois to receive on its behalf service of all process in any such proceedings in any such court (which representative shall be available to receive such service during regular business hours), such service being hereby acknowledged by such representative to be effective and binding service in every respect. Said agent may be changed only upon the giving of written notice by Airline to the City of the name and address of a new Agent for Service of Process that works within the geographical boundaries of the State of Illinois and is employed by or contracted with Airline. Airline irrevocably waives any objection (including any objection of the laying of venue or based on the grounds of forum non conveniens) which it may now or hereafter have to the bringing of any action or proceeding with respect to this Agreement in the jurisdiction set forth above. Nothing herein shall affect the right to serve process in any other manner permitted by law or shall limit the right of the City to bring proceedings against Airline in the courts of any other jurisdiction.

18.9    **Severability**

If any provision of this Agreement shall be held or deemed to be or shall in fact be inoperative or unenforceable as applied in any particular case in any jurisdiction or jurisdictions or in all cases because it conflicts with any other provision or provisions hereof or of any constitution, statute, ordinance, rule of law or public policy, or for any other reason, such circumstances shall not have the effect of rendering the provision in question inoperative or unenforceable in any other case or circumstances, or of rendering any other provision or provisions herein contained invalid, inoperative, or unenforceable to any extent whatsoever. The invalidity of any one or more phrases, sentences, clauses or sections contained in this Agreement shall not affect the remaining portions of this Agreement or any part hereof.

18.10   **Representatives**

The City and Airline shall each designate a representative who, except as otherwise provided hereunder, shall be authorized to act for the City and Airline, respectively, with respect to any actions to be taken by either of them under the terms of this Agreement. Except as specifically set forth herein, for the purposes of actions to be taken by it or by the Commissioner, the City's representative shall be the Commissioner. Airline's representative shall be designated in a written notice delivered to the City. Any party hereto may change its designated representative by notice to the other party.

18.11   **Successors and Assigns**

All of the covenants, stipulations and agreements herein contained shall inure to the benefit of and be binding upon the successors and assigns of the parties hereto.

18.12   **No Third Party Beneficiaries**

Unless otherwise provided in this Agreement, this Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein expressed or implied shall give or

be construed to give to any person or entity other than the parties hereto and their assigns any legal or equitable rights hereunder.

### 18.13   No Waiver

No failure by a party to insist upon the strict performance of any obligation of the other party under this Agreement or to exercise any right, power or remedy arising out of a breach thereof, irrespective of the length of time for which such failure continues, prior to the expiration of the Term, shall constitute a waiver of such breach or of the non-defaulting party's right to demand strict compliance with such term, covenant or condition or operate as a surrender of this Agreement.

No waiver of default of any of the terms, covenants and conditions of this Agreement to be performed, kept and observed by the other party shall be construed or operate as a waiver of any subsequent default of any of the terms, covenants or conditions of this Agreement to be performed, kept and observed by the other party.

### 18.14   No Exclusive Right or Remedy

All rights and remedies provided in this Agreement are cumulative and not exclusive of any other rights or remedies that may be available to the parties hereunder or at law or in equity.

### 18.15   Labor Disputes

Airline agrees to use commercially reasonable efforts to avoid disruption to the City, its tenants, or members of the public arising from labor disputes involving Airline, and in the event of a strike, picketing, demonstration or other labor difficulty involving Airline, to use its good offices, including the utilization of available legal remedies Airline deems appropriate, to minimize or eliminate any disruption to the City, its tenants or members of the public, arising from such strike, picketing, demonstration or other labor difficulty.

### 18.16   Action or Exercise of Power by the City

Any provision in this Agreement that requires action or an exercise of power by the City may be performed by the Commissioner or her or his designee, unless otherwise specified in this Agreement.

### 18.17   Headings

The headings of the several sections of this Agreement are inserted only as a matter of convenience and for reference, and in no way define, limit, or describe the scope or intent of any provisions of this Agreement, and shall not be construed to affect in any manner the terms and provisions, or the interpretation or construction, of this Agreement.

### 18.18   Counterparts

This Agreement may be executed in one or more counterparts.

* * * *

**IN WITNESS WHEREOF,** the City has caused this Agreement to be executed on its behalf by its Mayor, pursuant to due authorization of the City Council of the City, and its seal to be hereunto affixed and attested by the City Clerk of the City, and Airline has caused this Agreement to be executed on its behalf by its Chief Exec. Officer, pursuant to due authorization, all as of the day and year first above written.

Attest:

_____
City Clerk

CITY OF CHICAGO

_____
Mayor

Recommended by:
DEPARTMENT OF AVIATION

_____
Commissioner

Approved as to form and legality:

_____
Corporation Counsel

UNITED AIRLINES, INC.

By: _____
Name: Oscar Munoz
Its: Chief Executive Officer

Address for Notice to Airline:

208 South LaSalle Street
Suite 814
Chicago, IL 60604

Designation of Agent for Service of Process:

CT Corporation System

Term Expiration Date:

December 31, 2033