**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| AMERICAN AIRLINES, INC.,<br><br>       Plaintiff,<br><br>  v.<br><br>THE CITY OF CHICAGO and MICHAEL P. MCMURRAY, in his capacity as the Commissioner of the Chicago Department of Aviation,<br><br>       Defendants. | Case No. 25-cv-4874<br><br>Hon. Judge Joan H. Lefkow |

## REPLY TO AMERICAN AIRLINES, INC.'S MEMORANDUM IN OPPOSITION TO UNITED AIRLINES, INC.'S MOTION TO INTERVENE

### INTRODUCTION

Defendants the City of Chicago and Michael P. McMurray, in his official capacity as the Commissioner of the Chicago Department of Aviation[1] (together, the "City"), respectfully submit this reply to American Airlines, Inc.'s ("American") Memorandum in Opposition to United Airlines, Inc.'s Motion to Intervene. The City's reply provides the Court with helpful context regarding the unique nature of the 2018 Airline Use and Lease Agreement ("AULA") that is central to this dispute, as well as the rights and obligations of the City and its airline partners under the AULA. As explained below, given the unique nature of the AULA and American's allegations in

---

[1] The Chicago City Council confirmed Michael P. McMurray as the new Commissioner of the Chicago Department of Aviation on May 21, 2025. Pursuant to Federal Rule of Civil Procedure ("Rule") 25(d), Commissioner McMurray is automatically substituted for Acting Commissioner Tracey Payne.

this lawsuit, United Airlines, Inc. ("United") has an interest in the AULA and this case, and the City supports United's motion to intervene.[2]

## ARGUMENT

**A. United has a legally protectable interest because the AULA is a unique contract that cannot be interpreted as if it were between two parties alone.**

Although American's complaint refers to one single AULA signed by all parties, Dkt. 1, Compl. ¶ 5, and recognizes the close involvement of multiple airlines in reaching a final agreement, *id.* ¶ 29, American's opposition to United's motion to intervene strikes a different tune. American now claims the AULA "is personal to American," "[t]here are no other parties," and United has no interest in the subject matter at issue here. Dkt. 26, Mem. in Opp'n to United's Mot. to Intervene ("Opp'n Mem.") at 1, 4. American got it right the first time. The AULA is a unique contract that for all relevant purposes here functions as a single contract between the City, on the one hand, and the Signatory Airlines,[3] on the other hand, and any interpretation of the AULA must take that into account.

As the owner and operator of O'Hare International Airport ("O'Hare"), the City relies on a contract known as an "airline use and lease agreement" to govern the rights and obligations of the City and the airlines operating at O'Hare. This agreement covers nearly all aspects of the airlines' operations at the airport, from identification of the space within the airport available for

---

[2] The City files this reply without waiver of or prejudice to its ability to assert defenses to American's complaint. The City is considering whether American has failed to join required parties to this lawsuit and may raise that issue, among others, in a responsive pleading or motion to be filed by July 8, 2025.

[3] *See* Dkt. 1-1 at 29, AULA Definitions: "'Signatory Airline' means [American] and each other Air Carrier that has executed an Airline Use and Lease Agreement with the City substantially similar to this Agreement. A Signatory Airline may be either a Long-Term Signatory Airline or a Short-Term Signatory Airline."

use, to calculation of the rates and charges to be paid, to authorization of capital improvement projects, to requirements to maintain appropriate insurance and comply with all manner of laws and regulations.  *See* Dkt. 1-1 at 3-8, AULA Table of Contents.

An airline use and lease agreement is "unlike an ordinary commercial lease."  Dkt. 1, Compl. ¶ 22.  The detailed "federal regulatory scheme governing airports" necessitates that airline use and lease agreements "involve collective negotiations among airlines and the airport authority."  *Id.*  Specifically, the Federal Aviation Administration prohibits airports receiving federal funding from unjustly discriminating against airport users and requires that similarly situated airport users be subject to substantially comparable fees, charges, regulations, and conditions.  *See* 49 U.S.C. § 47107(a)(1)-(2); *see also* Policy Regarding Airport Rates and Charges, 78 Fed. Reg. 55,330, 55,335 (Sept. 10, 2013).  To ensure compliance with these requirements, airport sponsors such as the City negotiate *one* agreement for the use and lease of airport facilities, to be executed by each airline that desires to become a signatory.

The City followed that process here.  As American notes, the AULA was "fiercely negotiated" over a multi-year period and signed by the City and multiple airlines in 2018.[4]  Dkt. 1, Compl. ¶¶ 5, 21.  While the City entered into an individual contract with each airline, those contracts are virtually identical, with the only difference (in addition to each airline's identifying information) being an exhibit that shows the specific premises each airline is authorized to use.  *Compare* Dkt. 1-1, American AULA, *with* Dkt. 7-2, United AULA.  In fact, the Mayor's authority to execute the AULA, provided by City Council through ordinance, was specifically limited to

---

[4] An airline may sign the AULA as a "Long-Term Signatory Airline," committing to O'Hare through the year 2033, or a "Short-Term Signatory Airline," committing for a shorter period of time. Dkt. 1-1 at 24, 29, AULA Definitions.  There are currently 21 Long-Term Signatory Airlines (including American and United) and 27 Short-Term Signatory Airlines.

executing an agreement in the form attached to the ordinance—the same for each airline.  *See* City of Chicago, Journal of the Proceedings of City Council 72586 (Mar. 28, 2018).[5]  And the AULA itself contains a provision preventing the City from entering into any agreement, directly or indirectly, with an airline that contains fees, charges, or other terms more favorable than those offered to other airlines—requiring the City's agreement with each airline to *remain* identical. Dkt. 1-1 at 134, AULA § 18.1.

