IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AMERICAN AIRLINES, INC., <br><br> Plaintiff, <br><br> v. <br><br> THE CITY OF CHICAGO and MICHAEL P. MCMURRAY, in his capacity as the Commissioner of the Chicago Department of Aviation, <br><br> Defendants. | Case No. 1:25-cv-04874 <br><br> Hon. Judge Joan H. Lefkow |

**DECLARATION OF AMANDA ZHANG IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

I, Amanda Zhang, declare as follows:

1. I am the Vice President of Airport Affairs and Facilities at American Airlines, Inc. ("American" or "AA"). I am authorized by American to make this declaration and have personal knowledge of the facts described below and, if called as a witness, could testify competently thereto.

2. I submit this declaration in support of American's Motion for Preliminary Injunction in the above-captioned proceeding.

3. I have been an employee at American since 1996. I have been in my current role since 2022.

4. My current responsibilities at American include, but are not limited to, (1) managing airport affairs, design, and construction, at all of American's hub airports and around 300 non-hub airports, including at Chicago O'Hare International Airport ("O'Hare");

1

(2) negotiating and administering airport lease agreements on behalf of American; and (3) overseeing any gate and other facility changes under the Airline Use and Lease Agreement (the "AULA") entered into between American and the City of Chicago (the "City").

5. From 2016 to 2018, I was Director and then Managing Director of Airport Affairs. As part of that role, I was a member of the American team that negotiated the AULA. The AULA governs, among other things, the assignment and any reallocation of gate space at O'Hare.

6. Since 1978, O'Hare has been a dual-hub airport—meaning that it serves as a hub of operations for both American and United Airlines, Inc. ("United")—which preserves balance at the airport between the two lead carriers competing for gate space. In the years preceding the start of the AULA negotiations in 2016, United had increased its gate advantage over American. The prospect of United gaining an even greater, outsized gate share through the new AULA threatened to upend the competitive balance of the dual hub. American thus entered into the AULA negotiations with the express goal of preserving its competitive position vis-à-vis United and ensuring that the AULA did not grant United any disparate advantages that would allow it to increase its competitive position at American's expense.

7. Throughout the negotiations, which involved the City and the Chicago Department of Aviation ("Aviation Department," together with the City, "Defendants"), the parties seemed to agree that eight gates in O'Hare's Terminal 2 made available by Delta Air Lines, Inc.'s ("Delta") relocation to Terminal 5 would remain available for any airline to use on a shared basis as "Common Use Gates."

8. Then, on February 15, 2018, Defendants suddenly revealed the purported "final" AULA, announcing a revision to the AULA that would award United five of the eight Terminal 2 gates previously slated for common use. This announcement stunned American because it did not

2

align with the discussions of the previous months, and American immediately objected. The last-minute change ran counter to American's goal of maintaining balanced gate allocations with United and ensuring O'Hare remained a dual hub airport.

9. Although Defendants insisted the change was unilateral, American later learned that it resulted from a secret deal between Defendants and United concluded prior to the February 15, 2018 meeting. Defendants intentionally kept American in the dark about the deal, only announcing it at the last minute when further changes to the AULA would be difficult, if not impossible, to make.

10. American publicly objected to the last-minute change and announced it would not sign the AULA. After significant negotiations and increasing media scrutiny of Defendants' actions, Defendants and American reached a compromise. That compromise was the only reason American was willing to proceed under the AULA.

11. The singular focus of the compromise was the scope of the "Gate Space Ramp-up Period" to ensure that airlines would begin their race for gates at O'Hare from the same starting line.

12. The Gate Space Ramp-up Period was envisioned as a pause in the annual redetermination process for reallocating gate space at O'Hare. The AULA sets up a mechanism for yearly gate space redeterminations at O'Hare, where the results of the redetermination would be based on each airline's flight statistics in the preceding calendar year. The more departures an airline had at O'Hare in the calendar year preceding redetermination, the more gates an airline would be allocated in the redetermination.

13. The redetermination process favors airlines that start off with more gates because with more gates, an airline can have more daily and, by extension, yearly departures.

14. When we were negotiating with Defendants to see if a compromise could be reached, we knew that the scope of the Gate Space Ramp-up Period was crucial for maintaining balance at O'Hare since it provided a pause in the yearly redeterminations, allowing all airlines at least 12 months to ramp up their flight operations at O'Hare.

15. Exactly when the Gate Space Ramp-up Period would begin and when a redetermination would occur following the end of the Gate Space Ramp-up Period were key issues we negotiated during our discussions to see if we could find a compromise with Defendants.