Against this backdrop, the position advanced by American—that because only one airline has executed each agreement, each agreement affects the legally protectable interests of only one airline—is untenable.  American's complaint makes this plain:  American asserts that *United's* request for a redetermination of gate space under the AULA has affected *American's* rights to such a degree that American has grounds to maintain this lawsuit and will allegedly suffer "substantial damages" and "irreparable injury."  *See* Dkt. 1, Compl. ¶¶ 12, 48, 78-79, 86, 94.  Under the specific provisions at issue here, *any* Long-Term Signatory Airline meeting certain requirements can request additional gate space, triggering a redetermination of the gate space "to be offered to *each* Long-Term Signatory Airline"—notwithstanding the fact that each Long-Term Signatory Airline is not technically a party to the others' contracts.  Dkt. 1-1 at 52, AULA § 5.4.1 (emphasis added). The relationship of the signatory airlines under the AULA is far more than just "day-to-day operational engagement."  Dkt. 26, Opp'n Mem. at 5.

American's attempts to avoid this conclusion require an overly narrow reading of the AULA and should be rejected.  First, American's contention that "United is never mentioned in American's lease," *id.*, is simply not true.  United is mentioned by name in exhibits to the AULA

---

[5] Available at: https://chicityclerk.s3.us-west-2.amazonaws.com/s3fs-public-1/reports/2018_03_28_VI_VII_VIII.pdf?VersionId=tZoBhJkjtRKGnKxJWVRUr_uUILuNSIf0.

American signed, including in Exhibit D, which American makes central to its lawsuit. *See* Dkt. 1-2 at 95-97, AULA Ex. D (referencing United and other airlines); *see also id.* at 102-113, AULA Ex. E (referencing United and other airlines); Dkt. 1-1 at 32, AULA § 1.3 (incorporating exhibits into AULA); Dkt. 1, Compl. ¶¶ 40-70 (describing importance of Exhibit D-1.3). And United is a "Signatory Airline" and a "Long-Term Signatory Airline," mentions of which are ubiquitous throughout the AULA. *See, e.g.*, Dkt. 1-1 at 50-55, AULA §§ 5.3, 5.4. Second, American's reliance on the AULA provision disclaiming any third party beneficiaries is misplaced. Dkt. 26, Opp'n Mem. at 5. That provision applies "[u]nless otherwise provided in [the AULA]," *id.* at 3; Dkt. 1-1 at 138, AULA § 18.12—and the AULA *does* otherwise provide, in the many sections making signatory airlines' rights interdependent. *See, e.g.*, Dkt. 1-1 at 50-55, AULA §§ 5.3, 5.4 (two provisions central to American's Complaint).

**B. Denial of intervention would impair United's interests and risk multiple lawsuits.**

The unique nature of the AULA means that United cannot simply "initiate an action against the City under its own independent lease," as American claims. Dkt. 26, Opp'n Mem. at 10. The AULA provisions governing the gate space redetermination process contemplate *one* annual redetermination for *all* airlines. *See* Dkt. 1-1 at 50-55, AULA §§ 5.3, 5.4. The City cannot postpone the redetermination for American while moving forward for United. This case is not like the cases American cites in which a proposed intervenor sought to protect its right to enforce some separate, secondary obligation or obtain maximum benefit in a separate lawsuit. *See, e.g.*, *Shea v. Angulo*, 19 F.3d 343, 347-48 (7th Cir. 1994) (proposed intervenor's interest in recovering earnings from alleged partnership with plaintiff would not be impaired by plaintiff's unrelated breach of contract action against defendant); *Lloyd's Syndicate 3624 v. Biological Res. Ctr. of Ill., LLC*, 2018 WL 3861559, at *4 (N.D. Ill. Aug. 14, 2018) (proposed intervenors' separate litigation against defendant would not be impaired by plaintiff insurance company's lawsuit against defendant,

although amount available for recovery could be affected). A decision in American's favor in this lawsuit would, as a practical matter, foreclose a decision in United's favor. *See* Dkt. 26, Opp'n Mem. at 10.