16. Defendants' initial proposal in the AULA provided that the Gate Space Ramp-up Period would last for at least 12 months and would begin upon the completion of construction to expand O'Hare's Terminal 5 (the "T5 Expansion") and the subsequent move by Delta from Terminal 2 to Terminal 5. This initial proposal was depicted in the working draft of Exhibit D-1.3, attached hereto as **Exhibit 1**.

17. Under the terms of the compromise agreement struck between American and Defendants, United would still receive the five gates in Terminal 2 vacated by Delta, but a new condition was added to the Gate Space Ramp-up Period. In addition to completion of the Terminal 5 expansion and Delta's relocation, construction on the "stinger" facility of O'Hare's L Concourse (the "L-Stinger Expansion") would have to be complete, and the three new L Stinger gates built during that construction (the "L-Stinger Expansion Gates") operational, in order for the Gate Space Ramp-up Period to start.

18. The L-Stinger Expansion Gates would be designated as Common Use, but because of their location at O'Hare, American was expected to be the only carrier to have access to them during the Gate Space Ramp-up Period. Having full use of those three gates during this critical Gate Space Ramp-Up Period would have a significant impact, allowing American a fair

opportunity to ramp up its operations at those three new gates and mitigating American's gate disadvantage.

19. Instead of changing the language of the AULA itself to reflect the compromise, Defendants proposed amending Exhibit D-1.3 to the AULA, which shows the "Post T-5 Extension" gate assignments at O'Hare. Before the compromise, the working draft of Exhibit D-1.3 circulated by Defendants did not include the L-Stinger Expansion Gates. As Defendants' chief negotiator, Susan Warner-Dooley (the Aviation Department's then-First Deputy Commissioner) proposed that Defendants and American effect their agreement by revising the gate assignments shown in Exhibit D-1.3 to include the L-Stinger Expansion Gates and thus clarify that the Gate Space Ramp-up Period would begin only after the L-Stinger Expansion Gates were allocated and operational. The parties thus memorialized their compromise in a revised Exhibit D-1.3 to the AULA, which required no change to the wording of the AULA.

20. American confirmed the parties' mutual understanding of the compromise numerous times in discussions among Mr. Rivkin, Carole Brown (the City's then-Chief Financial Officer), Ms. Warner-Dooley, Erika Ituassu (the Aviation Department's then-Assistant Commissioner for Intergovernmental Affairs) and American's representatives Mike Minerva, William Glunz, and myself. The agreement was clear that no gate redetermination could occur for at least 12 months after completion of the Terminal 5 expansion, the relocation of Delta, and the opening of the three L-Stinger Expansion Gates for service. Defendants were keenly aware that American never would have agreed to the AULA without these conditions, which would mitigate (somewhat) the harm to American caused by United's expanding gate advantage.

21. After reaching the compromise on March 14, 2018, American's representative Mike Minerva emailed Defendants, copying me, to document the parties' agreement regarding

5

gate redetermination and other aspects of the AULA. A true and correct copy of the email exchange between Mr. Minerva and Defendants' representatives dated March 14, 2018, is attached as **Exhibit 2**.

22. In this email sent the night of March 14, 2018, after the negotiations concluded, Mr. Minerva reiterated that "American changed its position and agreed to support the [AULA]" based on the parties' "mutual interpretation" that "the term 'such assignments' [in accordance with Exhibit D-1.3] which shall remain in place for a period of at least twelve (12) months, includes *American's use of the three . . . gates on the L Stinger Expansion*." Ms. Brown responded: "We agree that our intent is that Section 5.2.4 . . . is intended to apply to all assignments shown on Exhibit D-1.3 and not just those associated with relocations after the completion of the T-5 Extension."

23. The next day, on March 15, 2018, the final AULA with the revised Exhibit D-1.3 was submitted to the Chicago City Council Committee on Aviation and approved unanimously by a vote of the Committee Members. On March 28, 2018, the final AULA with the revised Exhibit D-1.3 was submitted to the Chicago City Council and approved by a vote of the City Council. An excerpt of the true and correct copy of the Chicago City Council Journal of Proceedings, which notes the Aviation Committee's and the City Council's approval of the AULA, is attached as **Exhibit 3**.[1] Defendants and each airline executed independent leases containing the AULA's terms.

---

[1] The full copy of the proceedings is available at https://chicityclerk.s3.us-west-2.amazonaws.com/s3fs-public-1/reports/2018_03_28_VI_VII_VIII.pdf (last visited on July 3, 2025). A copy of the summary of the Aviation Committee meeting on March 15, 2018, is available at https://occprodstoragev1.blob.core.usgovcloudapi.net/lsmeetingattachmentspublic/74805a55-2e53-4701-ad03-1699f8b97df1.pdf (last visited on July 3, 2025).