Even if United *could* maintain a separate action to protect its interests in the redetermination proceeding, granting intervention so that United may protect its interests in *this* proceeding is the more prudent approach. United states that it "could pursue its own declaratory judgment action," and suggests that it might be "forc[ed] . . . to initiate a separate lawsuit to protect its interests" if it is not granted leave to intervene here. Dkt. 7, Mem. in Supp. of Mot. to Intervene ("Mot. to Intervene") at 7-8. A separate lawsuit from United would burden the resources of the City, the airlines (for surely American would move to intervene to protect its own interests), and the judicial system. And it would risk placing the City in the position of being ordered by one court to proceed with the redetermination, and by another court to halt the redetermination. The Court may consider these impacts in evaluating United's motion. *See* 6 *Moore's Federal Practice – Civil* § 24.03 (2025) ("[T]he absence of discretionary language in the text of Rule 24(a) relating to judicial administration and prejudice to existing parties has not prevented courts from considering these factors when assessing motions to intervene as of right."). Intervention should be granted in these circumstances. *See Atain Specialty Ins. Co. v. Hodge*, 2022 WL 4367358, at *2 (S.D. Ill. Sept. 21, 2022) (granting intervention as of right where there was "consistency in resolving the[] issues in a single proceeding and denial of intervention could create conflicting results"); *see also Sec. Ins. Co. of Hartford v. Schipporeit, Inc.*, 69 F.3d 1377, 1381 (7th Cir. 1995) (affirming grant of intervention as of right that "enabled the court to address important issues in th[e] case once, with fairness and finality").

**C. The City does not represent United's interests.**

The City does not, and cannot, adequately represent United's interests. American claims there is a rebuttable presumption of adequate representation. Dkt. 26, Opp'n Mem. at 11. But this presumption applies only when the proposed intervenor and an existing party have "the same goal." *Bost v. Ill. State Bd. of Educ.*, 75 F.4th 682, 688 (7th Cir. 2023). "For the potential intervenor and the named party to have 'the same goal,' it is not enough that they seek the same outcome in the case"—their interests must be "genuinely 'identical.'" *Id.* Here, the City and United may both support the gate space redetermination moving forward. But the City's and United's interests are not identical. The City's interest is in the proper interpretation and administration of the AULA, and in the success of *all* airlines who choose to fly at O'Hare. As explained above, this neutrality is a cornerstone of the federal regulatory framework—and one the City takes very seriously. *See supra* at 3. United, by contrast, has an interest in its own corporate success, which United describes as "realizing its growth strategy" at O'Hare. Dkt. 7, Mot. to Intervene at 9. While the City supports airline investment at O'Hare as a general matter, it does not and cannot represent airlines' individual interests.

Because the City and United do not share the same interests, they do not share the same goal, and the "lenient default rule" for adequacy of representation applies. *See Bost*, 75 F.4th at 688; *see also id.* at 689 (applying default rule where named party and proposed intervenor both wanted the law upheld, but did not share the same interests); *Driftless Area Land Conservancy v. Huebsch*, 969 F.3d 742, 748 (7th Cir. 2020) (applying default rule where named party and proposed intervenor both wanted case dismissed and had "interests and objectives [that] overlap in certain respects but are importantly different"). Under that rule, United need only show that the representation of its interests by the City *may* be inadequate. *Bost*, 75 F.4th at 688. United has done so here, identifying the arguments it will make that the City cannot. *See* Dkt. 7, Mot. to

Intervene at 9.  United also indicates that it may sue the City itself.  *Id.* at 7-8.  The City cannot be said to adequately represent United under these circumstances.  *See Hartford Accident & Indem. Co. v. Dresser Indus.*, 1994 U.S. Dist. LEXIS 1763, at *19 (N.D. Ill. Feb. 16, 1994) (separate litigation between existing party and proposed intervenor demonstrated adverse interests and lack of adequate representation).  United has met its "minimal" burden of showing its interests are not adequately represented.  *See Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972).

## <u>CONCLUSION</u>

The AULA is a unique contract that was heavily negotiated by multiple sophisticated parties.  American's efforts to deny the interests of United—and any other Signatory Airlines—in the interpretation of the provisions challenged here should be rejected, and United's motion to intervene granted.

Respectfully submitted on May 28, 2025.

/s/ Samantha R. Caravello

Samantha R. Caravello (Bar No. 48793 (CO))
Peter J. Kirsch (Bar No. 28489 (CO))
KAPLAN KIRSCH LLP
1675 Broadway, Suite 2300
Denver, CO 80202
Telephone: (303) 825-7000
E-mail: scaravello@kaplankirsch.com
       pkirsch@kaplankirsch.com

Fiona A. Burke (ARDC No. 6273779)
Cornel H. Kauffman (ARDC No. 6300161)
CITY OF CHICAGO DEPARTMENT OF LAW
2 N. LaSalle Street, Suite 540
Chicago, IL 60602
Telephone: (312) 744-6929
       (312) 742-0330
E-mail: fiona.burke@cityofchicago.org
       cornel.kauffman@cityofchicago.org

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I, Samantha Caravello, an attorney, certify that on May 28, 2025, I caused a true and correct copy of the foregoing document to be electronically filed with the Clerk of Court using CM/ECF, which will serve on all counsel of record.

/s/ Samantha R. Caravello
Samantha R. Caravello