24. Since the execution of the AULA, American has closely followed the progress of construction on the L-Stinger Expansion and pushed Defendants to bring the L-Stinger Expansion Gates online as soon as possible.

25. For nearly seven years after the AULA was signed, Defendants were silent on conditions relating to the Gate Space Ramp-up Period. The T5 Expansion and Delta's relocation to Terminal 5 were completed by June 2023. However, I am not aware of any communications sent from Defendants to American when these two important prerequisites to the Gate Space Ramp-up Period were triggered. At that time, the L-Stinger Expansion Gates were still under construction. Indeed, it is my understanding that concrete had not even been poured on the apron in front of the third L-Stinger Expansion Gate until early 2025; instead, there was just a large, uneven hole resulting from excavation that rendered the space unusable to park any aircraft, and thus precluded the gate from being allocated in accordance with Exhibit D-1.3.

26. Despite American's singular focus on the issue during the final negotiations of the AULA in March 2018, and subsequent communications reaffirming the fundamental importance of the compromise regarding the Gate Space Ramp-up Period to American's agreement to the deal, I am not aware of any communication sent from Defendants to American suggesting that the Gate Space Ramp-up Period had started, let alone ended.

27. On or around February 3, 2025, I learned that Defendants were planning to commence a redetermination of gate space, effective October 1, 2025 (the "Gate Redetermination"). A true and correct copy of Defendants' letter to airlines dated February 3, 2025, is attached hereto as **Exhibit 4**. Defendants indicated that United had requested the Gate Redetermination under Section 5.4.1. Defendants did not suggest that the Gate Redetermination

7

needed to proceed for any reason other than that United had requested it. Defendants have not indicated any operational reasons why the Gate Redetermination must take place this year.

28. I was disappointed by this announcement, because the final L-Stinger Expansion Gate was nearing completion, which under the parties' collective understanding in 2018 would start the Gate Space Ramp-up Period and cease all redeterminations for at least 12 months. I understand that although the final L-Stinger Expansion Gate went into service on March 14, 2025, Defendants have not ceased the Gate Redetermination. True and correct copies of American's letters dated February 28, 2025, March 18, 2025, and March 29, 2025, notifying Defendants of American's position regarding the Gate Redetermination, are attached hereto as **Exhibits 5, 6, and 7,** respectively. In a letter dated April 1, 2025, Defendants notified the airlines of their initial gate assignments under the Gate Redetermination. A true and correct copy of that letter and its attachment is attached hereto as **Exhibit 8**. As required under Section 5.4.6(b) of the AULA, American then provided comments to Defendants regarding the proposed gate assignments prior to May 1, 2025, while reserving its rights to dispute the Gate Redetermination. On May 2, 2025, American filed this lawsuit to enforce the express language of the AULA and the compromise between American and the City. Subsequently, at the invitation of the Aviation Department's new Commissioner, Mr. McMurray, American and Defendants engaged in hopes of finding a resolution to this dispute. Unfortunately, those efforts were unsuccessful, and Defendants sent a letter dated May 30, 2025 indicating that they would proceed with the Gate Redetermination, with new gate assignments to take effect on October 1, 2025. A true and correct copy of that letter and its attachment is attached hereto as **Exhibit 9**. American will lose four narrowbody equivalent gates (corresponding to six regional jet gates) when the Gate Redetermination takes effect, while United will gain five narrowbody equivalent gates.

29. In addition to acquiescing to United's request for the Gate Redetermination, it is my understanding that Defendants have further prejudiced American through a series of decisions regarding the implementation of the new gate assignments at O'Hare announced May 30, 2025.

30. For example, while Defendants assigned 330 feet of linear frontage for American's L-Stinger Expansion Gates, they assigned only 289 feet of linear frontage for United's equivalent three gates on the Concourse C extension at United's request. That discrepancy in allocation and other adjustments made in United's favor allowed United to obtain an additional gate on the G Concourse.

31. Defendants also compensated United for linear frontage closed for construction at a higher rate than they compensated American (offering United 1.08 feet of replacement frontage per foot of closed frontage vs. 1 foot of replacement frontage per foot of closed frontage for American).

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct to the best of my knowledge.

Executed on this 3rd day of July, 2025, in Chicago, Illinois.

*[signature]*

_____

Amanda Zhang

**CERTIFICATE OF SERVICE**

      I, Sean Berkowitz, an attorney, certify that on July 3, 2025, I caused a true and correct copy of the foregoing document to be electronically filed with the Clerk of Court using CM/ECF, which will serve on all counsel of record.

                                                   /s/ *Sean Berkowitz*
                                                   Sean Berkowitz